Charles Goodman et al. [1] v. Commissioner. Goodman v. Commissioner
Docket Nos. 103137, 104869-104871, 110224-110227, 110246, 1837, 4976, 5294-5296, 5809, 5810, 6002, 6021.
United States Tax Court
1946 Tax Ct. Memo LEXIS 11; 5 T.C.M. (CCH) 1126; T.C.M. (RIA) 46300; December 18, 1946
L. L. Hamby, Esq., Transportation Bldg., Washington, D.C., for the petitioners. Conway N. Kitchen, Esq., for the respondent. *14 DISNEY
Memorandum Findings of Fact and Opinion DISNEY, Judge: These proceedings were consolidated for hearing and involve the following deficiencies and penalties, the amounts of the deficiencies being in income taxes unless otherwise indicated: Gradwik, Inc. of Delaware
Year
Docket
Tax
Deficiency
50% penalty
25% penalty
1934
103137
Income tax
$2,442.38
1934
103137
Excess profits
263.14
1934
103137
Surtax
749.99
$ 187.50
1935
103137
Income tax
8,204.10
$4,102.05
1935
103137
Excess profits
2,292.91
1,146.46
1935
103137
Surtax
6,824.12
3,412.06
1,706.03
Charles Goodman
1929
104869
$ 25,155.64
$ 12,577.82
1930
104869
8,684.85
4,342.43
1931
104869
11,481.34
6,305.18
1935
104869
28,565.03
14,282.52
1936
104869
28,918.46
14,459.23
1937
104869
8,570.98
4,285.49
1938
6021
16,215.42
8,107.71
1939
1837
89,027.11
44,513.56
1940
4976
4,536.76
2,268.38
1941
6002
8,791.45
4,395.73
$229,947.04
$115,538.05
Mideastern Contracting Corporation
1938
5294
Income tax
$ 7,790.98
$ 3,895.49
$ 1,947.75
1938
5294
Excess profits
6,361.03
3,180.52
1,590.26
1939
5294
Income tax
76,956.00
38,478.00
19,239.00
1939
5294
Declared value excess profits
tax
63,600.00
31,800.00
15,900.00
*15 James E. Gibbons
Year
Docket
Deficiency
60% penalty
1938
5295
$ 1,637.59
$ 818.80
1939
5809
77,941.25
41,133.29
$79,578.84
$41,952.09
William Heyman and Lydia Vogel Heyman
Year
Docket
Deficiency
50% penalty
1938
5296
$ 48.00
$ 24.00
Lydia Vogel Heyman
1939
5810
$68,255.47
$38,497.44
Year
Docket
Deficiency
5% penalty
Sylvia Goodman
1938
110224
$ 51.14
Robert and Carolyn Goodman
1938
110225
108.38
William Goodman
1939
110226
99.37
Annette Goodman
1938
110227
99.37
Doris G. Jacoby
1938
110246
99.37
Builo Corporation
1936
104870
672.39
$33.62
Winhill Corporation
1937
104871
Income tax
$3,839.15
Excess profits tax
2,141.51
$5,980.66
Many issues were raised by the petitions, some of which were conceded or abandoned at the hearing. The questions so disposed of at the hearing, as well as admissions of the parties upon brief, will be reflected in the recomputations to be filed under Rule 50. The questions still at issue will be indicated in the captions for findings of fact or in the opinions. There are some common issues *16 in the proceedings and part of the evidence relates to more than one petitioner. With the exception of the case of the Mideastern Contracting Corporation, findings of fact will be made for each year, followed by opinions on the issues raised for that year. In some instances the facts so found will be applicable to, or include facts for other years. All of the facts, notwithstanding the segregation made for convenience in disposing of the proceedings, constitute findings of fact on all issues involved herein to the extent material. Because of the large number of cases, years and issues involved, for the sake of clarity certain general findings of fact are made, having to do with the parties and corporations involved and their general relation to each other. More detailed findings are set forth in connection with the opinion on each year, party, or issue, as the case may be. General Findings of Fact 1. These cases involve, in general, three families, together with corporations with which the families, or some of them, or some members of them, were connected, as follows: 2. The members of the three families involved are: Goodman: Charles (hereinafter sometimes referred to as *17 Goodman) Rose, his wife (died May 1934) Sylvia, second wife (married November 1934) Sons: Robert, born August 1914; William, born December 1926 Daughters: Annette, born January 1924; Doris, born October 1919 Heyman: William Lydia Vogel, his wife Son: Samuel, born March 1, 1928 Gibbons: James E. (hereinafter sometimes called Gibbons) Catherine, his wife Sons: James E., III, Eugene, Raymond, all of age in July 1939 3. The corporations involved, and their general relation to various members of the above families, are: Heyman & Goodman Co. of New Jersey. The stock of the corporation was owned equally by Charles Goodman and William Heyman, business associates from 1916 until about 1940. Winhill Corporation. One-half of the corporation's stock was owned by Goodman and members of his family. Builo Corporation. The stock was owned by Goodman family, Goodman one-sixth, and was not in the family account. Mideastern Contracting Corporation. The stock was owned by Goodman, Gibbons and Lydia V. Heyman, each one-third. William Heyman was never a stockholder of the corporation. Goodman's shares were in the family account. Gradwik, Inc. of Delaware, a personal holding *18 corporation. Goodman owned five-sixths of its stock and his second wife, Sylvia, one-sixth. It was organized in 1933 and dissolved December 1936. Goldberger-Raabin Co., Inc. Goodman owned 500 shares of the corporation's stock, and included them in the family account. Hart & Early Co., Inc. Goodman owned 530 shares of the corporation's stock. The stock was carried in the family account. Airhill Corporation. The corporation's stock was owned by the Goodman family in and after 1940. Goodman made loans to it out of family account. Gradwik, Inc. of New York. The corporation held title to the summer home of the Goodman family on Tupper Lake, New York. The capital stock of the corporation was in the family account on September 30, 1939, when the corporation was dissolved. Docket No. 104869 - Charles Goodman - Year 1929 Findings of Fact Issue A. - Loss of $15,000 on sale of stock of Bankers Securities Corporation 4. Charles Goodman, the petitioner, is an individual residing at 300 Central Park West, New York, New York. His income tax returns for the years 1929, 1930, 1931, 1935, 1936, and 1937, were filed with the collector for the third district of New York, and for 1938, *19 1939, 1940, and 1941, with the collector for the second district of New York. Joint returns of husband and wife were filed by petitioner and his wife Rose for 1929 and 1931, and individual returns by the petitioner for the other years. 5. On April 26, 1928, the Bankers Securities Corporation, Philadelphia, Pennsylvania, issued to petitioner a preferred stock allotment warrant for 1,000 shares at the price of $60 a share, payable in four equal installments. The petitioner paid the purchase price and on September 25, 1928, was issued stock certificate No. P-693 for 1,000 shares of the stock. The certificate was surrendered on October 21, 1930, for transfer. The stock certificate contains one assignment dated November 15, 1930, and to the Heyman & Goodman Co. of New Jersey, a corporation whose outstanding stock was owned in equal amounts by petitioner and William Heyman, one of the petitioners in these proceedings, and a business associate of petitioner from 1916 until between 1938 and 1940. The certificate bears a cancellation date of November 22, 1930. 6. On December 3, 1928, the Bankers Securities Corporation issued a preferred stock allotment warrant to petitioner for the purchase *20 of 1,000 shares of stock at the price of $60 a share. The petitioner paid the purchase price and on January 21, 1929, stock certificate No. S-2 was issued to him for 1,000 shares of the stock. The certificate was surrendered on October 21, 1930, for transfer. The stock certificate was assigned by petitioner under the date of November 15, 1930, to the Heyman & Goodman Co. of New Jersey. It bears a cancellation date of November 22, 1930. 7. On April 29, 1929, the Bankers Securities Corporation issued to petitioner stock certificates Nos. T-2012, T-2013, T-2014, T-2015, and T-2016, each for 50 shares of its preferred stock. Each of the stock certificates was assigned by petitioner under date of September 30, 1930, to Rose Goodman, his wife, and were surrendered for transfer on that date. They contain no other assignments. On October 15, 1930, the Bankers Securities Corporation paid a dividend of $187.50 to Rose Goodman as the registered owner of 250 shares of its stock on September 30, 1930. 8. At some undisclosed time prior to January 15, 1929, petitioner transferred stock certificate No. P-693 for 1,000 shares to Heyman & Goodman Co. of New Jersey by voucher transfer certificate *21 for $60 a share. A like transfer for the same price was made of certificate No. S-2 for 1,000 shares at some undisclosed time prior to April 15, 1929. In October 1929, petitioner reacquired 1,500 shares of the stock from Heyman & Goodman Co. of New Jersey for $60 a share. 9. On September 26, 1928, and January 21, 1929, William Heyman acquired 2,000 shares of preferred stock of the Bankers Securities Corporation represented by certificates Nos. P-817 and S-1, each for 1,000 shares. Certificate No. P-817 contains an assignment under date of November 15, 1930, transferring 500 shares to the Heyman & Goodman Co. of New Jersey, and a like number to the Goldberger-Raabin Co., Inc. Certificate No. S-1 contains an assignment under the same date transferring the shares to the Goldberger-Raabin Co., Inc. 10. The Mideastern Contracting Corporation, the petitioner in docket No. 5294, was organized in 1927 by petitioner, William Heyman, and James E. Gibbons, the petitioner in docket No. 5809, to engage in the contracting business. 11. In 1929 petitioner and William Heyman desired to borrow $150,000 from the Mideastern Contracting Corporation to finance the construction of an apartment by *22 the Eldorado Towers Corporation, a subsidiary of Heyman & Goodman Co. of New Jersey, and offered to deposit stock of the Bankers Securities Corporation as collateral. James E. Gibbons insisted that it would be necessary for the Mideastern Contracting Corporation to purchase the stock so that it could sell the securities in the event it needed the money. On October 28, 1929, and November 4, 1929, the Mideastern Contracting Corporation issued its checks in favor of William Heyman for $70,000 and $80,000, respectively, in payment of 3,000 shares of preferred stock of the Bankers Securities Corporation owned by Charles Goodman and William Heyman, and purchased by Mideastern. The check for $80,000 was signed by James E. Gibbons as "President-V. Pres." and by William Heyman as "Secty-Treas." The checks were deposited in a bank to the credit of the Eldorado Towers Corporation. Petitioner was given credit for one-half of the check for $70,000 in a notation on the stub of the check books of the Eldorado Towers Corporation. The stock was transferred by a voucher transfer certificate, a form of transfer frequently used when the purchaser does not intend to hold the securities for a great length *23 of time. The stock was used on about February 20, 1930, by the Mideastern Contracting Corp. to pay for stock of Goldberger-Raabin Co. At the same time Goldberger-Raabin acquired 1,000 shares of the stock from Heyman & Goodman Co. of New Jersey. 12. The Bankers Securities Corporation acted as its own transfer agent. Its stockholders' ledger indicates that Charles Goodman was the owner of stock certificates Nos. T-2012 to T-2016, inclusive, and stock certificates Nos. P-693 and S-2, until September 30, 1930, and October 21, 1930, respectively, when the certificates were surrendered. 13. In his return for 1929 the petitioner claimed a loss of $15,000 on the sale of 1,500 shares of stock of the Bankers Securities Corporation on October 15, 1929. In his determination of the deficiency the respondent disallowed the deduction upon the ground that the petitioner had failed to submit evidence that the sale was actually consummated in 1929. Issue B. - Dividends of $7,250 paid on Bankers Securities Corporation stock 14. During 1929 the Bankers Securities Corporation paid by its checks the following dividends to Charles Goodman on the preferred stock outstanding in his name: January 15
$ 750 [1]
April 15
2,000 [2]
July 15
2,250 [1]
October 15
2,250 [3]
*24 15. The Heyman & Goodman Co. of New Jersey charged petitioner with the dividends of January 15, and April 15, and the dividends on 2,000 shares of the 2,250 shares on which the dividends of July 15, and October 15, were paid. 16. The dividends referred to in finding No. 14 were not reported in the joint income tax return filed by the petitioner for himself and his wife for 1929. Issue C. - Gain of $43,081 on sale of stock and warrants of Midwest Utilities Corporation 17. On August 14, 1929, the petitioner purchased through Boody, McLellan & Co., stockbrokers, 200 shares of 6 per cent preferred stock of Midwest Utilities Corporation at a cost of $30,050 and on October 15, 1929, received 200 rights on preferred stock and 200 rights on common stock. On October 21, 1929, petitioner sold the 200 rights on common for $10,264, and on November 21, 1929, the *25 200 shares of preferred stock were redeemed for $22,100. On November 14, 1929, the 200 rights on preferred stock were delivered out of the account. On December 10, 1929, the broker received into the account, 100 class A and 100 class B warrants, and 100 shares of preferred stock of the Midwest Utilities Corporation. All of each class of warrants was sold on December 10, 1929, for $393, a total of $786, and all of the preferred stock was sold on December 12, 1929, for $9,931. The gain realized by the petitioner on the sales was $13,031. 18. In his determination of the deficiency the respondent included the selling price of $43,081 of the securities referred to in finding No. 17 in petitioner's income as ordinary gain without any deduction for basis upon the ground that cost had not been shown. Issue D. - Gain of $16,637.40 on sale of stock of Cities Service Corporation 19. On August 1, 1927, petitioner acquired under his account with Boody, McLellan & Co. 100 shares of stock of the Cities Service Corporation at a cost of $4,552.50. Stock dividends increased the number of shares to 524. On May 6, 1929, Boody, McLellan & Co. sold the stock and 16 additional shares for $16,637.40 *26 and credited the proceeds to the account of Rose Goodman. Thereafter in May 1929 the broker purchased 16 shares of the stock on account of the shortage in the sale and charged the cost of $103.03 to Rose Goodman's account. 20. At times the petitioner's wife held securities in her name. With a few exceptions such securities were held for petitioner as his agent or nominee. Securities outstanding in the name of and owned by Rose Goodman were reported in income tax returns whenever necessary to reflect her income. 21. The petitioner and Rose Goodman were married in 1912. She died on May 1, 1934. In a petition executed on May 23, 1934, applying to the Surrogate's Court of the County of New York for the issuance to him of letters of administration on his wife's estate, the petitioner alleged that the value of the personal property of which Rose Goodman died possessed did not exceed $250. On June 24, 1937, pursuant to a petition filed by petitioner, as administrator, on June 23, 1937, the court amended the record in the proceedings to show that the value of such property at the death of the decedent was $1,250. The administrator never filed an estate tax return for the decedent. 22. *27 The sale of stock related in findings of fact No. 19 was not reported in the joint return filed by petitioner and his wife for 1929. In determining the deficiency the respondent included the entire selling price of $16,637.40 in income as ordinary gain upon the ground that the petitioner had failed to prove the cost of the securities. Issue E. - Gain of $30,304.28 on sale of bonds of Buenos Aires 23. In February 1927 the petitioner purchased $3,000 of bonds of Buenos Aires for $2,970 and sold them in March 1929 for $3,178.37. During February 1927 he purchased $2,000 of the same bonds for $1,980 and sold them in April 1929 for $2,138.91. In May 1927 petitioner purchased $24,000 of the same bonds for $24,149.88 and sold them in June 1929 for $24,987. The purchases and sales were made through Boody, McLellan & Co. and were entered in the account of petitioner with the broker. 24. The sales of bonds set forth in findings of fact No. 23 were not reported in the joint income tax return filed by petitioner and his wife for 1929. In determining the deficiency the respondent included all of the proceeds of sale, amounting to $30,304.28, in petitioner's income as ordinary gain, upon *28 the ground that the petitioner had not shown the cost of the bonds. Issue F. - Statute of Limitations and Fraud 25. The joint return of petitioner and his wife for 1929 was filed on March 13, 1930. The notice of deficiency to petitioner for the years 1929, 1930, 1931, 1935, 1936, and 1937, was mailed on June 28, 1940. The joint return for the year 1929 showed income from "Salaries, Wages, Commissions, etc.," of $150,000, and from Rents and Royalties from Domestic Corporations of $2,134, less $32,500 loss on stocks, and less $17,500 "Income from Partnerships" - deducted, though not indicated as loss, making a "Total Income" of $102,134. The $32,500 consists of $15,000 loss on 1,500 shares of Bankers Securities Corporation and $17,500 loss on 500 shares of U.S. Rubber Co. The sale of U.S. Rubber Co. stock is indicated as through Boody, McLellan & Co. No other explanation is contained in the return and the return shows no profits from sale of securities or other transactions in securities. 26. The joint income tax return filed by the petitioner for 1929 was false and fraudulent with intent to evade tax, and a part of the deficiency was due to fraud with intent to evade tax. *29 Opinion Statute of Limitations and Fraud The petitioner alleges that assessment and collection of the deficiency determined against him for 1929 are barred by the statute of limitations. The joint return of petitioner and his wife for 1929 was filed on March 13, 1930, and as the notice of deficiency was not mailed until June 28, 1940, a date after the expiration of the period of two years allowed by section 275(a) of the Revenue Act of 1928 for assessment and collection, the notice of deficiency was not timely unless one of the exceptions in section 276 applies. The respondent asserted a fraud penalty and alleged in his answer and amendment thereto that the petitioner filed a fraudulent return with intent to evade tax. If such a fraudulent return was filed, assessment may be made at any time. Section 276(a), Revenue Act of 1928. Under the circumstances the fraud question will therefore be considered first. The contentions of respondent, upon brief, are, in general, that petitioner sustained no loss upon a scale of stock of the Bankers Securities Corporation, as claimed in his return, and that he failed to report dividends of $7,250 on such stock, and gain on the sale of stock *30 of the Cities Service Corporation, and bonds of Buenos Aires. He has abandoned his claim of fraud in connection with omission in the return of gain on the sale of stock and warrants of the Midwest Utilities Corporation. The statute places upon the respondent the burden of proving fraud. Section 601, Revenue Act of 1928. His proof must be by clear and convincing evidence, a mere preponderance not being sufficient. George L. Rickard, 15 B.T.A. 316; M. Rea Gano, 19 B.T.A. 518 (533); The National City Bank of New York, Executor, 35 B.T.A. 975 (988); affd., 98 Fed. (2d) 93. Falsity or fraud, with intent to evade tax, need not be proven as to the entire return, and if part thereof is found false or fraudulent, with intent to evade tax, the statute of limitations will not apply. Lorraine Corporation, 33 B.T.A. 1158. After detailed examination of the petitioner's return, and the facts above set forth as to 1929 income, we have come to the conclusion that the respondent has shown clearly and convincingly, though only as to a portion of the matters covered by the return that there was false and fraudulent filing, with intent *31 to evade tax for the year 1929. Petitioner's return is simple. The income consists of $150,000, "Salaries, Wages, Commissions, etc.," from Heyman & Goodman Co., and $2,134 Rents and Royalties from Domestic Corporations, with deduction of $17,500 ("Income from Partnerships" - not indicated as loss, but apparently so considered, since it is deducted) and deduction of $32,500, explained as loss on 1,500 shares of Bankers Securities Corporation and 500 shares of U.S. Rubber Co. This leaves a "Total Income" of $102,134. The only explanation is with reference to the Bankers Securities Corporation and U.S. Rubber Co. stock. It thus appears that the petitioner claims a loss of $32,500 on two transactions in stock. He had, however, as shown by the facts above, eight other stock transactions throughout the year, three with reference to the Buenos Aires stock, one as to Cities Service Corporation, one purchase of Midwest Utilities Corporation, and three sales of Midwest Utilities. As seen above, the respondent does not rely upon the failure to report profits from the Midwest Utilities sales as proof of fraud, and we will not do so. Yet, we can not overlook the fact that, as shown by the petitioner's *32 return, he had very few stock transactions in 1929, and out of ten (if we include those in Midwest Utilities) reported only two, as losses, omitting to report the profits in the others, which amount to $1,204.40 as to the Buenos Aires transactions and $11,981.87 as to the Cities Service stock, a total of $13,186.27. We note that the Cities Service stock, the Buenos Aires bonds and the U.S. Rubber Co. stock were handled through Boody, McLellan & Co., as was the purchase of the Midwest Utilities stock. We note also that the total sales of securities during the year (aside from those of Bankers Securities Corporation and U.S. Rubber Co., totaling $100,000) were $90,022.68. We think it clear that a person does not honestly omit from earnings $13,186.27 and report only his two losses, when he has had at most only ten transactions in securities and four of them have been productive of gain. Mere proof of oversight is, of course, not proof of fraud, but we can not but hold that fraud and intent to evade tax clearly appears where out of not more than ten transactions in stocks only two are reported, showing losses, and four, showing gains of $13,186.27 are omitted. The result would not be *33 different even if the Cities Service stock was not considered. We therefore find it unnecessary to consider whether there was, as respondent charges, fraud in the sale of the stock of Bankers Securities Corporation. We hold that the statute of limitations has not run as to the year 1929. It follows, from the facts above found, that the petitioner is taxable upon the profit from the sales made, including those of the stock and warrants of Midwest Utilities Corporation. Issues C, D, and E. - Profits The parties are in agreement that the profit from sale of Cities Service Corporation stock is $11,981.87 and that the gain on Buenos Aires bonds was $1,204.40. We so hold. In the determination of the deficiency against Charles Goodman, the Commissioner included in his income the gain from sale of the Cities Service stock. The burden is upon the petitioner to show otherwise. The evidence is not sufficient to overcome the presumption. The parties agree that the selling price of the Midwest Utilities Corporation securities was $43,081. The respondent contends that the petitioner has not discharged his burden of proving cost and asks us to sustain his action in including such amount in *34 income as gain. The petitioner contends that he has shown a cost of $30,050, the amount paid on August 14, 1929, for 200 shares of 6 per cent preferred stock, plus $10,000 paid in connection with the acquisition of the warrants, and preferred stock sold on December 12. We have found a cost of $30,050 for the 200 shares of preferred stock acquired through the broker on August 14. There is indication, but no convincing proof, that the rights were acquired in the purchase. The account of petitioner with the broker shows a deposit of $10,000 on November 27, 1929, but there is no proof that the $10,000 as alleged by the petitioner, together with the 200 preferred rights, was used to purchase the warrants and new preferred stock, and so forms a part of the cost basis, as contended by petitioner. Accordingly, there is no proof of cost in excess of $30,050, and we hold that petitioner's gain on the sales was $13,031. Issues A and B. - Loss on Bankers Securities Corporation Stock and Dividends Although the respondent strenuously contends to the contrary, we have found that there was a sale of the 1,500 shares of stock of the Bankers Securities Corporation by the petitioner to Mideastern *35 Contracting Corporation for $75,000, or $15,000 less than the petitioner's cost basis, and therefore that there was deductible loss. The evidence from which we made the finding includes testimony of petitioner, William Heyman and James E. Gibbons on the transaction. The respondent requests us to disregard their testimony as "too fantastic for belief." It was not unbelievable or unreasonable for Gibbons, as an officer of the Mideastern Contracting Corporation, to require the sale of the stock to the corporation, rather than to make the loan desired by petitioner and Heyman with the stock as security. Gibbons was not a stockholder of the Eldorado Towers Corporation and no contention is made that he had no financial interest in Mideastern or that the sales price was below the prevailing market for the stock. It is true that the certificates for the stock were not assigned to Mideastern, but we can not, under the evidence before us, hold that the method used was not sufficient to pass title as between the parties. The purchase price was paid and the money reached the treasury of the Eldorado Towers Corporation, its ultimate destination. The documentary evidence shows that the Eldorado *36 Towers Corporation recognized by a notation on a stub of its check book that $35,000 of the amount came from petitioner. Thus there is some documentary evidence in the record to corroborate the testimony of the three individuals. Proof by petitioner of a sale to Mideastern was sufficient to overcome the showing of respondent that the books of the Bankers Securities Corporation showed petitioner to be the owner of the stock throughout 1929. No evidence controverts the showing of a custom of using voucher certificates as indicia of title. The failure of petitioner to produce books of Mideastern to corroborate the testimony of petitioner, Heyman, and Gibbons, is explained none too well, it is true, by inability to locate them. If its books were secreted or destroyed, it is not shown. A mere showing that the books can not be located is not enough to support a finding that they do not reflect the sale. The argument of respondent with respect to the dividends paid on the stock of the Bankers Securities Corporation is that petitioner was the owner thereof throughout 1929. The proof is that the stock was owned by the Heyman & Goodman Co. of New Jersey on the dividend payment dates and that *37 the deposit of the checks by petitioner to his or his wife's credit was compensated by a charge to petitioner on the books of the owner, thus leaving petitioner without income to report. No objection was made by respondent to testimony of petitioner that the dividend payments were charged to him on the books of the Heyman & Goodman Co. of New Jersey. On all of the evidence, with reference to the Bankers Securities Corporation stock and the dividends therefrom, it is our opinion that the petitioner has met his burden of showing that the stock was sold, and that the dividends therefrom were paid, though indirectly, to the vendee. Docket No. 104869 - Charles Goodman - Year 1930 Findings of Fact Issue A. - Loss of $15,400 on Sale of 700 Shares of Stock of Commonwealth Casualty Co. 27. On July 27, 1929, petitioner purchased from Hart & Early Co., Inc., at a cost of $18,900, 700 shares of stock of Commonwealth Casualty Co. On July 30, 1929, the shares were received on the account of petitioner with Boody, McLellan & Co. The account was long, i.e., the stock was being carried in the account for petitioner, with respect to the same stock, until December 5, 1931. On December 27, 1930, petitioner *38 sold the stock to William Goldsmith for $3,500, the purchaser making payment by a note for $11,500, which amount included the selling price of $8,000 for 500 shares of stock of B. F. Goodrich Rubber Co. The note was paid on April 3, 1931. 28. In his individual income tax return filed for 1930 on June 15, 1931, the petitioner claimed a loss deduction of $15,400 on account of the sale. In his determination of the deficiency the respondent disallowed the deduction upon the ground that the sale was not bona fide. Issue B. - Loss of $14,437.50 on Sale of 500 Shares of Stock of B. F. Goodrich Rubber Co. 29. On December 4, 1929, the petitioner purchased 500 shares of stock of B. F. Goodrich Rubber Co. through Boody, McLellan & Co. for $22,512.50. The stock was long in the account of petitioner with the broker throughout 1930. On February 5, 1931, the shares were delivered out of the broker's account and new certificates were issued in the name of petitioner. The new certificates were received by the broker and delivered to petitioner on February 6, 1931. The petitioner sold the stock on December 27, 1930, to William Goldsmith for $8,000. The note for $11,500 received in payment for *39 the stock and 700 shares of stock of Commonwealth Casualty Co. was paid on April 3, 1931. 30. In his individual income tax return for 1930, the petitioner claimed a loss of $14,437.50 on account of the sale of 500 shares of stock of B. F. Goodrich Rubber Co., based upon cost of $22,437.50 and a selling price of $8,000. In his determination of the deficiency, the respondent disallowed the deduction upon the ground that the sale was not bona fide. Issue C. - Income of Rose Goodman - $8,108.64 31. The separate income tax return filed by Rose Goodman for 1930 reported net income of $6,858.64. The gross income of $9,128.44 reported in the return consisted of interest on bank deposits and bonds in the amount of $2,082.50, dividends totaling $1,375 and $5,670.94 from a building and loan association. The respondent disallowed a deduction of $1,250 and included the corrected net income of $8,108.64 in the income of petitioner upon the ground that the income represented his property. Issue D. - Dividends of $7,125 on Stock of Bankers Securities Corp. 32. During 1930 the Bankers Securities Corporation paid the following dividends, totaling $7,125, to petitioner on stock outstanding *40 in his name on its books: 1. January 15, 1930, $2,250, at the rate of $1 a share to stockholders of record on December 30, 1929. The check was endorsed by petitioner for credit to his bank account. Of the dividend paid $1,500 was paid to the Mideastern Contracting Corporation by a charge on its books to petitioner. 2. April 15, 1930, $1,687.50, at the rate of 75 cents a share on 2,250 shares, to stockholders of record March 31, 1930. The check was endorsed by petitioner for deposit with Boody, McLellan & Co. Of the amount of the dividend, the net amount of $1,500 was paid to Goldberger-Raabin Co. by a charge on its books to petitioner. 3. July 15, 1930, $1,687.50, at the rate of 75 cents a share on 2,250 shares, to stockholders of record June 30, 1930. The check was endorsed as follows: Charles Goodman, by W. H. William Heyman Goldberger-Raabin Co. Inc.
At that time petitioner was in Europe and William Heyman had a power of attorney from petitioner to endorse the check. Of the amount of the dividend, the net amount of $1,500 was paid to Goldberger-Raabin Co. by a charge on its books to petitioner. 4. October 15, 1930, $1,500, at the rate of 75 cents a share on 2,000 shares, *41 to stockholders of record September 30, 1930. The check was endorsed by petitioner to Goldberger-Raabin Co. 33. In his return for 1930 the petitioner reported dividends of $17,246.63 on stock of domestic corporations. The amount did not include the dividends of $7,125 referred to in finding No. 32. Issue E. - Loss of $20,000 on Sale of 2,000 Shares of Stock of Union Building Co. 34. On November 12, 1928, petitioner acquired 2,000 shares of stock of the Union Building Co. at a cost of $30,000. The petitioner sold the stock on October 1, 1930, to his wife for $10,000, such amount being the market price for the stock on that date. 35. In his return for 1930, the petitioner claimed a loss of $20,000 sustained on the sale described in finding No. 34. In his determination of the deficiency the respondent disallowed the loss upon the ground that it was not incurred in a bona fide sale. Statute of Limitations Opinion For the year 1930, as for 1929, the respondent asserted a fraud penalty and depends upon sustaining his burden of proof in that regard to support the timeliness of his notice of deficiency. He contends that petitioner fraudulently claimed losses in the stock sales *42 involved in issues A and B, and omitted from his return the income involved in issues C and D, in each case with intent to evade tax. He makes no contention, upon brief, that there was fraud in connection with the loss of $20,000 alleged to have been sustained in the sale of stock of the Union Building Co.
The sales of stock of Commonwealth Casualty Co. and B. F. Goodrich Rubber Co., involved in issues A and B, were made in one transaction and will be considered together. The respondent contends that the stock was not sold in 1930 and that the absence of sales to support the claims made by petitioner in his return for losses in conclusively established by the proof he made from the books of Boody, McLellan & Co. that the stock was long in the brokerage account of petitioner with the broker throughout 1930 and was not delivered out of the account for transfer until 1931. We have from testimony of petitioner that he sold the stock to William Goldsmith on December 27, 1930, for $11,500, and that in payment, he received the purchaser's note, which was paid in full on April 3, 1931. The petitioner supported his testimony by introducing a bank statement showing a deposit entry on April 3, 1931, in *43 his account of the amount of $11,500 paid by the maker of the note. The respondent asks us to disregard petitioner's testimony for lack of corroboration. It does not appear unusual for stock not to be delivered at the time of its sale, especially in transactions in which a note is given for the purchase price, and the mere fact that stock is long in a brokerage account does not prove that the stock was not sold prior to its delivery out of the account for transfer. The petitioner's testimony is supported by the bank statement and his investment book, kept by his bookkeeper. The respondent says that petitioner's failure to produce William Goldsmith as a witness leads to the conclusion that the buyer would not have corroborated petitioner's testimony respecting the sales. The assertion is based upon the theory that Goldsmith was available as a witness. The record does not show that William Goldsmith could have been produced by petitioner as a witness and respondent does not directly allege that he was available. The inference we are asked to make without a foundation is no substitute for the proof required of respondent under the circumstances. The petitioner furnished some corroborative *44 evidence for his testimony and it was the duty of respondent, not the petitioner's, to overcome it. It is true that, with reference to Gradwik's income for 1935, below considered, we hold as fraudulent a purported sale to William Goldsmith, though holding otherwise here as to a sale to him. But, though matters in other years may be corroborative of fraud, each year should be considered separately, and proof of fraud for one year will not sustain the respondent's burden of proving fraud in another Charles J. Delone, 34 B.T.A. 1139; reversed on other grounds, 100 Fed. (2d) 507; Thomas J. McLaughlin, 29 B.T.A. 247, 249. We think such burden was not met, as to 1930, and as to this issue. Next, respondent contends that petitioner's failure to include in his return the net income of $6,858.64 (increased to $8,108.64 in determining the deficiency involved herein) reported by his wife, was fraudulent with intent to evade tax. He relies chiefly upon testimony of petitioner before the Special Intelligence Unit of the Bureau of Internal Revenue on November 21, and 22, 1939, which testimony he contends establishes that Rose Goodman was at all times the *45 nominee of petitioner. The respondent requested such a finding of fact in connection with this issue, and also as part of our findings of fact in issue D in 1929. In disposing of the issue of fraud in 1929, we did not find it necessary to discuss the matter. The point requires comment here in view of the position taken by the respondent. The petitioner testified under oath before the Special Intelligence Unit that: It [Gradwik, Inc., of Delaware, a corporation] bought its securities [at the time of its organization in 1933] from myself, I suppose from Charles Goodman, or from Charles Goodman's agent, Rose Goodman. [Words in brackets supplied.] In response to the next question as to whom he meant by "Rose Goodman, your agent," petitioner testified that: Rose Goodman was my wife and I used her in many transactions, to hold securities in her name, and with few exceptions, most of them were, of course, my securities. * * * I used her to put my securities in her name at times. As to whether the securities purchased by Gradwik, Inc., of Delaware, at the time of its organization "were in reality your own property," petitioner testified: They were. There may be one or two *46 exceptions that would show on her income tax. For income tax purposes, very often she was the owner of certain things, and where she is stated she was the owner, she really was. When she reported it on her income tax, she was the absolute owner there. There is no doubt about that because I wouldn't let her be in any dubious position. Concerning the value of securities owned by Rose Goodman "at any certain time," petitioner testified: No I have no idea. It is I owned it except when she reported in her income tax. Other pertinent questions and answers during the interview were: Q. Well then if the record in this book shows that the securities were Rose Goodman's securities, that would be correct then? A. Well, I testified to you that the securities in Rose Goodman's name was in her name as my agent and they belonged to me. I can't change that, Mr. Nelson; that is correct. * * *
Q. Had you ever told him [Kilburn Arnold, who did some bookkeeping for petitioner, including the making of entries in a security record or ledger] that she was your nominee? A. That Rose Goodman -. I wouldn't say we never discussed that particular, but he should have known. I customarily paid *47 for securities and put them in my wife's name. [Words in brackets supplied.] * * *
Q. In regard to these transactions that he entered in the books as being Rose Goodman's, did you tell him those were Rose Goodman's transactions? A. Well, he would have to enter them in Rose Goodman's account if I wanted her account kept as my agent that way. Q. Well, the entries in the records indicate that the securities belonged to Rose Goodman. A. Not when it is my wife, as I explained to you; my wife, and we were very close, and I used her as nominee in a great many things and it was utterly safe for me to do so. * * *
Q. Well, Mr. Goodman, you want us to believe that all these transactions reported as Rose Goodman's income on her income tax return were transactions that she owned outright? A. That's right. Q. And all other transactions were transactions that she consummated as your agent? A. I don't want you to understand it that way at all. In all transactions she was my agent except for the few where she became the absolute owner as reported on the income tax return. I wanted to be very sure that my wife, Rose Goodman, was never involved in anything dubious. At the *48 hearing before this Court the petitioner was interrogated with respect to this testimony and his replies were generally that he had no recollection of the questions and answers and, in effect, that Rose Goodman was the owner of the securities concerning which she reported income. The petitioner argues that we should disregard his testimony before the Special Intelligence Unit upon the ground that it is incomplete. Counsel appeared for petitioner at the time of his examination by agents of the Special Intelligence Unit. He testified before us that the stenographer present did not take down or transcribe all of petitioner's testimony, or all of his objections and remarks on behalf of petitioner, including a request that the stenographer should take down all statements of petitioner. Petitioner's counsel also was present at interviews on dates later than November 21 and 22, 1939, but he could not recall whether he interposed objections on such dates, his best recollection being that he made objections "during the entire series of examinations." There were some proceedings off of the record. We are not aware of the nature of all of the alleged objections or satisfied from the testimony *49 that the objections, if made, were intended to be part of the record of the proceedings. The stenographer at the interview testified that she took notes of all of petitioner's testimony; that if any objections were made by his counsel, they would appear in her notes and that the transcripts she subsequently made represent accurate transcriptions of her notes. The testimony of petitioner's counsel at the interview fails to establish that his alleged objections had any reference to the point involved here or that they were made during the interviews on November 21 and 22. We think the transcripts, introduced into the record as respondent's Exhibits W-9 and X-9, represent accurate statements of the proceedings had on such dates. Some of the testimony of petitioner before the Special Intelligence Unit indicates that he at all times used his wife as a nominee or agent. Some of it relates to the situation prevailing in 1933. Consideration of all of the testimony establishes that there were exceptions and that the exceptions are shown by her income tax returns. Respondent introduced into the record a computation made from available records, particularly the books of Gradwik, Inc., of *50 Delaware, to show that Rose Goodman had a net worth of about $184,000 at the time of her death on May 1, 1934. From this showing, he says that Rose Goodman would have had an estate of such value if she had not been the nominee of petitioner. To support his view he points to the petition filed by petitioner in the Surrogate's Court of New York County for letters of administration on the estate of his wife, asserting a value of only $250 for her estate, and an amendment thereto, increasing the value to $1,250. The point raised may be disposed of without extensive discussion. The date of valuation is more than three years after the taxable year involved herein and during such period many things could have occurred to alter the ownership of property outstanding in her name in 1930. No claim is made that the specific property outstanding in her name at the time of her death was held by her as a nominee of petitioner in 1930. The computation shows that it was not. The most it proves is that on May 1, 1934, Gradwik, Inc., of Delaware, was indebted to Rose Goodman in the amount of about $184,000. This is far from proof that property was held in 1930 as a nominee of petitioner. The final *51 contention of respondent is that fraud is shown by petitioner's failure to report dividends of $7,125, received on stock of the Bankers Securities Corporation. A similar point was raised with respect to dividends on the same stock in 1929. The facts are similar and we see no reason to reach a different conclusion. Petitioner acquired 1,000 shares of the stock in 1928 and 1,500 additional shares in blocks of 1,000 and 250, in 1929. He transferred 2,000 shares to Heyman & Goodman Co., of New Jersey, prior to April 15, 1929, and subsequently acquired 1,500 shares from it for transfer to Mideastern in October or November 1929. In February 1930, the Goldberger-Raabin Co. acquired the 1,500 shares of stock held by Mideastern and the 500 shares held by Heyman & Goodman Co. of New Jersey. The 250 shares remaining in petitioner's hands were surrendered for transfer on September 30, 1930, but he continued to be the record owner of 2,000 shares on the books of the Bankers Securities Corporation. The testimony shows that proper charges were made against petitioner on the books of the owners of the stock for the dividends received by him, except $500 of the dividend check of January 15, 1930, as *52 to which there is no evidence. The mere failure to account for this small amount is not of itself enough to establish fraud. It is obvious that the amount should have been paid to Heyman & Goodman Co. of New Jersey, the owner of 500 shares at that time. Nothing of record shows that it was not so paid by a charge against petitioner on its books or otherwise, or shows, with the necessary cogency, that it was omitted from the income tax report falsely or fraudulently with intent to evade tax. From all the evidence we conclude that respondent has failed to sustain his burden of proof of fraud in 1930. Accordingly, assessment of the deficiency is barred by the statute of limitations and it is unnecessary to consider the issues raised by the petitioner. Docket No. 104869 - Charles Goodman - Year 1931 Issue A. - Increase of Interest Income by $3,243.16 Findings of Fact 36. In the joint return of petitioner and his wife for 1931, filed on June 15, 1932, and amended return, filed on March 4, 1933, the petitioner reported income of $14,921.10 from interest. In his determination of the deficiency for 1931, respondent increased the amount of interest reported in the return to $18,164.26. *53 Opinion The petitioner admitted at the hearing that some interest collections were overlooked when preparing his return and that the correct amount is $18,164.26, as determined by the respondent. Accordingly, the respondent is sustained on this issue. Issue B. - Loss of $28,524 Sustained on Sale of 2,050 Shares of Stock of United American Utilities, Inc. Findings of Fact 37. On September 27, 1929, the petitioner purchased from E. A. Fitkin & Co., stock brokers, 2,000 shares of common stock of United American Utilities, Inc., at a cost of $30,000. A stock dividend of 50 shares was paid on the stock in 1930. On November 5, 1931, petitioner sold the stock to E. A. Fitkin & Co. for $1,455.50. The petitioner repurchased the stock from E. A. Fitkin & Co. on December 4, 1931. 38. On December 15, 1931, B. H. Brunner & Co., a corporation engaged in the over-the-counter security business, purchased from petitioner for its trading account, an account used by the broker for buying and selling securities the same day, 2,050 shares of stock of the United American Utilities, Inc., for $1,640, less $82 stamp tax, or for the net amount of $1,558. Stock certificates Nos. CC-782 to CC-801, *54 inclusive, and CC-0965, for the securities sold, were delivered to the purchaser on December 16, 1931, on which date it sold the stock to James F. Murphy, 1860 Broadway, New York City, for $1,768.13, which amount included a selling commission of $128.13. 39. B. H. Brunner & Co. had never purchased any other shares of stock of the United American Utilities, Inc., and would not have purchased the 2,050 shares from petitioner, if it had not had a buyer to purchase the stock from it. At times the seller of stock to B. H. Brunner & Co. furnished a buyer to purchase the stock from it. 40. James F. Murphy was a contractor. His checking account in the National City Bank of New York shows a deposit of $1,800 on December 15, 1931, a charge of $1,768.13 on December 18, 1931, for a certified check and a charge of $31.87 on December 22, 1931. 41. The checking account of the petitioner with the Chase National Bank of New York shows a charge of $1,800 on December 16, 1931, for a check issued in favor of James F. Murphy, and a deposit on December 21, 1931, of $31.87. The check for $1,800 was issued in favor of J. F. Murphy for the purpose of making the purchase of stock from B. H. Brunner & *55 Co., referred to in finding No. 38, with the understanding that any excess amount would be refunded to petitioner. James F. Murphy made a deposit of $2,500 in his checking account on November 21, 1931, to increase the balance in the account to $2,536.38. The balance in the account from the close of November 28, 1931, to December 3, 1931, was $260.73. From December 1, 1931, until the deposit of the check for $1,800 on December 5, 1931, the balance in the checking account of James F. Murphy was never in excess of $237.90. 42. On March 19, 1934, petitioner was the stockholder of record of 2,050 shares of common stock of United American Utilities, Inc. On March 21, 1934, the petitioner, giving his address as 1860 Broadway, New York City, deposited with the Delaware Trust Company in connection with a plan of reorganization of the United American Utilities, Inc., certificates Nos. CC-782 to CC-801, inclusive, and CC-0965, for a total of 2,050 shares of the latter's common stock, and on April 2, 1934, received in exchange therefor common stock of the Community Gas & Power Co. The certificates of stock of the United American Utilities, Inc., which were surrendered in the plan of reorganization, *56 were destroyed in 1937, pursuant to a court order. Issue C. - Loss of $7,000 on the Sale of 2,000 Shares of Stock of the Union Building Company
Issue D. - Loss of $2,150 on the Sale of 100 Shares of Preferred Stock of the Mitten Bank Securities Corporation Issue E. - Loss of $13,250 on the Sale of 250 Shares of Preferred Stock of the Bankers Securities Corporation Findings of Fact 43. On October 1, 1930, Rose Goodman purchased from her husband 2,000 shares of stock of the Union Building Co. for $10,000. At some undisclosed time she purchased 100 shares of preferred stock of the Mitten Bank Securities Corporation for $2,500. On September 25, 1930, Rose Goodman purchased 250 shares of preferred stock of the Bankers Securities Corporation for $15,000. 44. The books of L. L. Friedman & Co., a stockbroker with offices in Newark, New Jersey, disclose that on November 24, 1931, it purchased these securities from Rose Goodman and sold them to Harry Cooper, 1 Exchange Place, Jersey City, New Jersey, as follows: Prices
Stock
Purchase
Sale
Union Building Co.
$3,000
$3,000
Mitten Bank Securities Corp.
350
350
Bankers Securities Corp.
1,750
1,750
*57 The broker paid Rose Goodman $3,350 for the United Building Co. and Mitten Bank Securities Corporation stock, and received payment for the sales made to Harry Cooper. The broker charged a commission of $70 for the sale of the Union Building Co. stock to Cooper and a commission of $21.88 for the other stocks. 45. The books of L. L. Friedman & Co. disclose that on January 4, 1932, it purchased the stocks from Harry Cooper and sold them to Rose Goodman for the same prices and charged the same commissions. The broker was paid $3,000, plus a commission of $70 by Rose Goodman for the Union Building Co. stock sold to her. 46. L. L. Friedman & Co. merely acted as broker in the transactions. The broker was furnished a buyer for the securities when it purchased them from Rose Goodman and Cooper, as set forth in findings Nos. 44 and 45. 47. Stock certificate No. C-1182, issued on October 1, 1930, to Rose Goodman for 100 shares of stock of the Union Building Co., bears an assignment of November 27, 1931, to the name of Harry Cooper. Stock certificate No. C-1271, issued on December 2, 1931, in the name of Harry Cooper for a like number of shares of the same stock, bears an undated assignment *58 under the signature of Harry Cooper to the name of Rose Goodman. 48. Stock certificate No. P-1428, issued on October 14, 1930, to Rose Goodman for 100 shares of preferred stock of the Mitten Bank Securities Corporation, bears an assignment of November 27, 1931, to the name of Harry Cooper. Stock certificate No. P-1798, issued on December 2, 1931, in the name of Harry Cooper for a like number of shares of the same stock bears an assignment of January 4, 1932, to the name of Rose Goodman. 49. Stock certificates Nos. R-3799, R-3800, and T-3384, issued on September 30, 1930, in the name of Rose Goodman for a total of 250 shares of preferred stock of the Bankers Securities Corporation, bear assignments of November 27, 1931, to Harry Cooper. Stock certificates Nos. R-4213, R-4214, and T-3652, issued on December 3, 1931, in the name of Harry Cooper for a like number of shares of the same stock, bear assignments of January 4, 1932, to the name of Rose Goodman. 50. Harry Cooper has been practicing law in the State of New Jersey as an attorney for about 29 years. In 1931 and 1932 he was engaged in private practice and had his office with Heyman & Heyman, brothers of William Heyman, one *59 of the petitioners in these proceedings, in Jersey City, New Jersey. 51. Harry Cooper never met or saw Rose Goodman. He did not purchase from or sell to L. L. Friedman & Co. any of the stocks referred to in findings Nos. 44 and 45, and has never had a beneficial interest in any stock of such corporations. He has never had any business dealings with L. L. Friedman & Co. and has never purchased any stock of those corporations. Harry Cooper never received any money from or paid any money to L. L. Friedman & Co. or Rose Goodman for the stocks in question. 52. The joint return for 1931 of the petitioner and his wife claimed deductions of $28,524, $7,000, $2,150, and $13,250 for losses sustained on the sale of the securities involved in issues B, C, D, and E, respectively. The respondent disallowed the deductions upon the ground that the sales were not bona fide. 53. The sales of stock as set forth in findings Nos. 38 and 44 were not bona fide. 54. The joint return filed by petitioner and his wife for 1931 was false and fraudulent with intent to evade tax, and part of the deficiency was due to fraud with intent to evade tax. Opinion The petitioner alleges that assessment and *60 collection of the deficiency for 1931 are barred by the statute of limitations. As was the case in 1929 and 1930, the notice of deficiency was mailed after the expiration of the statutory period for assessment and collection of the proposed deficiency, and unless, affirmatively pleaded by respondent, the return was false or fraudulent, with intent to evade tax, assessment is barred by the statute of limitations. The respondent contends upon brief that he has sustained his burden of proving fraud with respect to the stock losses claimed by petitioner in issues B, C, D, and E. The fraudulent character of the alleged sale involving stock of United American Utilities, Inc., is clearly shown by the evidence. Petitioner concedes upon answering brief that the first transaction conducted through E. A. Fitkin & Co. was a wash sale and did not result in a deductible loss under the provisions of section 118 of the Revenue Act of 1928. That petitioner realized soon after his repurchase of the stock that any loss deduction he might claim under the transaction would be disallowed, is apparent from the steps he took promptly thereafter to sell the same stock in a transaction that would give color *61 to a deductible loss. The evidence on the alleged sale through B. H. Brunner & Co. establishes that petitioner furnished the buyer and the money with which to make the purchase. The force of the evidence is not weakened by a failure of respondent to show that the stock broker knew that Murphy would be the buyer. Petitioner knew the approximate amount for which the stock could be purchased from B. H. Brunner & Co., including its commission for making the sale, for he gave Murphy a check for $1,800 to make the purchase and the small excess of $31.87 of the amount of the check over the purchase price and commission was promptly refunded to petitioner. Thus petitioner knew that Murphy would be the buyer. Neither is it in any wise weakened by a failure to show that petitioner did not repurchase the stock from Murphy. The proof is that the certificates deposited with B. H. Brunner & Co. and later on the same day allegedly sold to Murphy, were surrendered by petitioner in 1934 in connection with a reorganization of the United American Utilities, Inc. If such a repurchase was made, it was the burden of petitioner to show it to overcome the inference of the evidence that delivery of the *62 certificates by Murphy to petitioner without consideration was a part of the scheme to obtain a loss without a bona fide sale. Under the circumstances here, we can not presume a repurchase. Transactions of this sort do not occur without a prearranged plan. The object of the plan devised and carried through by petitioner with the assistance of Murphy was to obtain a fictitious loss for income tax deduction purposes. It was deliberately entered into and discloses a purpose of petitioner to evade his just burden of taxation by fraudulent means. Little discussion is required to show the fraudulent nature of the other transactions relied upon by the respondent to support his assertion of the fraud penalty. The facts disclose a carefully prepared plan to pass the stocks through the office of a broker without a real buyer and with the hope and expectation that the substance of the transactions would be hidden by their outside form. The broker was supplied a buyer at the prices it paid, and was sure of a commission for the part it played, without assuming any risk of loss. The payment it made for the securities was immediately offset by a receipt of the same amount, plus a fee, in the deal *63 put through in the name of Harry Cooper, if, in fact, the payment to it was not made concurrently with its payment to Rose Goodman, the purported seller. Harry Cooper was selected to lend his name to give the transaction some color of substance for income tax deduction purposes. We need not know with whom he made the arrangement or why he was willing to become a party to the fictitious sales. His character of nothing more than a mere dummy in the transaction is shown beyond question by his testimony, among other things, that he never paid out or received any money in the deals, never owned or had any beneficial interest in stocks of the issuing corporations, never had any business dealings with the broker, and had never seen or met Rose Goodman. We do not know who paid the broker, but he was paid, and the payer was not Harry Cooper. The 1931 transactions were only part of the plan. In 1932 the transactions were reversed at the same prices and with no more reality than the 1931 deals. Upon completion, Rose Goodman had the same number of shares of stock and was not out of pocket anything more than the commissions charged by the broker to pass the unreal sales through its books. *64 She had some evidence of a right to deduct an amount for losses sustained in the 1931 transaction to counterbalance the commissions paid to the broker. The evidence proved to be unavailing before the Commissioner and has no greater weight here. The facts before us establish fraudulent sales of the stocks in question with intent to evade taxes, with the result that a part of the deficiency was due to fraud with intent to evade tax. The petitioner having deducted amounts in the return as losses sustained in the fraudulent sales, the return was false or fraudulent with intent to evade tax, and it follows not only that assessment and collection of the deficiency for 1931 are not barred by the statute of limitations, but that the sales were not bona fide, and respondent did not err in disallowing the loss deductions and imposing the fraud penalty. Issue F. - Increase of Loss on the Sale of 500 Shares of Stock of B. F. Goodrich Rubber Co. from $4,557.50 to $19,070 55. In their joint return for 1931, petitioner and his wife claimed a loss of $4,557.50 on the sale of 500 shares of common stock of the B. F. Goodrich Rubber Co. for $3,442.50. In his determination of the deficiency, respondent *65 increased the loss to $19,070 by allowing a cost basis of $22,512.50, instead of the basis of $8,000 claimed by petitioner. Opinion In his determination of the deficiency against petitioner for 1930 the respondent disallowed a loss deduction of $14,437.50, alleged to have been sustained on the sale of 500 shares of stock of B. F. Goodrich Rubber Co., his ground for his action being that the sale was not bona fide. Our conclusion that assessment and collection of the deficiency for 1930 was barred by the statute of limitations because of the failure of respondent to sustain his burden of proof on the fraud issue, rendered it unnecessary for us to pass upon the loss question for that year. The parties are in agreement that the 500 shares of Goodrich stock are the same as those involved in the alleged sale in 1930 to Goldsmith, paid for by the note paid on April 3, 1931, and that they were reacquired for $8,000 and resold in 1931. The petitioner contended that the sale in 1930 was bona fide and resulted in a loss of $14,512.50. Consistent with such a position, he alleged as error in 1931 the respondent's action in increasing the loss from $4,557.50 to $19,070 by ignoring the sale *66 in 1930 and using the original cost of $22,512.50 as a basis. In his answer, respondent admitted that if the bona fides of the 1930 sale were shown, then he erred in increasing the loss. Upon brief petitioner admits that the allowance of a loss deduction for $19,070 would not be in accordance with the evidence. Under the circumstances, a loss of $4,557.50 will be allowed in the recomputation to be made under Rule 50. Issues G and H. - Losses of $5,116.61 and $4,980 on Sales of 505 Units of Stock of the Plaza Investing Corporation and 50 Units of Media Drug Company Findings of Fact 56. On December 30, 1930, Rose Goodman purchased through B. H. Brunner & Co., at a cost of $6,123.13, 505 units of stock of the Plaza Investing Corporation. The same broker signed a statement bearing the date of November 25, 1931, and addressed to Rose Goodman in which it purported to confirm the purchase from her on that date of 505 units of the stock for $1,010, or $2 per unit, less $3,48 for transfer stamps. On the same day it signed a statement addressed to Kilburn S. Arnold, confirming the sale to him on that date of 1,010 units of the stock at $2-1/8 per unit, or for $2,146.25. 57. On September 26, 1930, Rose *67 Goodman acquired, at a cost of $5,050, 50 units of stock of the Media Drug Co. Adrian H. Muller & Son, security auctioneers (with an office at 81 William Street, New York City) issued a bill bearing the date of December 2, 1931, and containing a statement that it had on that date sold at auction to Kilburn S. Arnold for the amount and risk of Rose Goodman 50 units of stock of the Media Drug Co. for $70. 58. Kilburn S. Arnold was a bookkeeper for Heyman & Goodman Co. of New Jersey, commencing in 1925. From 1928 or 1929 until about 1935, he kept the personal books of petitioner. His net worth in 1931 was $6,000 or $7,000. 59. In the joint return filed by petitioner and his wife for 1931 deductions of $5,116.61 and $4,980 were claimed for losses sustained in sales of the stock involved in these issues. The respondent disallowed the deductions upon the ground that the sales were not bona fide. 60. The sales were not bona fide. Opinion The point on which the issues turn is whether the alleged losses were sustained in bona fide sales. The effect of the contention made by the petitioner in his opening brief is that the disposition of units of Plaza Investing Corporation involved *68 only a sale to the broker at $2 per unit. On the date of the alleged sale, the broker issued a statement purporting to confirm a sale of 1,010 units of the security to Kilburn S. Arnold at $2-1/8 per unit. The argument of petitioner in his reply brief is that the purchaser of the 505 units was Arnold. Aside from the indirect admission of petitioner, the inference from the facts is that the 505 units in question are involved in the alleged sale of 1,010 units by the broker to Arnold. The Media Drug Co. stock involves only one alleged sale and that was to Kilburn S. Arnold through a firm of auctioneers. The alleged buyer, Kilburn S. Arnold, was called as a witness on behalf of the petitioner and on direct examination was interrogated only concerning transactions with Gradwik, Inc., of Delaware. Upon cross-examination he testified that he had no recollection of using his own funds to buy stocks of the corporations or ever owning any of such stocks. When shown sales memoranda of the broker and the auctioneer for the transactions disclosing him to be the purchaser of the stocks, the witness testified on redirect examination that he recalled purchasing the stocks and that if he purchased *69 them, he used his own funds. Upon recross-examination he testified that his net worth in 1931 was not more than $7,000, which amount he accumulated out of his salary as a bookeeper, bonuses paid to him, Christmas presents and a little outside work, and that he had no recollection of using one-third of his net worth in 1931 to purchase the Plaza Investing Corporation stock. It is evident that the record does not disclose all of the facts concerning the transactions and no useful purpose would be served by speculating on evidence not furnished us. The equivocal testimony of Kilburn S. Arnold, and categorical testimony of petitioner while consulting the alleged sales slips and an income report prepared by his bookkeeper, the alleged buyer, are not enough to overcome the presumption in favor of the correctness of the respondent's determination that the sales were not bona fide. Accordingly, the issues are decided in favor of the respondent. Docket No. 103137 - Gradwik, Inc. of Delaware - Year 1934 Issue A. - Fraud and statute of limitations Issue B. - Deductibility of $3,000 and $2,000 paid to Robert Goodman and Charles Goodman as salary Findings of Fact 61. Gradwik, Inc. *70 of Delaware, the petitioner, was organized on April 10, 1933, under the laws of Delaware. Its original and amended income and excess profits tax returns for 1934 were filed with the collector for the third district of New York on March 11, 1935, and April 10, 1935, respectively. 62. The petitioner was a personal holding corporation having its principal place of business at 1860 Broadway, New York City. 63. On June 1, 1933, the petitioner issued certificate No. 1 to Charles Goodman for one share of its common stock, and certificates Nos. 2 to 6, inclusive, to Rose Goodman for one share each. The certificates were signed by Rose Goodman as president and Charles Goodman as secretary-treasurer. On the same day Rose Goodman executed an instrument assigning certificates Nos. 2, 3, 4, and 5, to herself, in trust, for the purpose of collecting the income on the stock and accumulating it during the minority of her children, Robert, Annette, Doris and William, for their equal benefit. The instrument further provided for payment of the income and accumulations in equal amounts to the children during the lifetime of her husband and herself for their support, maintenance and education, and *71 that upon the death of herself and her husband the stock should be distributed equally among the children of their survivors and the issue or spouse, if any, of any deceased child. Also that "upon my death I empower my husband Charles to designate a new trustee hereunder, including himself." On January 8, 1934, certificates Nos. 2, 3, 4, 5 and 6, were assigned by Rose Goodman in her individual capacity to Charles Goodman. Certificate No. 11 for one share was issued to Charles Goodman on January 8, 1934, in exchange for certificate No. 6. On November 23, 1934, certificate No. 11 was assigned to Sylvia Goodman, the second wife of Charles Goodman, and on the same date, certificate No. 12 was issued in her favor upon the surrender of certificate No. 11. Certificate No. 12 was signed by Sylvia Goodman as president and Charles Goodman as secretary-treasurer. 64. On May 1, 1934, the date of death of Rose Goodman, Charles Goodman executed an instrument reciting that he was the owner of stock certificates Nos. 2, 3, 4 and 5; that he assigned the certificates to himself, in trust, to collect, accumulate and distribute the income during his lifetime, the same as was provided for in the instrument *72 executed by his wife on June 1, 1933. It provided also for a like distribution of corpus upon his death, when his son could designate a new trustee, including himself. The income tax return filed by petitioner for 1934 lists Charles Goodman, who signed the document as secretary, as the owner of five shares of the corporation's stock. 65. Robert Goodman, son of Charles Goodman, was born August 5, 1914. He was in residence at Cornell University from September 1931 to June 1936 and for the first terms of the 1936-1937 and 1938-1939 sessions. He was on leave of absence from January 4, 1937, to June 1937. On November 23, 1934, the petitioner issued a check in favor of Robert Goodman, for $3,000 in payment of salary for the year ending December 31, 1934. The check was endorsed by Charles Goodman for deposit to the credit of Robert Goodman in the Public National Bank and Trust Co.
66. Robert Goodman performed no services for petitioner during 1934 and 1935. 67. On November 23, 1934, Charles Goodman took out four life insurance policies with the Prudential Insurance Co. of America on his own life for $25,000 each, on which the total premium was $5,393.50. 68. On November 17, 1934, Robert *73 Goodman drew a check on his account with the Pacific National Bank and Trust Co. in favor of himself for $3,050. Thereafter, Robert Goodman endorsed the check and delivered it to Charles Goodman, who endorsed it to the Prudential Insurance Co. of America. On November 24, 1934, Charles Goodman drew checks on his bank account in favor of the Prudential Insurance Co. for $5,218.48 and $2,343.50. The three checks, aggregating $10,611.98, were deposited by the Prudential Insurance Co. of November 24, 1934, and were in payment of two annual premiums on the policies of Charles Goodman, one of which was a prepayment at a discount of $175.02. 69. The checking account of Robert Goodman in the Public National Bank and Trust Co. shows a credit balance of $1,005.13 on November 20, 1934, a deposit of $3,000 on November 23, 1934, of the check of Gradwik, Inc. of Delaware for that amount, withdrawals totaling $114.63 on November 23 and 24, and a withdrawal of $3,050 on November 26. 70. The balance sheets of petitioner in its income tax return for 1934 list assets of about $300,000 at the beginning of the year and $186,000 at the close of the year, consisting principally of stocks and bonds. *74 71. During 1934, 1935 and 1936, Charles Goodman, as secretary and treasurer of petitioner, devoted about one-half of his time to the affairs of petitioner. Most of that time during those years was spent investigating the value of securities of utility companies throughout the United States, with the view of making purchases or sales of such securities. 72. Robert Goodman and Charles Goodman reported in their income tax returns for 1934 the receipt of $3,000 and $2,000, respectively, as salary from Gradwik, Inc. of Delaware. The check for $3,050 received by Charles Goodman from Robert Goodman on or about November 17, 1934, was not reported in the return filed by the former for 1934. 73. The income tax return filed by petitioner for 1934 reported gross income of $15,854.78 and claimed deductions of $3,000 and $2,000 as officers' salaries paid to Robert Goodman, vice president and to Charles Goodman, secretary-treasurer, respectively. The word "necessary" was inserted in schedule C of the return in response to a question as to the time the alleged officers devoted to the business. In his determination of the deficiency the respondent disallowed $1,500 of the amount paid to Charles *75 Goodman, upon the ground that the amount represented excessive compensation, and all of the amount paid to Robert Goodman, upon the ground that the petitioner had failed to establish the reasonableness of the compensation or that he had performed service for the corporation. 74. The notice of deficiency was mailed to the petitioner on March 14, 1940. 75. The income tax return filed by petitioner for 1934 was false and fraudulent with intent to evade tax, and a part of the deficiency was due to fraud with intent to evade tax. Opinion Issue A. - Fraud and statute of limitations The petitioner alleged that assessment of the deficiencies is barred by the statute of limitations because of the respondent's failure to mail the notice within the three year period allowed by the statute. In his answer to the amended petition, respondent alleged that as petitioner omitted in excess of 25 per centum of the amount of its gross income in its income and excess profits tax return, and failed to file a personal holding company return, the notice was timely. At the hearing respondent moved and was given permission to amend to conform to proof to assert fraud penalties in respect to all of *76 the deficiencies and thereafter filed an amendment to his answer to raise the issue. Upon brief the respondent relies upon the presence of fraud to support the timeliness of the notice of deficiency. He argues that he proved fraud by evidence of the payment of a salary to Robert Goodman without rendering any service to the corporation. Throughout 1934 the stock of petitioner, a personal holding company, was owned by Charles Goodman, Rose Goodman, who died on May 1, 1934, Sylvia Goodman, Charles Goodman's second wife, and Rose Goodman and Charles Goodman as trustees in the instruments executed on June 1, 1933, and May 1, 1934, respectively. We need not decide whether the instruments created valid trusts, for in any event the corporation's stock was owned and controlled during the taxable year by Charles Goodman and his respective wives, either in their individual capacity or as such and as trustees, and, accordingly, were in a position to administer the affairs of the corporation in any manner they saw fit. The evidence showed that during 1934 Robert Goodman was a minor, having been born August 5, 1914, and was a student at Cornell University. Thus, he was not available to perform *77 the customary duties of a corporate officer or to devote "necessary" time to the affairs of the business, assuming that he was qualified to serve in the capacity of an officer of the corporation. Notwithstanding the absence of Robert Goodman in school during the period for which he was paid a salary, he was paid as compensation for services rendered, 50 per cent more than his father who was the directing head of the corporation. Upon brief petitioner, while alleging that there is no evidence to support a proposed finding of respondent that Robert Goodman performed no services for the corporation, points to no evidence to establish that services were performed, in spite of the absence of Robert in school. The effect of the testimony of Charles Goodman on direct examination, which constitutes the sole evidence on the point is that during 1934 he discussed security investment matters with his son to educate him for future services with his various enterprises, including Gradwik, Inc. of Delaware. Charles Goodman testified that "He [Robert Goodman] had responsibility of an officer but he is really the son of a father and my idea was to build him up and have him have experience in *78 my various enterprises and one of them was Gradwik of Delaware." The testimony infers that the salary would not have been paid if the receipient had not been the son of Charles Goodman. It is not proof of rendition of service to petitioner; rather the testimony is no more than an effort to furnish a plausible basis for the deduction. Charles Goodman, the officer of petitioner who signed the check for the salary in question and the return in which the amount was claimed as a deduction, is an educated man of many years of business experience and must be charged with knowledge that corporations engaged in business for profit do not pay, and have no statutory right to deduct for tax purposes, salaries except for services actually rendered. No explanation was offered by petitioner for the payment of the salary in a lump sum, partially in advance, rather than in monthly or other regular installments as is customarily done. It is obvious that it was paid on November 23, 1934, to provide Charles Goodman with funds to pay premiums the next day on insurance policies taken out on his own life. Neither was any attempt made by petitioner to show the circumstances of the transaction between *79 Robert Goodman and his father for such use of the money. The effect of it, without any explanation, was the receipt by Charles Goodman of taxfree money to meet a personal obligation. The decisive facts are that the petitioner paid the salary and claimed the deduction with knowledge that Robert Goodman was not expected to and did not perform any services for it. The representations made under the circumstances disclose a fraudulent intent. J. L. Norie, 3 T.C. 676, affirmed 149 Fed. (2d) 739. It follows that assessment and collection of the deficiencies are not barred by the statute of limitations, that the deficiencies are due in part to fraud with intent to evade tax and that it was proper for the respondent to impose the fraud penalties. This conclusion will require us to dispose of other issues raised by the petitioner. Issue B. - Salary deductions Petitioner argues that as the salary paid to Robert Goodman "may seem somewhat excessive" and that the salary paid to Charles Goodman "seems grossly inadequate," under the circumstances, we should resolve the question upon the basis of whether the combined salaries are reasonable for the services of both *80 individuals. The statute confines deductions for salaries to reasonable amounts of personal services actually rendered. (Section 23(a) Revenue Act of 1934). No provision is made for lumping salaries for deduction purposes. L. Schepp Co.25 B.T.A. 419. Robert Goodman performed no personal services for petitioner and no part of the amount paid to him is deductible. No proof was offered to show that petitioner ever authorized a salary to Charles Goodman in excess of $2,000 and the issue, as framed by the pleadings, limits the amount of the deduction to $2,000. Personal services were actually performed by Charles Goodman and enough has been shown to establish the reasonableness of the compensation paid to him. Accordingly, respondent erred in disallowing $1,500 of the $2,000 claimed as a deduction for salary paid to Charles Goodman. Issue C. - Capital gain of $5,069.18 on sale of securities Findings of Fact 76. In 1934 the petitioner sold to Charles Goodman various securities, including $104,500 face amount of bonds of United Public Utilities Co., which bonds had a cost basis to petitioner of $27,981.53 and a fair market value of $27,170 at the time of the sale. *81 Included among the other securities sold were the following bonds: Date sold
Security
Cost
February 28
$ 10,000
Community Power & Light Co.
$ 3,925.00
January 3
5,000
General Water Works & Electric Corp.
2,012.50
January 3
1,000
Tobacco Products
865.50
January 3
50,000
New England Gas & Electric Co.
19,480.00
September 24
120,000
Federal Public Service
32,067.50
September 24
34,000
Central Western Public Service
7,480.00 The petitioner used the costs shown above as the selling price when recording the sales of the listed bonds in its books. 77. In his determination of the deficiency the respondent held that the petitioner realized gain of $4,002.22 on the sale of $104,500 face amount of bonds of the United Public Utilities Co., based upon a fair market value of $31,983.75 for the bonds at the time of the transfer, and gain or loss, or no gain or loss on the sale of 15 other securities in 1934. The total amount of gain determined was $5,069.18. The petitioner sustained a loss of $811.53 on the sale of the United Public Utilities Co. bonds. Opinion The petitioner alleged error respecting gain or loss on 13 of the 16 blocks of *82 securities involved in the transfers. At the hearing its counsel announced that he had abandoned the issues except those relating to bonds of the United Public Utilities Co., $120,000 face amount of bonds of the Federal Public Service, $34,000 face amount of bonds of the Central Western Public Service and $50,000 face amount of bonds of the New England Gas & Electric Co. Upon brief petitioner abandoned the issue respecting bonds of the New England Gas & Electric Co.
The respondent contends that the petitioner abandoned all of the issues. At the hearing, counsel for the petitioner, in connection with tax liability of Charles Goodman for 1935, offered testimony respecting the fair market value of bonds of the four corporations referred to in the preceding paragraph and subsequently the same day, when taking up the proceeding involving petitioner, he made the following announcement: With the exception, Your Honor, of the valuations under the heading of "Fair Market Value" in this notice of deficiency: Paragraph (A), as to those four securities, we have no contest, as to the cost or the gain or profit, but shall ask that you consider the valuations which the Petitioner has given *83 this morning as for those four items on that date. A portion of the remarks of counsel for petitioner indicates intention to concede the issues respecting the four blocks of securities but when construed in its entirety, it is evident that the intent was to reserve the right to contest the correctness of the fair market values determined by the respondent. There would have been no point in asking us to consider the testimony previously offered respecting the value of the securities unless petitioner intended to contest the valuations determined by the respondent. The respondent determined that the fair market value of the bonds of the Federal Public Service Co. and Central Western Public Service Co. at the time of the transfer was the same as cost to petitioner and consequently found that no gain was realized or loss sustained by petitioner with respect to the securities. The sales of these bonds were not included among the 13 blocks of securities as to which errors were alleged by petitioner in its amended petition and no question was raised by the petitioner concerning them in other pleadings or otherwise except upon brief. Accordingly, the only issue before us is the amount *84 of gain realized or loss sustained in connection with the sale of bonds of the United Public Utilities Co. The parties agree upon the cost of the United Public Utilities bonds. The sale was made in September 1934 but was not entered in the petitioner's books until the close of the year. The respondent held that the transaction constituted a sale of the bonds at their market value at the time of transfer and seems to have concluded that the sale was made on December 31, 1934. The proof here is that the sale was made on about September 24, 1934, and that the fair market value of the bonds on that date was $27,170. It follows that petitioner sustained a loss of $811.53 on the sale instead of realizing gain of $4,002.22, as determined by the respondent. Issue D. - Interest income in the amount of $718.99 Opinion In his determination of the deficiency the respondent included the amount of $718.99 in petitioner's income as interest accrued on certain securities. Upon brief the petitioner concedes that the interest was received and is includible in its income. Issue E. - Whether the amount of $8,416.88 paid to Charles Goodman was interest or a dividend Findings of Fact 78. *85 On or about November 22, 1934, to provide Charles Goodman with funds needed for a trip to Europe, which trip he made commencing five days later and ending January 3, 1935, petitioner's bookkeeper, K. S. Arnold, computed the amount of $11,416.83 as interest on the loan account of Charles Goodman to the close of the year and issued check No. 196 in favor of Charles Goodman for that amount. He made a notation on the stub of the check that it was "to be adjusted later." Upon his return to the United States, Charles Goodman directed K. S. Arnold "to cancel all the interest that applied on United Public Utilities, Central Trust, and Federal Public Service, and to take enough additional interest on the balance of the securities to bring the total refund up to an even $3,000." 79. The books of petitioner disclose a charge on November 23, 1934, of $8,416.83 to interest and a charge of $3,000 on December 31, 1934, to a loans payable account in the name of Charles Goodman or Rose Goodman or Robert Goodman or the survivors or survivor. Of the amount of $3,000, $2,000 represented payment of the salary of Charles Goodman for 1934. 80. In his return for 1934, Charles Goodman reported interest *86 income of $8,419.15. The petitioner's return for 1934 contained a deduction of $8,419.41 for interest. In his determination of the deficiency the respondant disallowed the deduction upon the ground that $8,416.88 of the amount constituted dividends paid in the guise of interest. Opinion The testimony on the issue is confined to mere statements of Charles Goodman on direct examination that he received the amount as interest on loans and that he had no knowledge of receiving dividends "as such" during 1934. Upon brief petitioner complains of the failure of respondent to offer evidence to establish that the amount constituted dividends and not interest. The determination of respondent is prima facie correct and the presumption must stand unless overcome by the petitioner. The testimony is nothing more than conclusions of the witness and without the surrounding circumstances, has little or no probative value. The assertions are, in effect, no more than appeared in his and petitioner's return, both of which he signed. Statements in returns, testified to be true, do not comprise proof. Louis Halle, 7 T.C. 245. We lack evidence on whether the loans were to bear interest, *87 and if so, the rate. Such evidence is important here in view of the arbitrary manner in which the net amount paid was ultimately determined. The method employed lacks the usual factors of computing interest on indebtedness. Our finding No. 63 shows that from January 8, 1934, until at least November 23, 1934, all of the stock of petitioner was outstanding in the name of Charles Goodman and he would be the proper stockholder to receive any dividends paid by the corporation. We think the evidence tends to sustain the respondent's determination. In any event, there is not enough evidence to overcome the presumption in favor of respondent and his disallowance of the deduction will not be disturbed. Issue F. - Delinquency penalty on surtax Findings of Fact 81. The petitioner did not file a return for 1934 as a personal holding company. Such a return was filed by the Commissioner of Internal Revenue for the petitioner on or about January 18, 1937, and disclosed adjusted net income of $1,676.15, undistributed net income of $1,340.92, surtax of $402.28, and a delinquency penalty of $100.57 for failure to file a return within the time prescribed by law was added. Opinion The petitioner *88 is not contesting the imposition of the delinquency penalty upon any ground other than that assessment of the deficiencies is barred by the statute of limitations. We having concluded that the statute has not run because of fraud, it follows, under the circumstances, that the imposition of the penalty under the provisions of section 351 of the Revenue Act of 1934 was proper. Docket No. 103137 - Gradwik, Inc. of Delaware - Year 1935 Issue A. - Statute of limitations: Delinquency penalty Opinion The petitioner concedes upon brief that assessment and collection of the deficiencies and penalties involved herein are not barred by the statute of limitations and that it was proper for the respondent to impose a delinquency penalty on the correct surtax for its failure to file a personal holding company return for the taxable year. The penalty is therefore approved. Issue B. - Disallowance of deductions in amount of $3,870.02 and $8,561.69 for salaries and other expenses, and interest, respectively Opinion Upon brief the petitioner conceded that respondent did not err in disallowing these deductions. The disallowance is therefore approved. Issue C. - Capital gain of $61,820.41
*89 Findings of Fact 82. In its income tax return for 1935, which was filed with the collector for the third district of New York, petitioner reported gain on sales of stock as follows: Date
Shares
Security
Cost
of sale
Sales Price
Gain
75
N. Y. Water Service
$ 1,500
4-24-35
$ 4,530.75
$ 3,030.75
500
Goldberger-Raabin Co.
50,000
1-15-35
50,000.00
1000
Mideastern Contracting Corp.
10,000
1-15-35
10,000.00
530
Hart & Early Co.
1-15-35
20,000.00
20,000.00 The sales of the last three stocks were made to Charles Goodman and were placed in the family account, infra. With the exception of stocks of N. Y. Water Service and Hart & Early Co., cost was used as the selling price. In his determination of the deficiency, respondent determined total gains of $61,820.41 by using the same cost basis and a total fair market value of $123,320.41, as follows, for the securities at the time of their sale: Number
Fair Market
of Shares
Security
Date of Sale
Value
75
N. Y. Water Service
3-24-35
$ 4,200.00
500
Goldberger-Raabin Co.
1-31-35
62,032.46
1000
Mideastern Contracting Corp.
1- 1-35
22,090.86
530
Hart & Early Co.
1- 1-35
34,997.09
*90 Opinion The parties never disagreed on the cost of these securities. Petitioner now admits on brief that the fair market values determined by the respondent are correct. Accordingly, the adjustments made by the respondent will not be disturbed. Issue D. - Salaries of $3,000 and $2,000 paid to Robert Goodman and Charles Goodman, respectively Opinion 83. We adopt as our findings of fact under this issue, findings of fact hereinbefore made with respect to a like issue involved in the tax liability of petitioner for 1934, under findings of fact Nos. 63 to 71, inclusive. The facts respecting this issue not differing from the facts under a like question in 1934, our conclusions must be the same, and, therefore, sustain respondent in disallowing the deduction of $3,000 claimed for salary paid to Robert Goodman and reverse his action in disallowing $1,500 of the salary of $2,000 paid to Charles Goodman. Issue E. - Loss of $51,755 on sale of stock of building and loan associations Fraud Penalty Findings of Fact 84. In 1932 or prior thereto Charles Goodman invested the following amounts in shares of building and loan associations doing business in Philadelphia, Pennsylvania: *91 Merrimac
$ 4,404.00
Lester M. Bloch
1,699.80
Nixon-Nerdlinger
7,324.00
C.B.C.
3,105.37
Baron Hirsch
6,747.20
Jewish Congress
566.40
Uniform
1,620.45
Combined
3,558.80
Gordon
2,162.60
Randall
744.15
Lillian
706.80
Morris Haber
12,609.00
Bank
9,743.64
$54,992.21
85. The pass books for the shares were issued to Charles Goodman and/or Rose Goodman, or vice versa, with the exception of the pass book for 200 shares of the Morris Haber Building & Loan Association, which was issued to Charles Goodman. The records of the building and loan associations indicate the individuals, to whom the shares were issued, as the owners of the pass books during the following periods: Merrimac - Oct. 2, 1936, to present time. Lester M. Bloch - Feb. 13, 1934, to Oct. 15, 1938. Nixon-Nirdlinger - Jan. 1, 1935, to Dec. 31, 1939. C.B.C. - Oct. 1932 to Sept. 1, 1938. Baron Hirsch - March 11, 1935, to present time. Jewish Congress - Aug. 22, 1935, to Nov. 30, 1942. Uniform - Oct. 1, 1933, to liquidation in about 1938. Combined - Dec. 14, 1933, to present time. Gordon - Feb. 1931 to present time. Randall - July 15, 1935, to May 15, 1944. Lillian *92 - Oct. 22, 1934, to Sept. 27, 1943. Morris Haber - Prior to 1935 to Dec. 1939. 86. The building and loan association paid the following dividends on the shares: Lester M. Bloch Building & Loan Association
Jan. 13, 1934
$ 72.00
Nov. 6, 1935
$ 43.20
June 12, 1934
72.00
June 10, 1936
28.80
Dec. 21, 1934
72.00
Jan. 10, 1938
57.60
Aug. 10, 1935
432.00
Oct. 15, 1938
57.60 Nixon-Nirdlinger Building & Loan Association $493.60 on August 14, 1935, February 1, 1936, November 5, 1936, November 12, 1937, and June 15, 1938. Uniform Building & Loan Association
Nov. 21, 1933
$550.78
Mar. 1, 1934
$137.69
Sept. 9, 1934
68.84
May 15, 1935
68.84
July 18, 1935
68.84
Sept. 16, 1935
68.84
Sept. 5, 1936
206.52
Nov. 25, 1936
68.84
June 20, 1938
27.54 All of the distributions were liquidating dividends. Combined Building & Loan Association
June 10, 1935
$157.25
Sept. 12, 1935
$251.60 All of the distributions were liquidating dividends. Gordon Building & Loan Association
Mar. 4, 1937
$196.50
Oct. 6, 1938
$ 98.25
Feb. 5, 1942
98.25
June 3, 1943
78.60 All of the distributions *93 were liquidating dividends. Randall Building & Loan Association
July 8, 1935
$ 41.93
Jan. 20, 1937
$ 41.93
Oct. 1, 1937
41.92
Dec. 20, 1937
41.92
Dec. 30, 1938
20.96
July 25, 1939
18.87
Lillian Building & Loan Association
Oct. 6, 1938
$30.75
Morris Haber Building & Loan Association Oct 4, 1937 $3,062.50 Oct. 27, 1938 $1,837.50 87. The Department of Banking of the State of Pennsylvania took possession of the affairs of the following building and loan associations on the dates shown: Baron Hirsch - January 16, 1936 C.B.C. - January 21, 1937 Combined - December 19, 1935 Jewish Congress - August 22, 1935 Merrimac - October 2, 1936 The building and loan associations were insolvent when the Department of Banking took charge of their affairs, and had no assets to pay shareholders. Shareholders of the associations were notified of the amount outstanding to their credit on the books of the associations at the time of taking possession. 88. All of the checks issued by the building and loan associations for the dividends referred to in findings of fact No. 86 were payable to Rose Goodman and/or Charles Goodman, or vice versa, *94 or Charles Goodman as the owners or owner of the shares at the times the distributions were made. All of the checks were endorsed by Charles Goodman, and with the exception of two checks endorsed to an insurance company, substantially all of them were deposited in a bank to his or Robert Goodman's credit and the remaining checks were deposited in a bank to the credit of Doris Goodman, Rose Goodman or Sylvia Goodman. 89. On December 18, 1935, Adrian H. Muller & Son, 40 Wall Street, New York City, rendered a statement for a sale at auction on that date for the account of Charles Goodman for $105, of all the shares of the building and loan associations referred to in findings of fact No. 84. A charge of $121 was made by the auctioneer in connection with the alleged sale. The check for $105 which was issued by the auctioneer on December 18, 1935, in favor of Charles Goodman for the proceeds of the alleged sale, was endorsed by Charles Goodman for deposit in his bank account. 90. The joint income tax return of Charles Goodman and his wife for 1932 contained the following deductions for partial worthlessness of the following building and loan shares: Per cent
Combined
50
$ 1,779.40
Bank
75
7,307.73
Merrimac
90
3,963.60
Uniform
50
810.22
C.B.C.
75
2,329.03
Baron Hirsch
90
6,072.48
Randall
50
372.07
Morris Haber
90
11,348.10
Lillian
70
494.76
Gordon
50
1,081.30
Nixon-Nirdlinger
50
3,662.00
*95 No deductions were claimed in the returns for 1933 and 1934 for losses on the shares. 91. In his income tax return for 1937, Charles Goodman claimed deductions of $6,747.20 and $3,105.37 for shares of the Hirsch and C.B.C. Building & Loan Associations, respectively, the amounts being his original cost basis, with the explanation that they "were part of Building loans by stipulation and agreement to stipulate in which losses were not allowed in 1932." The respondent disallowed the deductions because of failure of proof that the shares became worthless in 1937. 92. In an amended income tax return dated February 3, 1942, for 1938, Charles Goodman claimed losses aggregating $19,963.82, this being his original cost basis, less liquidating dividends of $1,166.10, on the shares of Merrimac, C.B.C., Baron Hirsch, Combined, Uniform, and Jewish Congress Building and Loan Associations. The computation of the losses attached to the return contains an assertion that the Commissioner disallowed deductions for losses on the shares in 1935 and that liquidation dividends of $408.85 and $206.52 were received on the shares of the Combined and Uniform Building and Loan Associations, respectively, *96 in 1935. 93. The individual income tax return of Charles Goodman for 1935 did not report the sale of any shares of building and loan associations to petitioner or claim as a deduction, losses on such shares. 94. In its income tax return for 1935 the petitioner reported a capital loss of $51,775 on sales of the shares involved herein, based upon a total cost of $53,514, and credits of $1,634 for recoveries of bases and $105 received at a sale. Capital gains of $23,030.75 were reported, and as a result, only $2,000 was claimed as a capital loss. In his determination of the deficiency the respondent disallowed the loss of $51,775 upon the ground that it was not bona fide. 95. A part of the deficiency for 1935 was due to fraud with intent to evade tax. Opinion The petitioner is asking us to allow this deduction upon the basis of an acquisition of the shares from Charles Goodman in January 1935 "at a net cost of $51,755 at the time it sold those shares," and a sale at auction on December 18, 1935, for $105. The respondent contends that petitioner never owned the shares and therefore could not, and did not, sell the shares in 1935. The petitioner does not deny that the records *97 of the various building and loan associations show Charles Goodman and him and/or Rose Goodman to have been the owners of the shares at all times and that all distributions of dividends on the shares, including payments made in 1935, some of which were liquidating dividends, were made to the record owners, which never included petitioner. All of the checks issued for the dividends were endorsed by Charles Goodman, and with a few exceptions all of them were deposited in bank accounts in his or Robert Goodman's name. Charles Goodman, the administrative officer of petitioner, believed as early as 1932 that many of the shares had decreased in value. This is shown by the claim he made in his return for that year for deductions of from 50 per cent to 90 per cent of his investuent on account of partial worthlessness of the shares of 11 of the 13 associations. Notwithstanding such action and the receipt by him in 1933 and 1934 of liquidating dividends from at least one of the associations, Charles Goodman caused petitioner to report the alleged sale at his original cost basis, less $1,634 for recoveries of capital. This indicates no arm's length sale to petitioner; rather an attempt on his *98 part to place the petitioner in a position to recover in a subsequent transaction an investment of his that in his opinion had greatly depreciated in value. Upon direct examination Charles Goodman testified that he sold the shares to petitioner in January 1935, having previously "overlooked" them. Later, with the 1935 return of petitioner before him for reference purposes, he testified that the date of sale was January 2, 1935. Upon reflection he concluded that the return was incorrect, as he did not return to the United States until January 3, 1935. No attempt was made by petitioner to justify the alleged sale to it at exactly the seller's cost or to explain its failure to have the record ownership of the shares transferred. The alleged auction sale was transacted in the name of Charles Goodman and he, not petitioner, received a check for the proceeds. In response to questioning upon direct examination concerning the payment of the distributions to him in 1935 instead of to petitioner, Charles Goodman testified that "Those amounts were credited to Gradwik of Delaware. I do not remember the bookkeeping," and that "they went to Gradwik of Delaware." No other effort was made to show *99 that petitioner received the dividend payments. No evidence was offered to establish that petitioner received, by credit or otherwise, the proceeds of the alleged auction sale of the shares. Neither did petitioner attempt to prove that it paid Charles Goodman for the shares or entered them on its books. Aside from the returns of petitioner claiming the losses in question, and unsupported testimony of Charles Goodman, there is no evidence showing ownership of the shares in petitioner. Other evidence shows that Charles Goodman and him and/or Rose Goodman were the record owners of the shares throughout 1935. Was any part of the deficiency due to fraud with intent to evade tax? We have found that petitioner never owned the building and loan shares. Accordingly, it could not sell them or rightfully claim a loss deduction arising from a sale made by the real owner. To claim a loss deduction on the sale of assets never sold or owned discloses a fraudulent purpose. Upon brief, however, petitioner argues that its tax would not have been more than $528.53 without the deduction for the losses in question, and if the shares were sold for the account of Charles Goodman, as the respondent contends, *100 and he had taken the deduction, he would not have had any tax liability for 1935, instead of $575.76, the amount paid by him. This argument is intended to show that the amount of tax involved would not justify the commission of a fraudulent act. The argument overlooks decreased deductions and greater capital gains by virtue of admissions made by petitioner at the hearing and upon brief. The facts found indicate that Charles Goodman was concerned about the year in which the Commissioner would allow deductions for losses on shares of the various building and loan associations. We know the effort he made in his 1932 return to take loss deductions on the shares. Nothing was claimed in his returns for 1933 and 1934. The question of when losses should be claimed was discussed by Charles Goodman with agents of the Bureau of Internal Revenue, but it does not appear that any of the discussion occurred prior to 1935. There is some indication that the subject was discussed in 1936 or 1937. In any event, inability to determine the year in which to claim a loss does not condone the action of Charles Goodman here in causing petitioner to make the claim without ever having acquired the shares. *101 The evidence points to the use by Charles Goodman of petitioner, a corporation whose stock was outstanding in the name of Charles Goodman and his wife, to take a loss on the shares. The distinction between the corporation and the individual, as taxpayers, was disregarded for the express purpose of obtaining relief from income taxes. This is shown, among other things, by the use by petitioner of Charles Goodman's cost basis, notwithstanding a belief that the value of most of the shares was considerably less than the cost to Charles Goodman; the failure to have ownership of the shares transferred to it on the books of the building and loan associations; the assertion of ownership of the shares by Charles Goodman by accepting dividends when the securities were allegedly owned by petitioner; the acceptance by Charles Goodman of the proceeds of the alleged sale of the shares at auction, and the use by Charles Goodman in his 1937 return and amended return for 1938 of his original cost basis in making claims for losses on some of the shares, which action completely ignores ownership by petitioner, and a sale by it, and is opposed to the idea, advanced by the petitioner, that the shares *102 were acquired by Charles Goodman from William Goldsmith, the alleged purchaser at the auction sale, in February 1936, as a gift. Charles Goodman testified that he claimed his original cost basis in the shares of the Baron Hirsch and C.B.C. Building and Loan Associations "Because the Internal Revenue Department would not allow me that in 1935, which is the right year for the loss * * *." Upon being asked why he claimed a loss in 1935, if petitioner owned the shares in that year, Charles Goodman testified: I state that Gradwik of Delaware had the loss in 1935. I did not take any loss in 1935, although apparently I should have, but I did not because I thought that the property which was Charles and/or Rose [Goodman's], should be sold, should go into Gradwik of Delaware as a matter of right the way I think, but I did not take much of a loss in Gradwik of Delaware in 1935, I simply gave the Government a present of a large amount of money. Counsel for petitioner then informed the witness that the notice of deficiency did not assert that he had taken a loss deduction in 1935. The testimony illustrates Charles Goodman's disregard of himself and petitioner as separate and distinct taxpayers. *103 We conclude from all of the evidence that petitioner made no sale of the shares in question, and, accordingly, sustained no loss to deduct from gross income. Not only did no sale by petitioner occur, but the evidence establishes that the deduction was taken upon the basis of a sale never made, and that a part of the deficiency was due to fraud with intent to evade tax. It follows that respondent did not err in disallowing the deduction or imposing the fraud penalty. The conclusion reached by us on the issue of fraud renders it unnecessary to consider whether fraud also was shown because of the deduction of salary paid to Robert Goodman without rendition of services for the compensation. The point was, in any event, not raised by respondent except upon brief. Docket No. 104869 - Charles Goodman - Year 1935 Issue A. - Increasing interest income from $1,476 to $10,928.81 Issue B. - Capital gains $67,663.71 Findings of Fact 96. During 1935 petitioner sold through his account with Boody, McLellan & Co., coupon bonds as follows: Date sold
Security
Cost
April 8
$9,000
Community Power & Light Co.
$5,150.04
April 9
$1,000
Community Power & Light Co.
572.36
April 5
$2,000
General Water Works and Elec. Corp.
1,328.61
April 23
$3,000
General Water Works and Elec. Corp.
2,090.42
March 13
$1,000
Ohio Water Service Co.
752.93
March 28
$5,000
Ohio Water Service Co.
3,750.08
April 1
$6,000
Ohio Water Service Co.
4,547.60
*104 97. The Community Power & Light Co. and General Water Works and Elec. Corp. bonds were acquired by petitioner from Gradwik, Inc. of Delaware as set forth in findings of fact No. 76. The bonds of the Ohio Water Service Co. were purchased by petitioner through brokers on November 22, 1932, at a cost of $6,070. During 1935 the petitioner received a total of $10,928.81 in interest on these bonds and other bonds as follows: Security
Cost
Community Power & Light Co.
$ 302.78
General Water Works & Electric Corporation
90.28
Ohio Water Service Co.
391.67
Tobacco Products (coupon bonds)
16.25
$ 800.98
American Utilities Service Corp.
$3,900.00
New England Gas & Electric Co.
3,192.00
United Public Utilities Corp.
3,035.83
$10,127.83
Total
$10,928.81
98. Of the interest received by petitioner, the following amounts were collected by the Chase National Bank and credited by it to petitioner's checking account on the dates shown: May 1, 1935 Ohio Water Service Co.
$ 300.00
May 1, 1935
American Utilities Serv-
ice Corp.
1,800.00
July 1, 1935
United Public Utilities
Co.
1,530.00
Dec. 31, 1935
United Public Utilities
Co.
1,222.50
Total
$4,852.50
*105 99. The return of Robert Goodman for 1934 reported interest income of $2,478.75, which amount included interest of $625 on $50,000 of bonds of the New England Gas & Electric Co. The investment ledger of petitioner for 1934 credited to his children interest of $2,500 received on the bonds. 100. On about September 24, 1934, the petitioner acquired bonds from Gradwik, Inc. of Delaware as follows: Security
Cost
$104,500 United Public Utilities Co.
$27,170
$120,000 Federal Public Service
30,600
$ 34,000 Central West Public Service
4,845
101. On February 14, 1935, the $104,500 of bonds of the United Public Utilities Co. were exchanged for the following bonds, stock and scrip of the United Public Utilities Corp. and having a total value of $41,292.33 at the time of the exchange. $37,250
bonds - 6/60
$15,000
bonds - 5 1/2/60
745
shares preferred stock - $3.00
300
shares preferred stock - 2.75
1,045
shares common stock
$ 7,650
ten year scrip
102. On February 15, 1935, the $120,000 face amount of bonds of the Federal Public Service were exchanged for $60,000 face amount of bonds; 1,200 shares of preferred stock, and 5,040 shares of common *106 stock of the American Utilities Service Corp. having a fair market value of $39,270 at the time of the exchange. 103. The $34,000 face amount of bonds of the Central West Public Service were sold by petitioner in 1935 through his account with Boody, McLellan & Co. for $12,188.90, as follows: April 1
$ 4,000
$1,038.40
May 24
5,000
1,498.00
July 8
15,000
5,444.00
Sept. 11
5,000
2,098.00
Oct. 14
5,000
2,110.50
104. On January 3, 1934, petitioner acquired $50,000 face amount of bonds of the New England Gas & Electric Co.from Gradwik, Inc. of Delaware for $19,312.50, this amount being the fair market value of the bonds on the date of sale, and sold them on December 31, 1935, to the Builo Corporation for $36,000. 105. On November 22, 1934, the petitioner executed an instrument reading as follows: Gifts made by Charles Goodman November 22, 1934, - $5,000
to my wife, Sylvia Goodman
5,000
to my son, Robert Goodman
5,000
to my daughter, Doris Goodman
5,000
to my daughter, Annette Goodman
5,000
to my son, William Goodman
I have purchased for $5,000 for the account and risk of each person above, one-sixth interest in the following *107 securities. I now have these securities in my possession. 120
Federal Public Service bonds
which cost
$32,067.00
104 1/2
United Public Utilities bonds
which cost
27,981.00
50
New England Gas & Elec.
bonds which cost
19,500.00
34
Central West bonds which cost
7,480.00
$87,028.00
The balance of present value of one-sixth share over $5,000 is to be a loan. I will act as trustee and will account for same from time to time as in my judgment seems best. This memo. is signed by me to make a record of an absolute gift clear of obligations to any persons or so far as I know, clear of tax to our Government. [Signed] Charles Goodman Witness Rose Spinrad The dates of birth of petitioner's four children were as follows: Robert
- August 5, 1914
Doris
- October 21, 1919
Annette - January 5, 1924
William
- December 6, 1926
106. On January 15, 1935, the Mideastern Contracting Corporation issued stock certificate No. C-32 to Charles Goodman as trustee for his wife and four children, and himself individually, each one-sixth, for 1,000 shares of its common stock. Petitioner has held the certificate since it was issued. *108 107. On October 2, 1935, the Goldberger-Raabin Co., Inc. issued stock certificate No. 32 to Charles Goodman as trustee for his wife and four children and himself individually for 500 shares of its common stock. 108. On or about June 15, 1935, Hart and Early Co., Inc., issued stock certificate No. 64 to Charles Goodman as trustee for his wife and four children and himself individually, each one-sixth, for 530 shares of its common stock. The certificate was issued in exchange for certificate No. 63, which was transferred by Gradwik, Inc. of Delaware by an endorsement bearing the date of June 15, 1935, to Charles Goodman as trustee for his wife and four children and himself individually, each one-sixth. 109. In 1935, $5,000 of the $37,250 of bonds of the United Public Utilities Co. were sold for $4,079.25 and the remainder of the bonds for $27,412. The $50,000 of bonds of the New England Gas & Electric, the $60,000 of bonds of the American Utilities Service and the $15,000 of 5 1/2 per cent bonds of the United Public Utilities, were also sold in 1935. 110. On November 23, 1935, petitioner signed a memorandum reading as follows: November 23, 1935 November 23, 1935 - Gifts made *109 by Charles Goodman, - $5,000.00
to my wife, Sylvia Goodman
5,000.00
to my son, Robert Goodman
5,000.00
to my daughter, Doris Goodman
5,000.00
to my daughter, Annette Goodman
5,000.00
to my son, William Goodman
[Signed] Charles Goodman Witness Rose Spinrad 111. The proceeds of sales made by petitioner in 1935 of securities in the alleged trust of November 22, 1934, hereafter referred to for convenience as the family account, and the interest and dividends received on the securities, were deposited in his personal bank account and used by petitioner to purchase other securities for the family account. 112. In 1936, 1937, 1938, 1939 and 1940, the income received by petitioner from dividends and interest on, and the proceeds of sale of securities in the family account were invested by petitioner in other securities for the family account. In 1939 a loan of $52,590.33 was made to the Airhill Corp. out of the family account. The shares of stock of the Mideastern Contracting Corporation, Goldberger-Raabin Co., Inc., and Hart & Early Co., Inc., referred to in findings of fact Nos. 106, 107 and 108, respectively, were acquired by petitioner for, and were *110 placed in the family account. There were no purchases in the family account in 1941. The proceeds of sales made in 1941 and interest and dividends, received by petitioner in that year on loans and securities, was about $28,500. In that year another loan of $4,409.67 was made to the Airhill Corporation and $350 was repaid. 113. The account of petitioner with Boody, McLellan & Co. shows the following securities in the account on October 29, 1941, and delivery of the securities out of the account on the dates specified: Security
Delivery Date
$17,000
Laclede Gas
June 26, 1941
29,000
Laclede Gas
Nov. 15, 1941
32,000
Jacksonville Gas
Nov. 15, 1941
120
shares preferred stock of
Bankers Securities Corp.
Nov. 26, 1941 The delivery of the Bankers Securities Corp. stock closed the account. On November 13, 1941, the family account was closed. Securities in the family account on that date included the following: $ 4,600
Laclede Gas bonds
$29,000
Jacksonville Gas bonds
120
shares preferred stock of Bankers
Securities Corp.
530
shares, Hart and Early Co. Inc.
1,000
shares, Mideastern Contracting Corp.
114. The petitioner prepared *111 the income tax returns for his wife and four children after November 22, 1934, except that Robert Goodman prepared his own return after reaching the age of 21. 115. The family account was not mentioned by petitioner in his income tax returns for 1934 and 1935. It is referred to directly or indirectly in his returns for 1936, 1937, 1938, 1939 and 1940. 116. On January 11, 1939, the petitioner executed a waiver consenting to assessment of income taxes due under his return for 1935 at any time on or before June 30, 1940. 117. In his return for 1935 petitioner reported interest income of $1,476. In his determination of the deficiency the respondent increased the amount reported by $9,452.81, or to $10,928.81, in connection with which adjustment he held that of the total interest, $1,551 was erroneously included in the return of each of petitioner's four children, $1,476 in the return of petitioner's wife, and that $1,772.81 was not reported. The petitioner did not report in his return for 1935, the sale of bonds of the Community Power & Light Co., General Water Works and Electric Corp., and Ohio Water Service Co. He reported the sale of bonds of the American Utilities Service Co. *112 , United Public Utilities Corp., New England Gas & Electric Co., and Central West Public Service, and included in his income, one-sixth of the gain as computed by him. In his determination of the deficiency the respondent taxed all of the gain to petitioner. 118. A part of the deficiency for 1935 was due to fraud with intent to evade tax. Opinion The parties are now in agreement upon the amount of interest received under the issue. The difference between the parties is whether the interest is taxable in its entirety to petitioner, as contended by respondent, or whether the interest of $800.98 on the bonds of Community Power, General Water Works, Ohio Water Service and Tobacco Products is taxable in equal amounts to petitioner's four children, and the remaining interest, to them, and petitioner and his wife, one-sixth to each, as owners of the family account, a contended by petitioner. In each instance the question turns upon whether gifts were made of the securities from which the income was derived. Was there a gift to the children of the bonds on which the interest of $800.98 was paid? Upon brief, petitioner asserts that there was an intention to make a gift but "there was *113 no actual delivery to them at the time of payment of the interest * * * which would be required, at least among strangers, in the absence of a written declaration of trust which is lacking here. In that respect the transaction is lacking in the formality of a delivery or final execution of the gift, and we must recognize that the evidence falls short of establishing the complete execution of the intended gift unless, because of the relationship among the parties, the failure of strict formality may be considered excusable. That is for this Court to determine." No cases are cited by petitioner to support his suggestion of a rule making the elements of a gift by parents to their children less onerous than one between other individuals. Though in some states it has been held that rules as to delivery are not so strict between members of a family living in the same home, 38 C.J.S. 803, no cases from New York are cited as authority, or suggested by the petitioner, so we conclude there is no such rule in that state. Moreover even cases so holding require showing of passage of dominion and control, and completion of the gift. Mere intent was not sufficient, even though the proposed grantee *114 was a nephew, in Viggiani v. Favata, 13 N. Y. S. (2d) 353. As evidence bearing on the question of a gift, petitioner points to his testimony and entries made in his investment books, which he alleges show that the bonds and interest received were the property of the children. Petitioner's testimony is merely a conclusion that the bonds were owned by his four children, that "They got them from myself or my wife, Mrs. Rose Goodman" in 1932 and 1934, when the securities were acquired by him or his wife; that he "set them aside in a separate place as belonging to the four children" and that thereafter he maintained a record in his books of what belonged to them for income tax purposes. The investment ledger of petitioner, the only book relied upon, contains no entries in 1932 for income of the children. The ledger for 1934 contains entries under the heading "children" for interest on the bonds; also one on September 1 for interest on bonds of the New England Gas & Electric Co. The ledger sheet for 1935 contains an entry under the date of April 4 for interest of $529.17 without clearly identifying the bonds on which it was paid. The books containing entries, if any, after *115 May 3, 1935, are not in the record. In Adolph Weil, 31 B.T.A. 399, affirmed 82 Fed. (2d) 561, the Board said: From an examination of the authorities we find the essential elements of a bona fide gift inter vivos to be (1) a donor competent to make the gift; (2) a donee capable of taking the gift; (3) a clear and unmistakable intention on the part of the donor to absolutely and irrevocably divest himself of the title, dominion, and control of the subject matter of the gift, in praesenti; (4) the irrevocable transfer of the present legal title and of the dominion and control of the entire gift to the donee, so that the donor can exercise no further act of dominion or control over it; (5) a delivery by the donor to the donee of the subject of the gift or of the most effectual means of commanding the dominion of it; (6) acceptance of the gift by the donee; * * * "The 'delivery' must be as perfect as the nature of the property and the circumstances and surroundings of the parties will reasonably permit." Lunsford Richardson, 39 B.T.A. 927. Weil v. Commissioner, supra; Coffey v. Commissioner, 141 Fed. (2d) 204, affirming 1 T.C. 579. *116 In R. C. Coffey, supra, the taxpayer, in 1922, 1924, and 1925, endorsed the certificates of stock for transfer to his minor children and informed the witness to his signature that he was making a gift of the shares to the children to whom the certificates were endorsed. The taxpayer retained the certificates in his possession until 1938, when he presented them to the issuing corporations for transfer to the children on the corporations' book. In the meantime he received the dividends paid on the shares and appropriated them to his own use without making an accounting to his children until 1938. Under the circumstances we held that there were no completed gifts of the shares prior to the close of 1938. The fact that petitioner indicated in his investment ledger that the interest was income of his children and caused returns to be made for the children for interest on the bonds, coupled with his testimony here, is not sufficient proof of intent to make gifts of the bonds. No contention is made by petitioner that he ever took steps to deliver the securities by transferring title to them on the books of the issuing corporations, or otherwise. Neither does petitioner advance *117 the theory that he was holding the bonds as a trustee or guardian for his children. See Weil v. Commissioner, supra, in which, as in the Coffey case, the alleged donees were minor children. Under the circumstances, no completed gifts were made of the bonds of Community Power & Light Co., General Water Works and Electric Corporation, Ohio Water Service Co., or Tobacco Products, and it was not error for respondent to tax petitioner on $800.98, the amount of interest he received on those bonds in 1935. The respondent determined capital gain and loss on sales of the same bonds, the only question herein concerning his action being whether the entire amounts should be reflected in the return of petitioner as determined by the respondent or taxed to his four children, as contended by petitioner. The petitioner concedes that our decision on the interest question will dispose of this issue. Accordingly, the adjustments made by the respondent as to the capital gain will not be disturbed. Was there a gift of the other bonds (i.e., of American Utilities Service Corporation, New England Gas & Electric Co., and United Public Utilities Corp.) on which the remaining interest of $10,127.83 was *118 paid? The petitioner contends that by the memorandum executed by him on November 22, 1934, he made an absolute gift to his wife and four children of five-sixths, one-sixth to each, of his interest in the bonds and constituted himself trustee of the securities. While the document on its face lists gifts purportedly made by petitioner, the subject and extent thereof is not shown. The first paragraph of the memorandum, without more, indicates an intention to make a cash gift of $5,000 to each child and the wife. In the next paragraph petitioner asserted that he had used the $25,000 to purchase for each a one-sixth interest in specified bonds which had cost him $87,028. Together there is indication of some intent to make a gift to each of a one-sixth interest in the bonds. The provisions of the next paragraph, instead of clarifying the ambiguity, confuses the question, for its provides that "The balance of present value of one-sixth share over $5,000 is to be a loan." If there was a gift of only $5,000 to each, the loan would be from petitioner to them of the difference between $25,000 and the then value of the bonds, less the one-sixth retained by petitioner. Petitioner contends that *119 there were such loans. There is no evidence of record, however, and petitioner does not contend, that the alleged donees agreed to borrow any amounts from petitioner under the transaction, assuming that the "present value" was in excess of $30,000, the then value not being shown. If there was a gift of five-sixths of the value of the bonds, with a loan to petitioner of the value in excess of $25,000 the debt would be owing by petitioner, instead of the alleged donees. The memorandum of November 23, 1935, purports to list further gifts of $5,000 to each child and the wife. Petitioner testified that the alleged gift represented "* * * a cash credit against money they owed me.""For buying securities for them." Concerning whether a book record before him, which was not placed in evidence, contained any credit for the alleged gifts, petitioner testified as follows: It does, in this way, that I added $5,000 for my one-sixth, and I credit $30,000 or a total of $60,000 for two years' gifts, this paper and the other paper. Consideration of the memoranda in the light of petitioner's testimony indicates intent to make a record showing cash gifts, totaling $50,000 in connection with the *120 bonds specified in the November 22, 1934, memorandum, and securities purchased in 1935. If it was intended to cover subsequent purchases made by petitioner in 1935 for their account, there is no explanation of the status of any excess of value over $30,000. If the additional amounts are regarded as credits on "loans" made in the November 22, 1934, memorandum, it would seem that the alleged donees were regarded as the borrowers in that year. If such were the case, the alleged donees would be indebted to the petitioner for the difference, if any, between $60,000 and the fair market value of the bonds on November 22, 1934. There was no arms' length purchases by the petitioner of the bonds listed in his memorandum of November 22, 1934, as they were required by him from Gradwik, Inc. of Delaware at cost to it, and such cost figures, with some immaterial differences, were used as the cost to him. Findings 76 and 105. We have determined the sales price to Gradwik, Inc. of Delaware and cost to petitioner to be the fair market value of the bonds at the time of the transfer. Findings 100 and 104. Thus, the figures used by petitioner did not reflect the actual cost to him or represent the value *121 of the bonds on November 22, 1934, the date of his alleged gift. In 1935 the petitioner acquired shares of stock of Goldberger-Raabin Co., Mideastern Contracting Corporation and Hart & Early Co., and placed them in the family account. The sales price of these securities were returned by Gradwik, Inc. of Delaware at cost to it, but upon brief it is conceded that fair market value at the time of sale is the sales price to Gradwik and cost to petitioner. These securities, having a fair market value of about $120,000 at the time of their acquisition by petitioner from Gradwik, Inc. of Delaware, were placed in the family account, but no contention is made by petitioner upon brief that funds of the family account were used to purchase the securities. The memorandum of November 22, 1934, does not include these securities and there is no evidence in the record on petitioner's intent to make them the subject of a gift. The contention of petitioner upon brief is that the alleged 1935 gifts of $5,000 each to petitioner's wife and children were applied as credits against the purchase of the bonds listed in the memorandum of November 22, 1934. Such a view leaves us with no evidence on gifts *122 of these shares of stock. If the gifts alleged to have been made in 1935 were intended to apply on purchases made after November 22, 1934, there would be considerable indebtedness owing by petitioner or the alleged donees for excess value of the stocks. In any event, petitioner was, on the face of the memorandum made by him, either intended to be indebted to his alleged donees, or vice versa. Notwithstanding this condition of the record, aside from the gifts alleged to have been made on November 23, 1935, there is no evidence of repayment or charge-off of the loans. We do know that they were not taken into account by petitioner in the distribution he alleges was made of the securities when the family account was terminated in 1941. The investment ledger of petitioner for 1934 credits petitioner's four children with interest of $2,500 received on the $50,000 face amount of bonds of the New England Gas & Electric Co., one payment of which interest having been made on November 1, 1934. Robert Goodman reported one-fourth of such interest in his return for 1934. The record does not show the manner in which the petitioner acquired the bonds from his children, if, as he alleged, they owned *123 the securities as late as November 1, 1934. It is evident that petitioner did not intend to make outright gifts in 1934 of the bonds. The petitioner also asserts that the writing of November 22, 1934, constituted a declaration of trust with himself as trustee, as to the securities described therein. Though he does not discuss the point, the importance of the question justifies further examination of the record. The respondent contends that the document and the one executed in 1935 are nothing more than self-serving declarations and have no probative value. In Greenspun v. Commissioner, 156 Fed. (2d) 917, the court, referring to certain questions, involving family nature of trusts, dominance by a father-husband-grantor, also a question as to whether payments were deductions or dividends, said: * * * Coming up on a record which tells a tale of family trusts and family corporations, and of Greenspun as the genius evoking and dominating them all, their proper answer requires not only a recognition of these facts but a thorough understanding and correct appraisal of the weight they should be given in the scales of decision. The record is of much the same general nature *124 here, and we must weigh the facts in the light of the whole situation. There is little to indicate that petitioner ever regarded the writing of November 22, 1934, as creating a trust. There was no transfer of the bonds to petitioner, as trustee; the interest and dividends on the securities were paid to petitioner and deposited by him in his personal bank account; there was no segregation of the property and income therefrom in a special account, or otherwise; petitioner did not endeavor to prove and does not contend, that he ever filed a fiduciary return for the alleged trust; the 1934 return of petitioner contains nothing on the transfer of the bonds to a trust and while his 1935 return reported gains on sales on the basis of a one-sixth ownership, no reference was made to the "trust" as grounds for using one-sixth of the basis and selling price of securities in computing gain or loss; the 1936 return of petitioner reported total dividends and interest received and gain derived, and showed one-sixth thereof as being petitioner's income with a reference that his wife and four children each had a "one-sixth in the" accounts and other than the preparation of income tax returns for *125 the minor children, no accounting of any nature was ever made for the "trust". Thus, petitioner did not perform any of the ordinary duties of a trustee or divulge that he was acting as such, and his declaration that he would account for his acts as trustee from time to time "as in my [his] judgment seems best" was never put into effect. Neither did petitioner provide in his declaration for making distributions of income; for re-investing principal, investing earnings or otherwise increasing corpus, for a date of termination or for any restrictions upon his powers as a trustee. His failure in any manner to limit his powers as a trustee indicates that he never intended to assume any of the legal obligations of a trustee; rather that he intended to retain the right to deal with the property at all times in his individual capacity. The trust alleged, so obviously would not meet the test of Helvering v. Clifford, 309 U.S. 331, that we consider further discussion in that regard superfluous. We, however, note Harry F. Canelo, 41 B.T.A. 713, where the taxpayer contended that he created a trust orally to engage in stock transactions for the benefit of a member of *126 his family and close relatives. The brokerage accounts were kept in his name, but he informed floor men who handled the accounts that other members of his family had a financial interest in the brokerage accounts. He filed fiduciary returns each year for the alleged trust and caused individual returns to be prepared and executed for the individuals listed in the fiduciary returns as beneficiaries and later paid the tax shown to be due in the individual returns. Withdrawals of cash were made from the brokerage accounts by the taxpayer, some of which were used by him for the benefit of the alleged beneficiaries. From these and other facts we held that there was no trust. There was never a delivery of the securities to the alleged donees here, unless, as contended by petitioner, it occurred upon the closing of the family account in 1941. At that time petitioner prepared a statement of the securities on hand and showed a division of them approximately equally among his four children and his wife and himself. He testified that the securities were distributed in accordance with his tabulation. We are asked to accept this testimony of an interested witness as proof of distribution, without *127 being supported or corroborated by any other evidence. Uncontradicted evidence, particularly of a single witness, is not necessarily binding on the Court, especially where the witness is a party and so interested. Easton v. Brant, 19 Fed. (2d) 857; Ramsay v. Lebow, 220 Mass. 227; 107 N.E. 926; MacReynolds v. Coney Island & B.R. Co., 155 N. Y. S. 655. The evidence is to be considered as a whole and in the setting in which given. Dimond v. Terminal R.R. Ass'n of St. Louis, 141 S.W. (2d) 789. Its persuasiveness may be destroyed by analysis, though uncontroverted. Goodyear Tire & Rubber Co. v. Federal Trade Commission, 101 Fed. (2d) 620. There are many exceptions to the rule as to following uncontradicted testimony. Quock Ting v. United States, 140 U.S. 417. See also Platter v. Minneapolis & St. L.R. Co., 143 N.W. 992. Considering the nature of the issue and the interest of the witness, more should have been offered to prove actual distributions. Under the circumstances present here, we should not accept the petitioner's testimony alone as sufficient proof of actual distribution *128 of the securities to the designated parties. We therefore, on all of the evidence, find that no completed gifts were made; that no trust was created, and that all of the interest of $10,127.83 in question is taxable to petitioner. The petitioner concedes upon brief that our conclusion with respect to Issue A, will dispose of not only petitioner's taxable interest in gain or loss on the securities in 1935, but his interest in income from, and gain and loss from, the sale of the securities in the family account in all subsequent years. The petitioner is not contesting the respondent's determination respecting the date of acquisition, cost, sales price or fair market value of the securities in 1935, except the date of acquisition and cost of bonds of the Federal Public Service, United Public Utilities Co., and Central West Public Service. Such bonds were acquired about September 24, 1934, at a cost of $30,600, $27,170, and $4,845, respectively. Adjustments will be made under Rule 50 in accordance therewith. Issue C. - Salary, $1,500 Findings of Fact 119. In 1935 petitioner received salary of $2,000 from Gradwik, Inc. of Delaware for his services as secretary and treasurer of *129 the corporation. In his determination of the deficiency the respondent held that $500 of the amount constituted salary and that the remainder of $1,500 was taxable to petitioner as a dividend. Opinion We have held that the entire amount of $2,000 was deductible by Gradwik, Inc. of Delaware in 1935, as reasonable compensation for personal services actually rendered. The conclusion requires us to hold here that the amount in question constituted salary as an officer of the corporation, and not a dividend from the corporation. On this issue we hold for the petitioner. Issue D. - Dividend of $18,684.29 Findings of Fact 120. On October 9, 1935, Gradwik, Inc. of Delaware, issued a check to Robert Goodman in the amount of $3,000 for salary. The check was signed by petitioner as president-treasurer and was endorsed by petitioner for deposit in the payee's account in the Public National Bank & Trust Co.
121. On October 8, 1935, Robert Goodman issued a check to petitioner for $3,100, who deposited the check in his account with the Chase National Bank. The credit balance in the bank account of Robert Goodman was $2,018.36 at the time he issued the check. The amount of the check *130 was not included in petitioner's income tax return for 1935. 122. The petitioner reported no amount in his 1935 income tax return as income from dividends. In his determination of the deficiency the respondent included in petitioner's gross income the amount of $18,684.29 as dividends received from Gradwik, Inc. of Delaware. Opinion In determining the deficiency herein the respondent explained his inclusion of this amount in petitioner's income by stating that: Examination of the records of Gradwick, Incorporated, for the year 1935 discloses that you understated the dividends which you received from that corporation by $18,684.29. The petitioner alleged in his petition that he had "no knowledge of how the amount was computed by respondent nor where it comes from." In his answer to the petition, the respondent admitted a determination by him that petitioner received dividends in the amount of $18,684.29 from Gradwik, Inc. in 1935, and affirmatively alleged that petitioner knowingly, with intent to evade tax, "failed to report the receipt of any taxable dividends during said year." There also was a charge of fraud with respect to understatements by petitioner of interest income *131 and capital gains and the amount in each instance was specifically alleged. At the hearing petitioner testified that he received no dividends from Gradwik, Inc. of Delaware in 1935 and had no information on how the amount of $18,648.29 was computed except that he had a notion that some part of it might consist of disallowed salaries. Upon brief the respondent asks us to sustain his determination upon the ground that the petitioner has failed to overcome the prima facie correctness of his finding. He contends that a dividend of $3,000, being, he says, part of the $18,648.29, was paid to petitioner under the guise of a salary to Robert Goodman, and argues that petitioner's failure to report the amount was fraudulent with intent to evade tax. No charge of fraud is made upon brief, with respect to the amount of dividends in excess of $3,000. An examination of books of Gradwik, Inc. of Delaware which were submitted in evidence by respondent fails to disclose the payment of any dividends, as such, to petitioner and our attention has not been called to any other entries that could be construed as payments of dividends. The respondent did not disclose the basis of his determination, except *132 as to the $3,000 salary to Robert. Under the circumstances, we accept the testimony of petitioner that he received no dividends in 1935 from Gradwik, Inc. of Delaware, excepting, however, the payment of $3,000 as salary to Robert Goodman, which we conclude and hold represents a taxable dividend to petitioner. Issue E. - Interest deduction of $14.68 Issue F. - Contribution of $606 to Walden School Opinion The petitioner abandoned the issue raised on the disallowance by respondent of a deduction of $14.68 for interest, and respondent now concedes that petitioner is entitled to a deduction of $606 for a contribution made to the Walden School. Issue G. - Fraud Opinion The respondent alleged that the petitioner filed a false and fraudulent return for 1935 with intent to evade tax because of an understatement of interest income in the amount of $9,452.81; an understatement of capital gains, amounting to $59,475.71, and failure to report the receipt of any taxable dividends; and that petitioner is subject to the 50 per cent penalty under section 293 (b) of the Revenue Act of 1934. The burden is upon the respondent to show such fraud. Upon brief the respondent confines his *133 discussion of the question of fraud to affirmative proof of the receipt by petitioner of $5,112.50 [1] of interest income, all of which we have found was collected by the Chase National Bank and credited to petitioner's individual checking account. Of this amount $425 was received on bonds of the General Water Works and Electric Corporation and Ohio Water Service Co., which bonds the petitioner contended, supra, were the subject of gifts made by him or Rose Goodman to their four children, one-fourth to each, in 1934. The remaining $4,687.50 of the interest of $5,112.50, except $135 on bonds of New York City, was collected on bonds which petitioner contended, supra, belonged to the family account. Petitioner admits the receipt of all of the interest. The contentions of respondent with respect to failure of petitioner to report capital gains, relate to sales of some of the securities, which petitioner contended, supra, were owned by his children and the family account. *134 We will first consider the interest derived from bonds of the Community Power & Light Co. which petitioner contends were owned by his children. The facts and testimony on the question were discussed by us at considerable length in reaching a conclusion that no completed gifts were made and that the interest income and capital gains were taxable to petitioner. No effort appears to have been made to deliver the bonds to the alleged donees by any form of transfer and as to these particular securities, no contention is being made that they were held by petitioner as a trustee for the children. As the record owner of the bonds, petitioner received the interest paid on them and the proceeds of sale, without, so far as the evidence discloses, making any accounting therefor to his children. If the petitioner ever made an accounting to his children by segregating the income in separate bank accounts, or otherwise, the evidence to prove it would be in his possession, and he must bear the burden of his failure to produce it after the respondent had made out at least a clear prima facie case of fraud. He caused the children to report the interest, but the record does not disclose whether he *135 included in their returns, the gains realized from the sales. Fraud may be present even though the income is reported by fictitious owners and the tax thereon paid by the owner of the securities from which the income was derived. Harry F. Canelo, supro. The petitioner here had had numerous dealings in securities and had knowledge of means to employ to transfer title. The fact that he did nothing to make delivery and continued to hold the bonds as his own, while pretending to the Commissioner that they belonged in equal shares to his children, evidences, under the circumstances present here, a fraudulent purpose, with intent to evade tax. Proof by respondent that part of the deficiency was due to fraud, with intent to evade tax, is sufficient to sustain the imposition of a fraud penalty on the entire amount of the deficiency. Because of the importance of the question on like issues in subsequent taxable years involving petitioner, the contentions with respect to fraud in connection with the family account will be here considered and decided. The effect of the respondent's argument on the question is that the writings of November 22, 1934, and November 23, 1935, are mere self-serving *136 declarations of petitioner, which were used to form the basis for a tax evasion plan. The facts surrounding the creation and operation of the family account were considered at length in disposing of the issue concerning the taxation of the income of the account to petitioner, and it would serve no useful purpose to repeat them here. We concluded that there was no gift of the securities and that no trust was created. The petitioner argues that even if no trust existed, there is conclusive evidence contrary to fraud, and points to the income tax returns each filed for one-sixth of the income; that petitioner's returns for 1936 to 1941, inclusive, informed respondent of the existence of the "trust" and that upon the termination of the "trust" in 1941, the corpus thereof, consisting of securities, was distributed equally among the six beneficiaries. These points were considered to the extent necessary in passing upon the issue of whether the income of the account was taxable to petitioner. We have held that filing fiduciary returns for a trust created for a fraudulent purpose, and paying the tax shown to be on returns the trustor caused the alleged beneficiaries to file, may not *137 be enough to overcome fraud. Harry F. Canelo, supra. Here no claim is made by petitioner that he filed fiduciary returns as trustee, and there was no disclosure of the family account by petitioner to put the respondent on notice until his 1936 return was filed. Thus, the notice by petitioner was not as prompt or as complete when first made, as the notice given in the Canelo case, supra. Notwithstanding proof that petitioner prepared returns for his wife and minor children, and made no distributions of cash to the alleged beneficiaries of the family account, petitioner made no effort to prove the source of the money used to pay the taxes shown to be due on the returns. Such evidence as was offered on the matter of delivery of corpus of the family account is limited to a tabulation of securities on hand on November 13, 1941, in which an equal distribution among the four children and petitioner and his wife is shown and testimony of petitioner that distributions were made in accordance with the statement prepared by him. For reasons already given, we should not accept the evidence offered as sufficient proof of delivery among the alleged beneficiaries. Proof of delivery *138 of some of the securities out of the account of petitioner with the stock brokerage firm of Boody, McLellan & Co. on November 15, and 26, 1941, does not establish delivery of the securities to the alleged beneficiaries. No purchases were made in 1941 for the account of the family account but proceeds of sales and loans and interest and dividend payments received, amounted to about $29,000, of which $4,409.67 was loaned to Airhill Corporation. There is no evidence in the record as to the disposition of the balance of about $25,000 received into the account in 1941. We find nothing in the evidence relied upon by petitioner to overcome the showing of fraud which in our opinion respondent made. The evidence, in our opinion, establishes that the family account was a fraudulent device of petitioner to divide income among members of the family unit for income tax purposes, while retaining all the resulting benefits for himself; and we so hold. The failure of petitioner to report the interest and income in question from securities in the family account was fraudulent, with intent to evade tax, and a part of the deficiency for 1935 was due to fraud, with intent to evade tax and it was *139 not error for respondent to impose the fraud penalty. Docket No. 104870 - Builo Corporation - Year 1936 Issue A. - Reducing deduction for salaries from $6,000 to $500 Findings of Fact 123. The petitioner is a New York corporation organized November 27, 1935. Its income tax return for 1936 was filed on March 13, 1937, with the collector for the third district of New York. In March 1937 it filed a return as a personal holding company with the same collector. 124. The return of petitioner for 1936 reported interest income of $1,526.98 on bonds of five corporations; a fee of $2,900 received on a building loan mortgage, and interest of $1,105.11 received on mortgages executed by the Winhill Corporation, a corporation, one-half of whose stock was owned by Charles Goodman and members of his family, in the amount of $58,950 and deductions of $6,124, consisting of $25 for state tax; $99 for capital stock tax, and $6,000 for salaries to Robert Goodman and Charles Goodman, one-half to each. 125. In 1936 Charles Goodman managed the affairs of petitioner, made the loan to the Winhill Corporation for construction of small buildings, and saw to it that the loan was properly expended. *140 When Robert Goodman was home from school in 1936, he received training from his father in the construction of small buildings. Robert Goodman performed no services for petitioner in 1936. 126. All of the outstanding stock of petitioner, consisting of 100 shares of common was owned in 1936 by Charles Goodman and his wife and four children. Charles Goodman owned 16 2/3 shares of the stock. 127. The return of petitioner for 1936 lists Charles Goodman and Robert Goodman as president and vice president, respectively, and each owning 16 2/3 shares of its stock. 128. In his determination of the deficiencies the respondent disallowed the deduction of $3,000 for salary to Robert Goodman upon the ground that no services were performed by him; reduced the deduction of $3,000 for salary to Charles Goodman to $500 upon the ground that the difference of $2,500 represented excessive compensation, and held that the amount of $5,500 disallowed as salary represented a dividend to Charles Goodman. In determining a deficiency in income tax against Charles Goodman for 1936, the amount of $5,500, plus $1,250 of the interest involved in issue B, infra, was included in his taxable income by respondent *141 as dividend payments. Opinion The argument of petitioner on this issue is only that the aggregate salaries constitute reasonable compensation for services actually rendered by both of the officers and that the deductibility of the total amount should be tested upon that basis. Such a method is not sanctioned by the statute. L. Schepp Co., supra. No services were performed by Robert Goodman and no evidence was offered to establish the reasonableness of $3,000 as salary paid to Charles Goodman for the services he performed. The petitioner was a family corporation and its business activities in 1936 were not extensive, being limited to receiving interest on bonds and making a loan to a corporation, one-half of whose stock was owned by petitioner's stockholders. The meager evidence on the issue is insufficient to overcome the prima facie presumption of correctness of the respondent's action, and we will not disturb his adjustments of the salary deductions. Issue B. - Interest $1,750 Opinion The petitioner concedes upon brief that it received interest aggregating $1,750 on two classes of bonds of the New England Gas & Electric Co. and bonds of the American Utilities Service, *142 and that the respondent properly included the amount in its income. Issue C. - Negligence Penalty Opinion The respondent asserted a penalty of 5 per cent under the provisions of section 293(a) of the Revenue Act of 1934 because of petitioner's negligence in failing to include the interest of $1,750 in its return. The only explanation in the record for the omission of the amount in the return is testimony of Charles Goodman that it was overlooked and that he did not know why it was overlooked. Such testimony is not enough to prove lack of negligence in reporting the income. R. V. Board, 14 B.T.A. 374; affd., 51 Fed. (2d) 73; Oscar G. Joseph, 32 B.T.A. 1192. The penalty is therefore sustained. Docket No. 104869 - Charles Goodman - Year 1936 Issue A. - Statute of Limitations Issue B. - Interest Income, $1,549.17 Findings of Fact 129. During 1936 the petitioner received $1,842.50 interest on $67,000 face amount of bonds of the American States Public Service Co. 5-1/2/48, of which $3,000 were held by him for his sister, Rose Shupan, to whom in 1936 petitioner paid $165 of the interest received. Petitioner purchased the $3,000 of *143 bonds with money supplied him for that purpose by a sister of Rose Shupan. 130. In his income tax return for 1936, filed on March 13, 1937, petitioner reported as interest received on the bonds, $293.33, the amount being one-sixth of the interest of $1,760 received on $64,000 of the bonds. In his determination of the deficiency the respondent taxed petitioner on the entire amount of interest of $1,842.50 received on the bonds, without disclosing his reasons for including the amount paid to Rose Shupan. Opinion The petitioner upon brief concedes that assessment of the deficiency is not barred by the statute of limitations and admits the receipt of the interest payments of $1,842.50. The parties differ on whether the interest of $165 paid to Rose Shupan is taxable to petitioner and whether all, or only one-sixth of the remainder of the interest of $1,842.50 is taxable to petitioner. The testimony of petitioner concerning the purchase of the bonds for and the payment of interest, as received by him, to Rose Shupan is supported by two of his personal checks payable to the order of Rose Shupan for the semi-annual interest payments received by him in 1936. Other testimony by him *144 is that the bonds were exchanged in 1937 for preferred and common stock of the American States Utility Corporation and cash in a reorganization; that he purchased 84 additional shares of preferred with part of the cash, paying the remainder to Rose Shupan, and that in 1940 and 1941 he transferred the preferred and common stock, respectively, to her. We conclude that the $165 interest is not taxable to the petitioner As pointed out in our discussion of the income tax liability of this petitioner for 1935, supra, the family account was maintained until November 1941, when it was terminated. Each year the petitioner reported one-sixth of the income of the account as taxable to him and the respondent determined that all of the income was taxable to petitioner, and not one-sixth to petitioner, and a like share to his wife and each of the four children. Upon brief he concedes that our decision on the interest of petitioner in the account in 1935 will control the taxability of the income of the account in 1936 and subsequent years. It is also conceded that these bonds were a part of the account. Accordingly, we hold that, except for the interest of $165 on bonds held for the account of *145 Rose Shupan, all of the interest in question is taxable to petitioner. Issue C. - Dividends of $187.50 from Public National Bank Opinion Upon brief the petitioner concedes that he is taxable on $187.50 as dividends received on 500 shares of stock of the Public National Bank. Issue D. - 1. Dividends of $1,224 on 1,045 Shares of Stock of the United Public Utilities Corp. 2. Dividends of $357 on 1,190 Shares of Stock of the Penn Western Gas & Electric Co.
3. Liquidating Dividend of $10,000 on 500 Shares of Stock of Goldberger-Raabin Co. 4. Capital Gain of $83 on Bonds of Inland Gas Company Findings of Fact 131. In 1936 the petitioner purchased with funds in the family account 330 and 860 shares of stock of the Penn Western Gas & Electric Co. at a cost of $7,806 and $20,712.50 respectively. The certificate for the block of 330 was issued in the name of Robert Goodman and for the 860 shares, in the name of petitioner. Dividends aggregating $357 were paid on the stock by checks issued on December 23, 1936, payable to the order of the respective stockholders. The checks were deposited to the order of the respective payees, the one in favor of Robert having been endorsed *146 by petitioner. 132. The petitioner also received ordinary dividends of $1,224 on shares of stock of the United Public Utilities Corp., a liquidating dividend of $10,000 on 500 shares of stock of the Goldberger-Raabin Co., and derived capital gain of $83 on the sale of 18 bonds of Inland Gas Company. In his return for 1936 the petitioner reported $1,596.83 of the dividends, and $14 of the gain, as taxable to him. In his determination of the deficiency the respondent included all of the dividends and gain of $83 in the income of the petitioner. Opinion These securities were in the family account and the only question still at issue is whether petitioner's interest in the income thereof was 16 2/3 per cent, or 100 per cent. Having concluded that all of the income of the account is taxable to petitioner, we sustain the respondent on this issue. Issue E. - Dividends of $6,750 from the Builo Corporation Opinion The facts with respect to this issue are set forth in the case of the Builo Corporation for 1936, supra. At the hearing petitioner testified that no dividends were declared by, and that he received no dividends from, the Builo Corporation in 1936. Upon brief he asserts *147 that he is unaware of the basis of the respondent's determination of the receipt by him in 1936 of dividends totaling $6,750 from the corporation. The statements attached to the deficiency notices mailed to petitioner and the Builo Corporation show that the amount consists of the following items: Salary to Robert Goodman
$3,000
Disallowed portion of salary paid to
Charles Goodman by Builo Corporation
2,500
Portion of interest not reported by Builo
Corporation
1,250
Petitioner argues that after "showing" all of the income he received from the Builo Corporation, the burden shifted to respondent to prove that other income constituted the dividends in question, there being no burden upon petitioner to proceed further and prove a negative. The petitioner was on notice of the manner in which the respondent made his determination and can not escape his burden by a mere categorical denial of the receipt of any dividends. His testimony is nothing more than an unsupported negative answer to the question presented to us for decision. In Old Mission Portland Cement Co. v. Helvering, 293 U.S. 289, the Court said that a ruling of the Commissioner on whether *148 a certain donation was made for a prescribed purpose was presumed to rest upon a correct determination of the facts. The effect of the testimony of petitioner here is a conclusion, given without any circumstances to gauge its accuracy, that he did not receive the dividends in question. Such unsupported testimony is not enough to sustain his burden of proof. Birnbaum v. Commissioner, 117 Fed. (2d) 395; Hoefle v. Commissioner, 114 Fed. (2d) 713; National Weeklies v. Commissioner, 137 Fed. (2d) 39; Pennant Cafeteria Co., 5 B.T.A. 293. See also the authorities collated by us on pages 91 and 92 [CCH page 1158], supra, on a related question, in connection with petitioner's income for 1935, and as to distribution of securities in 1941. Considering the few duties required of petitioner as an officer of the Builo Corporation, the ownership by the Goodman family of all of the stock of the Builo Corporation and one-half of the stock of the Winhill Corporation, the only corporation to which the Builo Corporation made a loan, and other facts, there is support for the determination of the respondent that $2,500 of the $3,000 paid to petitioner *149 constituted a dividend paid in the guise of salary. Nothing in the evidence points otherwise and we will not disturb the respondent's determination. A similar situation exists with respect to the remaining amounts. The petitioner was in a position to offer some evidence on payment of salary to Robert Goodman, with no subsequent delivery or benefit to petitioner, and other circumstances surrounding the salary and interest to enable us to test the action of respondent. None having been offered, there is no alternative other than to sustain the respondent for lack of proof of error. Issue F. - Liquidating Dividend of $2,886.90 from Hart & Early Co. Findings of Fact 133. The income tax return of petitioner for 1936 did not report a liquidating dividend paid on stock of Hart & Early Co. In his determination of the deficiency the respondent included in petitioner's income a liquidating dividend of $2,886.90 paid on the stock in 1936 to the Estate of Rose Goodman upon the ground that "the stockholdings of the Estate of Rose Goodman represents your property." Opinion The petitioner alleged in his petition that the stock was owned by him and his wife and four children in equal *150 shares. Upon brief his argument is to the effect that the stock was owned by the Estate of Rose Goodman and as a distributee thereof under the laws of New York, he received only one-third of the amount. The amount was taxed to petitioner upon the ground that he owned the stock on which the liquidating dividend was paid. No evidence was offered by petitioner to establish that the stock was not owned by him in 1936. Accordingly, the respondent is sustained in this issue. Issue G. - Contribution of $500 to the Walden School Opinion The respondent concedes that the petitioner is entitled to a deduction of $500 for a contribution to the Walden School. Issue H. - 1. Capital Gain of $150 on $1,000 Bonds of Hamilton Gas Corporation 2. Capital Gain of $21.72 on $4,000 Bonds of New York City, 4-1/4/60 3. Capital Gain of $97.50 on $5,000 Bonds of New York City, 4-1/2/65 Findings of Fact 134. During April 1936 the petitioner purchased and sold bonds as follows: Bonds
Cost
Sales Price
Gain
$4,000 New York City
4-1/4/60
$4,601.60
$4,601.72
$ .12
$5,000 New York City
4-1/2/65
5,960.74
5,972.50
11.76 The gain realized on the sale of the bonds, and *151 gain of $150 on the sale of $1,000 of bonds of Hamilton Gas Corporation, were not reported in petitioner's return for 1936. The respondent determined that the petitioner realized a gain of $21.72 on the 4 1/4 bonds of New York City and gain of $97.50 on the other New York City bonds. Opinion The petitioner admits gain of $150 on the bonds of Hamilton Gas Corp. The petitioner's gain on the bonds of New York City was as shown in our findings of fact, the respondent having erroneously computed the cost of the securities. Issue I. - Earnings of $3,035.63 From Joint Ventures Findings of Fact 135. On October 14, 1935, December 23, 1935, and at some undisclosed time, the petitioner made the following respective loans or advances to, or investments in, the enterprises shown, which are classified by the parties hereto as joint ventures: $7,500
Rome Products
3,000
Murray Rubber Co.
2,500
Dulin and Martin All of them were liquidation ventures. 136. On December 23, 1935, the petitioner addressed a communication to the manager of the enterprises reading as follows: On October 14, 1935 I sent $7500.00 loan to Sherwin Trading Corporation. in connection with the *152 Rome Co. purchase. On December 16, 1935 I sent $3,000.00 loan to Sam Strassler, in connection with the Murray Rubber Co. purchase. By arrangement with Dr. Emanuel Klosk, of New Queens Hospital, 164th Street, Jamaica, he is to take over these loans and arrange with you to pay me back $10,500; thereafter he is to take over any profits out of the above ventures. Dr. Klosk, as Trustee, will distribute profits, if any, in small amounts as the occasion requires, so that at least one-third of the total will go to his mother and another one-third to Herbert Klosk. It was suggested that if his one-third permits, Herbert Klosk may be able to devote all his time in college to his studies and possibly consider finishing his law course at Harvard, or some other Eastern college. You are to make accounting reports to me. I hope you will arrange to have the above carried out. Some instructions were also given the manager for payments from the Dulin and Martin venture. Thereafter, petitioner received from the manager amounts out of return of principal and earnings of the enterprises equal to his capital outlay. The amount of $7,500 invested in the Rome products venture was repaid to petitioner *153 in that manner by February 1936. None of the profits of the ventures in 1936 annd 1937 was paid to petitioner. Such profits were paid to Emanuel Klosk and other participants in the ventures. The enterprises were not under any obligation to repay petitioner the amount of his capital outlay. 137. Emanuel Klosk was a brother-in-law of petitioner and was an interne in 1935. Herbert Klosk is a brother of Emanuel and was attending law school in 1935. 138. In the determination of deficiencies against petitioner for 1936 annd 1937 the respondent included the following amounts in income as petitioner's share of the earnings of the ventures. 1936
1937
Rome Products
$1,743.00
$330.51
Murray Rubber Co.
1,153.90
97.29
Dulin and Martin
138.73
30.00
Total
$3,035.63
$457.80
Opinion The effect of the argument of petitioner upon brief is that he derived nothing more from the ventures than a return of his loans, and consequently received nothing, directly or constructively, subject to tax. The respondent contends that there was an assignment of future income and that Helvering v. Horst, 311 U.S. 112, supports his action in taxing petitioner on the *154 earnings paid to Emanuel Klosk. The manager of the ventures testified with reference to the third venture, that: "There was some evidence for the third one also. It did not amount to very much." We construe this broadly to mean that he received directions concerning the Dulin and Martin venture, though the terms thereof are not in the record. The contentions of the respondent are based upon the theory that the letter of December 23, 1935, applied to the three enterprises, therefore, our discussion of the issue will assume that in general the same directions were given by petitioner for the Dulin and Martin matter. The plan put into effect provided for payments to petitioner until he had recovered his capital outlays. The enterprises were under no obligation to repay him the amount of his investments, and if returns on principal, and earnings had been less than such amounts, petitioner, not Klosk, would have sustained a loss. The petitioner received the amount of his investment in each venture by returns of capital and earnings, the proportions not being shown, and thereafter the earnings, the amounts in controversy here, were paid directly to Klosk. While the letter of December 23, 1935, provides *155 that Klosk "is to take over those loans" the record does not show all of the arrangements made in carrying out the plan, and we can not hold that petitioner would not have been entitled to recoveries of principal from the respective ventures themselves; therefore, can not hold that he had assigned his investments. We can not say that petitioner did not retain some interest in the corpus from which the earnings in question were derived. Thus some indeterminable part of the earnings paid to Klosk were, so far as this record shows, realized from the property interest retained by Goodman. No sufficient showing is made that petitioner assigned to Klosk that which produced the income paid to Klosk. Aside from the interest petitioner retained in the investments, he kept control over the disposition by Klosk of realizations from the principal by requiring the recipient of the earnings to pay over at least two-thirds thereof to the latter's mother and brother. To insure performance of the obligation petitioner designated Klosk a trustee. "The power to dispose of income is the equivalent of ownership." Helvering v. Horst, supra.Furthermore, petitioner directed the manager of *156 the ventures to make accounting reports to him, which is a request consistent with the retention of an economic interest in the enterprises. In our opinion the record before us fails to show that the action of the respondent is not supported by the Horst case. Accordingly, in this issue, we find for the respondent. Issue J. - Recognized Capital Gain of $68,901.50 on Liquidation of Gradwik, Inc. of Delaware Findings of Fact 139. Gradwik, Inc. of Delaware was liquidated on December 16, 1936. At that time its books were not complete. 140. Gradwik, Inc. of New York held title to a tract of about 600 acres on Tupper Lake, New York, improved by a nine room house and boat-house, which were occupied by petitioner and his family as a summer home. The land and improvements had a fair market value in November 1936 of $20,000. The capital stock of Gradwik, Inc. of New York was among the assets of the family account on September 30, 1939, when the corporation was dissolved. 141. Gradwik, Inc. of New York did not maintain a complete set of books. Among its books was a form of ledger running from 1933 to about 1935. The parties stipulated that, based upon cash receipts and disbursements, *157 Gradwik, Inc. of New York had assets and liabilities as follows on December 31, 1936: Assets (Cost)
Cash
$ 475.45
Tupper Lake property: Land
6,228.05
Building
50,309.81
Furniture & fixtures
3,125.39
Boats
1,715.81
Automobiles
4,754.88
Liabilities
Gradwik, Inc. of Del.
70,803.32
Charles Goodman
10,448.29
Charles Goodman, trustee
20,455.40 There was no account in the books of Gradwik, Inc. of New York entitled "Charles Goodman, trustee". 142. The final income tax return of Gradwik, Inc., of Delaware reported as an asset on December 16, 1936, stocks of a cost of $63,215.45, and a liability of $161,480.06 to petitioner for loans. In his income tax return for 1936 the petitioner reported taxable gain of $5,080.33 on the liquidation of Gradwik, Inc. of Delaware, this amount being one-sixth of 60 per centum of total gain of $50,803.32. 143. In his determination of the deficiency the respondent determined that the petitioner realized capital gain as follows, of which 60 per cent, or $68,901.50 was recognizable: Fair market value of assets received,
less liabilities assumed
$116,036.25
Cost of stock acquired June 22, 1933
1,200.00
Gain
$114,836.25
*158 144. At the time of liquidation of the Gradwik, Inc. of Delaware, petitioner owned five of the corporation's six shares of outstanding stock. Opinion The petitioner endeavored to overcome the determination of the respondent on the fair market value of the assets of Gradwik, Inc. of Delaware at the time of its liquidation by "balance sheets" of the corporation and Gradwik, Inc. of New York, the latter allegedly being indebted to the former, showing the cost and fair market value of assets and liabilities of the corporations, supplemented by testimony on the value of the real property of Gradwik, Inc. of New York at Tupper Lake, which we have accepted, and the value of an equity in real property located at 1860 Broadway. The amounts shown in the statements for the fair market value of the assets were eliminated by petitioner at the hearing and are not part of the record. Questioning upon cross-examination developed that the statements were prepared from checks, check book stubs, bills and such books of the corporations as were available; whereupon the exhibits were stricken from the record until the production of the supporting papers in court for examination by opposing counsel. *159 A conference led to a stipulation on the cost of assets and liabilities of Gradwik, Inc. of New York, nothing more. Subsequently the exhibits were stricken from the record, the one relating to Gradwik, Inc. of Delaware on motion of counsel for petitioner, and the other by the court. The basis for the motion and ruling was failure to produce papers to support the figures in the statements. Thus, aside from the stipulation and proof of value of the Tupper Lake real property, both of which relate to Gradwik, Inc. of New York, an alleged debtor of the Delaware corporation, the record lacks evidence to overcome the respondent's determination. Upon brief, petitioner asks us to find a fair market value of $57,385.06 for the net assets of Gradwik, Inc. of Delaware at the time of its liquidation. The basis for his request need not be discussed in detail. It is sufficient to say that he uses figures contained in the balance sheets, (which, as pointed out, were stricken from the record) under the belief apparently that such figures, representing alleged cost, are in the testimony of the witness who prepared the statements. The witness referred only to several of the figures. In any event, there *160 is no proof that the stricken statements contained all of the assets and liabilities of the corporations. For instance, the balance sheet of Gradwik, Inc. of Delaware contained only two assets, one being an account receivable against Gradwik, Inc. of New York in the amount of $70,803.32, and the other a like account against Charles Goodman, trustee, in the amount of $32,466.76. It also showed a liability of $5,771.91 to Charles Goodman. The income tax return of petitioner for 1937 contains a statement that for a debt of $170,041.75 to him at the time of its dissolution, Gradwik, Inc. of Delaware delivered to him certain securities of a value less than the debt. This indicates that the liability to petitioner was discharged by the delivery of assets in full settlement of his claim. The petitioner failed to overcome the determination of respondent that fair market value of the net assets of Gradwik, Inc. of Delaware at the time of its liquidation was less than $116,036.25. There is no disagreement on the cost of the stock of the dissolved corporation or the percentage of recognizable gain. The respondent determined that petitioner owned all of the stock of the corporation and petitioner *161 contended that he held only one of the six shares of outstanding stock. The proof here is that petitioner held five-sixths of the outstanding stock of the corporation. Accordingly, five-sixths of the recognizable gain as determined by respondent will be included in petitioner's income. Issue K. - Fraud Findings of Fact 145. A part of the deficiency was due to fraud with intent to evade tax. Opinion The respondent in his answer alleged fraud because of understatements by petitioner in his return of capital gains and income from interest and dividends, and failure to report gain of $3,035.63 from joint ventures. Upon brief he relies upon petitioner's failure to report all of the income of the family account and the liquidating dividends of Gradwik, Inc. of Delaware and omission of dividends of $1,500 received on stock of the Bankers Securities Corporation. Some of the income on which respondent alleged understatements was derived from securities in the family account, which was in existence until terminated in 1941. ( Issues B and C, supra.) Respondent's charge of fraud in 1935, in connection with the creation and operation of the account was discussed at length *162 by petitioner's counsel upon brief, in the course of which he remarked that "if the creating of this trust account constituted deliberate fraud and was without any justification whatever, then all of his returns for a period of seven years would have to be held for that reason alone a fraudulent act." Petitioner's counsel did not consider it necessary to argue the point in the issue in 1936 because of his discussion of the question in the taxable year 1935. Extended discussion of the question is unnecessary. The fraudulent purpose of the family account continued without any material change throughout the year 1936, as clearly appears from the findings of fact. The petitioner's utter disregard of the formalities ordinarily observed by individuals when creating legal interests in property owned by them, and his real purpose in establishing the family account for fraududent income tax purposes, is shown by his treatment of the liquidating dividend of Gradwik, Inc. of Delaware in his return. Petitioner owned five shares of the corporation's stock, one as record owner and the other four as an assignee of Rose Goodman, and Sylvia Goodman, his second wife, was the record owner of the *163 remaining share. (Findings 63). He executed an instrument on May 1, 1934, to create a trust for four of the shares he held as assignee but never caused the corporation to reissue and deliver the shares to himself as trustee for his four children. No contention is made here by petitioner that the instrument created a trust, or that the trust owned four shares of the corporation's stock. That petitioner did not consider that there was a trust, or consider that he, as trustee for his four children, owned the shares, is shown by the corporation's return for 1934, which was signed by petitioner, and contains an assertion that petitioner owned five shares of the corporation's stock. The evidence on the ownership of the stock discloses a purpose to establish a basis for reporting income on the stock equally among the Goodman family. By the close of 1936, petitioner seems to have been confused, for in his income tax return for that year he included the liquidating dividend in income of the family account, along with gain on the sale of bonds of the Inland Gas Co. and the liquidating dividend on stock of Goldberger-Raabin Co. The position taken at that time has been abandoned in favor of *164 the stock book of Gradwik, Inc. of Delaware as proof of ownership of only one of the six shares of outstanding stock of the corporation. He makes no contention as to the ownership of the remaining five shares in connection with such a view. The facts on the point are additional evidence that the family account was never intended by petitioner to create legal interests in property among himself and members of his family, as donees or beneficiaries of a trust; rather was a fraudulent plan for tax evasion purposes. Another example was the use by petitioner of money in the family account to purchase 330 shares of common stock of the Penn Western Gas & Electric Co. in the name of his son Robert. The dividend check for $99 was deposited by petitioner in a checking account of Robert, but for tax purposes the income was divided equally among the six members of the family. The respondent contends that the failure of petitioner to report as taxable income to him the dividends of $1,500 on stock of Bankers Securities Corporation should be construed as a fraudulent omission of income with intent to evade tax. The testimony is that the omission of the income was due to an oversight. We regard *165 the testimony as showing lack of a fraudulent purpose in failing to report the income for taxation, and, we find as a fact that the omission was due to an oversight. A part of the deficiency for 1936 was due to fraud with intent to evade tax. In view of this conclusion, it is unnecessary for us to consider other contentions of the respondent under his allegation of fraud. Docket No. 104871 - Winhill Corporation - Year 1937 Issue - Deduction of salaries in the amount of $18,000 Findings of Fact 146. The Winhill Corporation, the petitioner in Docket No. 104871, was organized under the laws of New York on April 30, 1936. Its return for 1937 was made on the cash basis and was filed with the collector for the third district of New York. It was engaged in the construction of small homes. 147. One-half of the stock of the corporation was owned by Charles Goodman, one of the petitioners in these proceedings, and members of his family, including his son, Robert Goodman. 148. The return filed by the Winhill Corporation for 1937 lists the following individuals as officers of the corporation, together with the amount of their compensation and percentage of common stock owned by *166 them: Stock
Officer
Title
Owned
Compensation
Mitchell G. Ittelson
President
10
$14,000
Charles Goodman
Vice President
5
6,000
Robert W. Goodman
Vice President
5
3,000
149. During 1937 the corporation charged to salaries the sum of $23,000, of which $5,000 was paid in cash to Mitchell G. Ittelson and the remainder, $18,000, was credited on December 31, 1937, as a contribution to paid-in or capital surplus because of a need of the money in its business. The balance sheet attached to Winhill's income tax return for 1937 shows cash in bank at the end of the year as $3,670.61 and $174.20 cash on hand, and the cash journal also shows the $3,670.61 as balance on hand at the end of the year. The $18,000 charged to salaries bears date of December 31, 1937. The balance sheet at the close of the year showed total assets of $84,152.58 and liabilities of $66,092.58 (aside from $60 capital stock and the $18,000 item labeled "paid-in or capital surplus.") 150. In his determination of the deficiency against the Winhill Corporation the respondent allowed $5,000 of the salaries as a deduction and disallowed the remainder upon the ground that it "represents *167 compensation which was not actually paid during the year 1937. 151. In his return for 1937 Charles Goodman reported the amount of $6,000 as salary received from the corporation. In his determination of a deficiency against him for 1937, the respondent reduced the amount by $1,000 upon the ground that he received as compensation from the corporation property valued at only $5,000. Charles Goodman received no property from the corporation in payment of the salary. Opinion Respondent in contending that the corporation is entitled to no allowance for salaries greater than the $5,000 allowed by him, points to the absence of proof by petitioner that Charles Goodman was entitled to any sum as compensation for services rendered, or that Robert Goodman performed any services for the corporation, and argues that only $5,000 was actually paid, the corporation being on the cash basis. The disallowance of $18,000 was made by the respondent upon the sole ground that it was not paid in cash. The issue was tried upon the theory that the only difference between the parties was whether the amount was actually paid in 1937. We therefore consider as waived any question of reasonableness of salaries. *168 No part of the $18,000 was paid in cash directly to the officers but a showing was made that the amount was credited to "paid-in or capital surplus." The petitioner appears to take the view that such an entry amounts to constructive payment of the $18,000 and therefore gives the corporation a right to the deduction thereof. Charles Goodman recognized the receipt of his salary by reporting $6,000 for taxation in 1937. No proof was made that the other two officers followed the same procedure. The adjustment of the return of Charles Goodman for 1937 was upon the ground that property of a value of only $5,000 was received. In our opinion, the petitioner has not sustained its burden of proof, except as to the $5,000 paid to Mitchell G. Ittelson. Its return was made upon the cash basis of accounting. There was not the equivalent of actual payment, so far as this record shows. If checks had been given on December 31, the date of the transaction, and then contributed back to the corporation for "paid-in or capital surplus," the record indicates that there would not have been cash enough on hand to meet them. At least petitioner has not shown that the checks would have been good. Under such *169 circumstances we may not allow the deduction, for logically the equivalent of a cash payment appears lacking, the money not being shown available to the officers. Mark D. Eagleton, 35 B.T.A. 551 (559); affd., Eagleton v. Commissioner, 97 Fed. (2d) 62; Martinus & Sons v. Commissioner, 116 Fed. (2d) 732; C. E. Gullett, 31 B.T.A. 1067; R. V. Board, 18 B.T.A. 650. We hold, therefore, that the petitioner is not entitled to the deduction of $18,000 for salaries paid. The income of Charles Goodman for 1937 will be adjusted accordingly. Docket No. 104869 - Charles Goodman - Year 1937 Issue A - Dividends, $4,265 Opinion In his income tax return for 1937 the petitioner reported dividends aggregating $4,265 on shares of stock of the Continental Bank & Trust Co., Brooklyn Trust Co., Public Bank and Bankers Securities Corporation. He alleged in his petition that the shares of stock were owned by himself and his wife and four children, each having a one-sixth interest. Upon brief he concedes that all of the dividends are taxable to him. Accordingly, on this issue the respondent is sustained. Issue B. - Increasing dividends *170 to $8,609.10 on stock, interest on bonds to $503.45, and capital gain to $28,151.43, as follows: $447.00
on 745 shares of United Public Utilities Co.
165.00
on 300 shares of United Public Utilities Co.
120.00
on 120 shares of Bankers Securities Corporation
1,071.00
on 1190 shares of Penn Western Gas & Electric Co.
2,319.38
on 2474 shares of American States Utilities Corporation
310.95
on $9,000 bonds of Jacksonville Gas
192.50
on $7,000 bonds of Laclede Gas
4,486.72
liquidating dividend on stock of Mideastern Contracting Corporation
28,151.43
capital gain on exchange of bonds of American States Public Service Co.
Findings of Fact 152. Of the 2,474 shares of stock of American States Utilities Corporation, formerly American States Public Service Co., on which dividends in the amount of $2,319.38 were paid to petitioner in 1937, 150 shares were held by petitioner for the account of Rose Shupan. The check of the corporation for the payment on May 1, 1937, of a dividend of $618.50 on 2,474 shares of preferred stock, was payable to the order of petitioner and was endorsed by him and deposited in his bank account. On May 3, 1937, and October 18, 1937, petitioner *171 paid Rose Shupan $37,50 and $103.12, respectively, for dividends paid on the 150 shares held by him for her account. In his return for 1937 the petitioner did not report any of the dividends of $1,071 which were received on 1,190 shares of common stock of the Penn Western Gas & Electric Co., and reported one-sixth of the dividends and interest paid to him on, and gain realized on, the exchange of the other securities involved in this issue. 153. The dividends of $1,071 received on 1,190 shares of stock of the Penn Western Gas & Electric Co. were paid by two checks, one in the amount of $774 for the dividend on 860 shares in favor of petitioner, and the other in the amount of $297 payable to Robert Goodman for the dividend on 330 shares. The check for $774 was deposited to a checking account of Sylvia Goodman and the other check was endorsed and deposited by petitioner to a checking account of Robert Goodman. Opinion The only questions in controversy under this issue are whether petitioner is taxable on one-sixth or all of the dividends, interest and gain. on the stocks and bonds having been in the family account, and whether there should be excluded from the dividends received *172 on the stock of the American States Utilities Corporation the amount paid on the 150 shares held by petitioner for the account of Rose Shupan and the capital gain realized upon the acquisition of such stock in an exchange. The interest of Rose Shupan in $3,000 of bonds of the American States Public Service Co., held by petitioner, was discussed in Issue B of his case for 1936. In 1937 the bonds were exchanged for stock and cash in a reorganization, and petitioner received 66 shares of preferred stock and cash of $1,615.65. He used $1,354.50 of the cash to purchase 84 additional shares of the stock for her account and paid the remaining cash to her. Our conclusion on the question before us for 1936 requires a like answer here. Accordingly, the gain realized in the exchange, and dividends on the stock should be limited to $64,000 of the bonds and the amount paid on 2,324 shares, respectively. In other respects, we sustain the respondent. Issue C. - Liquidating dividends of $4,301.12 on stock of Hart & Early Co. Findings of Fact 154. In his return for 1937 the petitioner reported as a liquidating dividend on stock of Hart & Early Co. the sum of $2,448.74, the amount being one-sixth *173 of $10,391.32 paid on shares on which his unrecovered cost was $15,852.27, plus a like portion of $4,301.12 distributed to the estate of Rose Goodman. In determining the deficiency the respondent applied the dividend of $10,391.32 to petitioner's cost basis, resulting in no taxable gain, and held that all of the dividend paid to the estate of Rose Goodman was taxable to petitioner, and that there was an understatement of liquidating dividends on the stock in the amount of $1,852.38, this amount being the difference between the dividends reported and the dividends paid to the estate. Opinion A like question was involved in Issue F of the case of petitioner for 1936. The position of the petitioner in his petition and upon brief is the same as it was for 1936. The petitioner testified that he received $14,692.44 in 1937 in liquidating dividends on the stock as income on a security in the family account. This testimony is contrary to the contention being made that a portion of the stock was owned by the estate of Rose Goodman. In any event, as in 1936, proof is lacking that petitioner did not own the stock in 1937, as determined by the respondent. The petitioner having failed to prove *174 that he did not own the stock, the respondent's adjustment will not be disturbed. Issue D. - Deductibility of $559.96 paid on income taxes assessed against Gradwik, Inc. of Delaware Opinion Payment by the petitioner of the amount involved is not in controversy. The petitioner claimed the amount as a deduction for taxes paid and the respondent disallowed it upon the ground that the amount was not an allowable deduction under section 23 (c) (1) of the Revenue Act of 1936. The petitioner contends that as a former stockholder of Gradwik, Inc. of Delaware, he was liable for the payment of the taxes assessed against the corporation, and having paid all of the liability, that he should be entitled to deduct the entire amount. The petitioner cites no authority to support his contention and we are not aware of any statute entitling him to the deduction. On this issue we sustain the respondent. Issue E. - Losses of $6,747.20 and $3,105.37 on shares of the Baron Hirsch and C.B.C. Building and Loan Associations, respectively Opinion The facts respecting the shares involved in this issue are set forth in findings of fact numbered 84 to 93, inclusive, under Issue E of the case of *175 Gradwik, Inc. of Delaware for 1935. The petitioner finds himself in somewhat of a dilemma on this issue. He admits that if we follow the theory of his counsel that there was a sale of the shares by petitioner to Gradwik, Inc. of Delaware in 1935, and a sale by it at auction later in that year, and a reacquisition of the shares by petitioner in February 1936 by way of gift from William Goldsmith, the purchaser at the auction sale, that he had a zero basis in the securities for income tax purposes and consequently was not entitled to any loss in 1937 arising from worthlessness. We concluded that Gradwik, Inc. of Delaware never owned the shares and, under the circumstances, declined to make a finding that petitioner reacquired them in 1936 from the purchaser at the auction sale. Thus, based upon such contentions, the petitioner was in no position to claim his original investment as a deduction. His action is consistent with a view that the shares never left his ownership. The petitioner contends, in the alternative, that he is clearly entitled to the deduction if we held that he was at all times the owner of the shares, citing testimony that the associations were insolvent as to creditors *176 in 1937. The affairs of the Baron Hirsch Building and Loan Association were taken over by the Department of Banking of the State of Pennsylvania in January 1936 and a year later it took possession of the affairs of the other association. There is proof here that the associations were insolvent at the times the state took possession. That indicates that the loss on the shares of the Baron Hirsch share was sustained in or before 1936, prior to the taxable year, and that the loss on the shares of the C.B.C. Building & Loan Association was sustained in or before 1937. There is no evidence in the record on how long the associations had been insolvent before their affairs were taken over by the estate. Petitioner was of the opinion that they became partially worthless in 1932, for he claimed as loss deductions in his return for that year 75 per cent of his cost of the C.B.C. shares and 90 per cent of his investment in the other shares. From the evidence we may not hold that petitioner sustained losses on the shares in 1937. Accordingly, the disallowance of the deductions by the respondent will not be disturbed. Issue F. - Earnings of $457.80 from joint ventures Opinion The facts respecting *177 this issue are set forth under a like question involved in the proceeding of this petitioner for 1936. The conclusion there reached that the income was taxable to petitioner requires a like answer here. Accordingly, we hold for the respondent on this issue. Issue G. - Salary of $6,000 from Winhill Corporation Opinion The question is whether the respondent erred in reducing from $6,000 to $5,000 the amount of salary the petitioner reported as having been received from the Winhill Corporation. The facts are contained and discussed in the proceeding of Winhill Corporation for 1937, supra. In accordance with the conclusion there reached the amount will be eliminated from the income of petitioner. Issue H. - Credit of $1,133.33 for dependents Findings of Fact 155. In his return for 1937 the petitioner did not claim a credit of any amount for dependents. The respondent allowed a credit of $1,133.33 for three dependent children under 18 years of age in his determination of the deficiency. Opinion The petitioner asserts that his children were not dependent upon him financially and as he had no dependents, that he is not entitled to the allowance voluntarily made by the respondent. *178 No showing of dependency appears in the record. Under the circumstances, the adjustment made by the respondent will be eliminated in the recomputation under Rule 50. Issue I. - Fraud Findings of Fact 156. A part of the deficiency for 1937 was due to fraud with intent to evade tax. Opinion The respondent alleged fraud in his answer because of understatements by petitioner in his return of interest, capital gains, ordinary and liquidating dividends and overstatements of bases in claiming deductions for worthlessness of shares of building and loan associations. The understatements, some of which involved securities in the family account, are relied upon, upon brief, to support his charge. The petitioner, as in 1936, answers the primary contentions of respondent on this issue by referring to the argument he made on a like issue in 1935. He does, however, take exception to the reliance the respondent puts on petitioner's return as evidence of the receipt by him of the understated income. There was no necessity for respondent to make the returns a basis for such a contention. We have found as a fact from testimony of petitioner that the income from the securities in the family *179 account was received by the petitioner. Counsel for the petitioner asserts that the shares of stock of Hart & Early Co., Inc., and Mideastern Contracting Corporation were not part of the securities in the family account. The testimony of petitioner on direct examination is that the stocks, and shares of stocks of the Goldberger-Raabin Co. were part of the family account from 1936 to 1940, inclusive, and the statement prepared by him to show the securities in the account upon its termination on November 13, 1941, lists 530 shares of Hart & Early Co. stock and 1,000 shares of stock of the Mideastern Contracting Corp. Furthermore, the stock of the three corporations is listed in petitioner's returns for 1939 and 1940 as being in the family account at the close of the years 1935 to 1940, inclusive. It is clear that the petitioner treated the stock of the three corporations as part of the family account, even though they were not listed in the memorandum of November 22, 1934. They were received by petitioner in 1935 from Gradwik, Inc. of Delaware, which reported the sales at cost to it, but upon brief here it was conceded that the fair market value of the stock was the selling price to *180 Gradwik and cost to petitioner for tax purposes. No contention is made that funds of the family account were used to acquire the stock. A part of the deficiency for 1937 was due to fraud with intent to evade tax, and we sustain the imposition of the fraud penalty by the respondent. In view of that conclusion, it is unnecessary to consider respondent's contentions as to fraud on other evidence. Docket No. 6021 - Charles Goodman - Year 1938 Docket No. 110224 - Sylvia Goodman - Year 1938 Docket No. 110225 - Robert Goodman and Carolyn Goodman - Year 1938 Docket No. 110226 - William Goodman by Charles Goodman, father and General Guardian - Year 1938 Docket No. 110227 - Annette Goodman by Charles Goodman, father and General Guardian - Year 1938 Docket No. 110246 - Doris G. Jacoby (nee Doris Goodman) - Year 1938 Issue A. - Dividends of $3,401.75 on 2,474 shares of preferred stock of the American States Utilities Corporation Findings of Fact 157. During 1938 Charles Goodman received dividends of $3,401.75 on 2,474 shares of preferred stock of the American States Utilities Corporation, and of the amount received he paid $206.24 to Rose Shupan as the dividends paid on 150 *181 shares. In his return for 1938, Charles Goodman reported as taxable to him, one-sixth of $3,205.51, this amount being $3,411.75, less $206.24. [Error of $10 in addition of petitioner accounts for the difference.] The wife and four children of Charles Goodman reported amounts as dividends on the stock which excluded one-sixth, or $34.38, of the amount of $206.24. In determining the deficiencies the respondent included all of the dividends of $3,401.75 in income of Charles Goodman and increased by $34.38 the amount of dividends reported by each of the other petitioners, who filed their returns with the collector for the second district of New York. Opinion The issue here does not differ in any essential respects from Issue B in the case of Charles Goodman for 1936 and 1937, supra. We held there that he was taxable in 1937 on all of the dividends paid on only 2,324 shares of the stock, the security to that extent being a part of the family account, and Rose Shupan being the equitable owner of the remaining 150 shares. The facts require a like conclusion here. Accordingly, Charles Goodman is taxable on $3,195.51 of the dividends received by him and it was error for respondent to *182 include the additional amount of $34.38 in the income of each of the other petitioners. Docket No. 6021 - Charles Goodman - Year 1938 Issue B. - Dividends on shares of stock and interest on bonds as follows: Dividends
$ 765.00
United Public Utilities Corporation
7,555.10
Penn Western Gas & Electric Co.
Interest
$562.50
Granite City Generating Company
385.00
Laclede Gas
309.60
Jacksonville Gas & Electric Co.
8,937.32
(Liquidating dividend) on 530 shares
of Hart & Early Co., Inc.
11,525.87
(Liquidating dividend) Builo Corpo-
ration
Findings of Fact 158. During 1938 the petitioner received the following dividends on stock and interest on bonds of the corporations shown: $ 765.00
United Public Utilities Corporation
7,555.10
Penn Western Gas & Electric Co.
562.50
Granite City Generating Company
385.00
Laclede Gas
309.60
Jacksonville Gas & Electric Co.
8,937.32
(Liquidating) Hart & Early Co.,
Inc.
1,920.98
(Liquidating) Builo Corporation
159. In his return for 1938 the petitioner reported as taxable to him, one-sixth of the amounts listed in our statement of the issue, except that no amount was reported for *183 dividends received on stock of the Penn Western Gas & Electric Co. and interest on bonds of the Jacksonville Gas & Electric Co. and $1,920.95 was reported for liquidating dividends on stock of the Builo Corporation, instead of the correct amount of $1,920.98. 160. In his determination of the deficiency the respondent included in the income of petitioner all of the interest and dividends received by petitioner and $11,525.87 as a liquidating dividends from the Builo Corporation. Opinion The stock of the United Public Utilities Corporation and bonds of the Granite City Generating Co., Laclede Gas, and Jacksonville Gas & Electric Co. were in the family account and the only question as to the income derived therefrom is whether all or one-sixth thereof is taxable to petitioner. In accordance with the conclusion already reached on the general question concerning the account, we hold that all of the income is taxable to petitioner. The petitioner admitted in his petition that he received the amount of $7,555.10 from the Penn Western Gas & Electric Co. but alleged that it represented a non-taxable dividend in partial liquidation of the corporation. In his answer to the petition the *184 respondent admitted that petitioner received the amount in 1938 and denied the allegation of petitioner on the character of the payment. Notwithstanding this agreement in the pleadings on the receipt of the amount involved, upon direct examination at the hearing petitioner answered "No" to a question of his counsel on whether he received "a dividend in the amount of $7,555.10 in the year 1938 from the Penn Western Gas & Electric." Upon brief petitioner relies upon such testimony to support a proposed finding that he did not receive the dividends and in his argument, after referring to the testimony, asserts that "He can not be expected to prove a negative" and that "respondent has offered no testimony to show that he [petitioner] did receive such a dividend." The petitioner admitted that funds of the family account were used to purchase the stock in 1936 and that he received dividends of $357 on the stock in that year. An admission also was made by him that dividends of $1,071 were received in 1937 but were not included in his return for that year. He testified upon direct examination that in 1938 he received a distribution on 1,190 shares of the stock and that it consisted of *185 shares of stock of other corporations. He also testified that he received a final liquidating dividend on 1,290 shares in 1939, when he surrendered the stock to the corporation. With an agreement in the pleadings on the amount received, there was no necessity for petitioner to offer testimony on the point or for respondent to offer rebutting evidence. In any event, the simple denial of petitioner, an interested witness, that he received nothing, is not enough to overcome the presumption that the respondent's determination is prima facie correct. The omission of the amount in the return is, in effect, a denial of the receipt of the amount, and petitioner's testimony is nothing more than a conclusion, which is one of the points before us to decide. The securities were in the family account and it was not error for respondent to tax petitioner on all of the amount of $7,555.10. The liquidating dividend of $8,937.32 was paid on the 530 shares of Hart & Early Co., Inc. stock on which a like dividend of $10,391.32 was paid in 1937 and applied against petitioner's unrecovered cost to reduce his basis to $5,460.95 on December 31, 1937. The respondent should have held that $5,460.95 of *186 the amount was a return of capital, leaving only $3,476.37 as taxable gain. With the exception of that adjustment we sustain the respondent, the stock having been a security in the family account. The amount of the liquidating dividend paid on stock of the Builo Corporation is not in controversy, and petitioner does not contend that the stock had a basis. The stock was not in the family account. The respondent taxed petitioner upon the entire amount upon the ground that he was the sole owner of the stock. The respondent now admits that the corporation's stock was owned by petitioner and his wife and four children in 1936. We have found from the evidence that the petitioner owned one-sixth of the outstanding common stock of the corporation. (Finding No. 126.) Accordingly, petitioner realized income of only $1,920.98 from the distribution. Issue C. - Dividend of $3,000 from the Winhill Corporation Findings of Fact 161. In 1938 the Winhill Corporation paid salaries of $11,000 and $3,000, respectively, to Charles Goodman and Robert Goodman. In his income tax return for 1938 the petitioner included in gross income the salary paid to him and did not include the salary paid to his *187 son Robert. He did, however, make a notation on a statement attached to his return that a salary of $3,000 had been paid to Robert Goodman by the corporation. 162. In his determination of the deficiency the respondent did not make any adjustments to the salary reported by petitioner but held that the amount of $3,000 paid to Robert Goodman represented a taxable divident to the petitioner. Opinion The issue is whether the salary of $3,000 paid to Robert Goodman constituted a taxable dividend to his father, the petitioner. We have decided several questions herein involving salaries paid to Robert Goodman. In the case of Gradwik, Inc. of Delaware, five-sixths of whose stock was owned by petitioner, for 1934 we denied the corporation a deduction of $3,000 for salary paid to Robert Goodman upon the ground, in general, that he performed no services and that the action of the corporation in claiming the amount as a deduction constituted, under the circumstances, fraud with intent to evade tax. We sustained the respondent's disallowance of a like deduction claimed by the same petitioner in 1935 on similar facts but did not find it necessary to pass upon the question of fraud with respect *188 to the deduction. The Builo Corporation, owned by the Goodman family, paid to Robert Goodman $3,000 in 1936 and claimed the amount as a deduction for salary. The respondent disallowed the deduction and taxed the amount to petitioner as a dividend. We sustained the disallowance upon the ground that no services were performed by Robert Goodman, and also the taxability of the amount to petitioner as a dividend, there having been nothing more in the record to show error other than mere categorical denials by petitioner of the receipt of any dividends in 1936 from the corporation. In 1937 the Winhill Corporation, one-half of whose stock was owned by the Goodman family, deducted $3,000 for salary paid to Robert Goodman. In that case we sustained the action of the respondent in disallowing the deduction. The decision turned upon whether the total of $18,000 of all salaries, including the one to Robert Goodman, had been paid. In spite of that history of salary payments to Robert Goodman by Goodman corporations and adjustments made by the respondent in his audit of returns of the interested taxpayers, the evidence offered here by petitioner to overcome the presumption in favor of the respondent *189 consists of simple denials by petitioner on direct examination that he received the amount alleged in the deficiency notice to have been paid to Robert Goodman by the corporation and whether he received "as a dividend such sum of money paid to you for Robert Goodman." Upon brief the petitioner, after citing his testimony and lack of any entry in the books of the corporation disclosing the payment of any such dividend, together with the failure of respondent to cross-examine him or offer any evidence on the issue, asserts that if the dividend was received, respondent should have been able to establish it by competent evidence. No charge is made that the respondent's determination was arbitrary. The petitioner was fully aware that the respondent had regarded the salary payment to his son as a dividend payment to him; in other words, that he had received a taxable dividend from the corporation under the guise of a salary payment to his son. Thus petitioner's burden was to overcome by evidence the finding of the respondent that the salary payment to his son was not taxable as a dividend to him. It is evident that petitioner was in a position to produce more evidence under his burden. *190 The petitioner has not overcome the presumptive correctness of the respondent's determination and on this issue we sustain the respondent. Issue D. - Deduction of $937.57 for New York State income taxes Findings of Fact 163. In 1938 Gradwik, Inc. of New York issued three checks aggregating $937.57 payable to the order of the State Tax Commission of the State of New York in payment of income taxes of petitioner. The amount of the checks was charged to petitioner on the books of the corporation. In his determination of the deficiency the respondent disallowed a deduction claimed by petitioner for the taxes "due to lack of substantiation." Opinion Upon brief the respondent contends that no proof was made of a charge to petitioner by Gradwik, Inc. of New York of the amount of the payments. The petitioner testified that such a charge was made and that he had a book showing the details of his account with the corporation in 1938. The respondent did not call for the production of the book to support the testimony of petitioner or cross-examine him on the facts of the issue. The evidence offered by petitioner is uncontradicted and not otherwise discredited or shown erroneous, and *191 establishes his right to the deduction. Under these circumstances, on this issue we hold for the petitioner. Issue E. - Deduction of $1,074.21 for interest on indebtedness Findings of Fact 164. In 1938 the petitioner paid interest in the amount of $1,074.21 on indebtedness to the Chemical Bank & Trust Co. for loans, but did not claim a deduction for the amount in his return for that year. Opinion Upon brief the respondent makes no argument against the allowance of the deduction other than that the issue was not raised in the petition. Disallowance of the amount was not specifically claimed as an error committed by the respondent in determining the deficiency, but in a separate paragraph of his allegations of fact, the petitioner averred that he paid the amount as interest on indebtedness, and claimed the amount as a deduction because of his failure to deduct it from gross income in his return. The respondent denied the allegations in his answer. Thus the respondent had adequate notice of the question before trial, and there is an issue before us on the deductibility of the amount involved. The interest was shown to have been paid by charges to the account of petitioner with *192 the bank. The amount thereof is deductible from gross income. Issue F. - Miscellaneous deductions in the amount of $18,340.75 Findings of Fact 165. Mr. Hoffman, an accountant, was engaged for several years in auditing books of the Heyman & Goodman Co. of New Jersey and doing other accounting work relating to corporations engaged in subway construction work in which petitioner and William Heyman held the controlling interests. Most of the work was done in auditing books of the Heyman & Goodman Co. of New Jersey. The accountant instituted suit against petitioner and William Heyman for an undisclosed amount for services rendered, contending that they had employed him in their individual capacities and guaranteed payment of his fee. The suit was settled by a written agreement entered into while the jury was deliberating on a verdict. 166. In 1938 the petitioner paid to counsel representing the accountant in the litigation, in accordance with terms of the settlement agreement, the sum of $15,000 as his share of the settlement; the sum of $631 as his one-half share of the cost of reporter services, witness fees and court costs, and the amounts of $2,025 and $75, respectively, to *193 counsel for representing him in the suit and to an accountant for accounting work performed during the trial. 167. In 1938 the petitioner paid $57.75 to counsel for representing him in a lawsuit. Opinion The amounts set forth in the findings of fact are being claimed as ordinary and necessary business expenses under the authority of Kornhouser v. United States, 276 U.S. 145
The petitioner does not designate the business of which the amounts are alleged to be ordinary and necessary expenses. Hoffman, the accountant, alleged in his suit that he was engaged by the petitioner and Heyman to work for them in their individual capacities but the suit was settled by a written agreement, which was not introduced into evidence. All we know of its terms is that the petitioner was obligated to pay $15,000 to counsel for the plaintiff. It does not appear that the petitioner ever admitted primary liability to the accountant or liability as a guarantor of the corporations, and petitioner did not in his testimony acknowledge liability in either capacity. The business of the corporations was not the business of their stockholders, and there is no evidence from which we can find *194 that the business of the petitioner was that of being a stockholder of corporations or a guarantor of obligations of the corporations whose books the accountant worked on. The petitioner could not recall the nature of the suit in which he paid counsel the fee of $57.75. On this issue we sustain the respondent. Docket No. 6021, Charles Goodman, Year 1938 Docket No. 110224, Sylvia Goodman, Year 1938 Docket No. 110225, Robert Goodman and Carolyn Goodman, Year 1938 Docket No. 110226, William Goodman by Charles Goodman, father and General Guardian, Year 1938 Docket No. 110227, Annette Goodman by Charles Goodman, father and General Guardian, Year 1938 Docket No. 110246, Doris G. Jacoby (nee Doris Goodman), Year 1938 Docket No. 5294, Mideastern Contracting Corporation, a Dissolved Corporation, by James E. Gibbons, Lydia V. Heyman, William Heyman, and Charles Goodman, its former officers, directors, and stockholders, Years 1938 and 1939 Docket No. 5295, James E. Gibbons, Year 1938 Docket No. 5296, William Heyman and Lydia Vogel Heyman, Year 1938 Issue G. - Income tax liability on amount of $66,290.59 paid by New York City on a judgment obtained by Mideastern Contracting *195 Corporation Findings of Fact 168. The Mideastern Contracting Corporation, hereinafter referred to as "Mideastern", was incorporated on November 30, 1927, under the laws of Delaware, with an authorized capital stock of $600,000, equally divided between shares of common and preferred stock of a par value of $100 each, for the purpose of carrying on a business of general contracting. James E. Gibbons, William Heyman and Charles Goodman, the organizers of the corporation, were the original subscribers to its capital stock to the extent of 17, 17 and 16 shares, respectively. At the first meeting of the corporation, the incorporators were elected directors. At the first meeting of the directors, James E. Gibbons was elected president; William Heyman, vice president and secretary, and Charles Goodman, treasurer. In December, 1927, Mideastern issued for cash, 125 shares of its common stock at par of $12,500, and 2,875 shares for $575,000, one-half of which latter amount was credited to paid-in-surplus, and 1,145 shares of its preferred stock for $114,500. William Heyman was not a stockholder of Mideastern at any time after 1928. 169. On July 15, 1931, the common stockholders of Mideastern, *196 composed of James E. Gibbons, holding 1,000 shares, and Heyman & Goodman Co. of New Jersey, holding 2,000 shares, approved the action taken by the directors previously the same day, to reduce the capital stock to 3,000 shares of common stock without par value by retiring the 1,145 shares of outstanding preferred stock and changing the 3,000 shares of outstanding common stock into a like number of shares without par value, to enter the new common stock in the books at $1.00 a share, and to transfer the balance of $297,000 to paid-in surplus. 170. On July 18, 1931, the preferred stock was redeemed at par and on July 20, 1931, new common stock was issued for the old common stock. On July 30, 1931, Rose Goodman, Lydia Vogel Heyman and James E. Gibbons each owned 1,000 shares of the new common stock of Mideastern, and on September 24, 1931, each of them received $183,871.67, a total of $551,615.01 of paid-in surplus of the corporation, pursuant to action of the board of directors. The additional amount of $3,500 was paid on March 2, 1932. 171. From 1933 to 1937, inclusive, Mideastern reported paid-in surplus of $29,384.99 in its income tax returns. 172. Mideastern had only one contract *197 and that was for the construction of a portion of a subway for the city of New York, the work under which was substantially completed in 1931. 173. On October 21, 1931, James E. Gibbons, the petitioner in docket No. 5295, executed an instrument in which, for a recited consideration of one dollar and the execution concurrently therewith by Lydia Vogel Heyman, one of the petitioners in docket No. 5296, and her husband, William Heyman, the other petitioner therein, and Charles Goodman and Rose Goodman, of releases, he assigned to Rose Goodman and Lydia Vogel Heyman, jointly, all of his rights to receive dividends, liquidating dividends or distributions in liquidation as a stockholder of Mideastern up to the sum of $68,200, the amount of his indebtedness to them for loans to purchase stock of Mideastern. The instrument provided that there was to be no personal liability on the assignor in the event the amount distributable to him by Mideastern should not amount to $68,200. It provided, also, that to "insure and secure" the payment to Lydia V. Heyman and Rose Goodman of dividends and distributions in liquidation on any stock of Gibbons in Mideastern, Gibbons agreed to endorse the certificates *198 with a notation that the stock was subject to the terms of "this assignment." Another provision gave them and their heirs, executors, administrators and assigns the right to collect and give acquittances for any dividends and distributions in liquidation "hereby assigned to them up to the amount so assigned." 174. Mideastern filed a claim against the city of New York based, generally, upon unpaid balances due under the subway construction contract, and requirements of the city of New York that tunnel shields be used in performing the construction work and that a bulkhead be constructed. On November 19, 1931, after the claim was rejected, Mideastern filed suit against the city of New York in the United States District Court of the Southern District of New York. The suit was discontinued and on May 21, 1932, an action was begun in the Supreme Court of New York, in which the defendant denied all liability. The suit came on for trial on November 15, 1937, and on December 21, 1937, judgment was rendered in favor of Mideastern for $781,808.77. The judgment, plus interest and costs, was entered on January 7, 1938, in the amount of $784,064.54. The judgment was never paid in full. 175. *199 On April 18, 1938, pursuant to a stipulation entered into in the proceeding on March 11, 1938, the defendant issued a warrant in favor of Mideastern or Nevius, Brett & Kellogg, as its attorneys, for the sum of $66,290.59 as the recovery on certain counts of the suit. An instrument authorizing the clerk of the court to satisfy the judgment to the extent paid was signed by James E. Gibbons on April 21, 1938, as president of Mideastern. On April 23, 1938, Nevius, Brett & Kellogg issued a check payable to the order of Mideastern for $48,008.62, this being the amount paid on the judgment by the city of New York, less the amount of $18,281.97 for counsel fees, charges, and disbursements. Thereafter, while the case was being prepared for appeal, an agreement was entered into to accept $620,000 in settlement of the unsatisfied portion of the judgment, for which amount the city of New York issued its warrant on May 1, 1939, payable to the order of Mideastern, or Nevius, Brett & Kellogg as its attorneys. On May 3, 1939, counsel issued their check to Mideastern for $530,000 for the payment on the judgment, less $90,000 for fees and charges. The checks for $48,008.62 and $530,000 bear the endorsements *200 "Mideastern Contracting Corporation, Charles Goodman, Trustee." 176. Counsel for Mideastern in the suit had no knowledge prior to the conclusion of the litigation against the city of New York that the claim of Mideastern had been assigned. 177. On October 13, 1933, the directors of Mideastern, with the unanimous consent of its stockholders, adopted a resolution to dissolve the corporation as provided in section 39 of the General Corporation laws of Delaware. No time limit was fixed in the resolution for the liquidation of the corporation. 178. On October 18, 1933, the Secretary of State of the State of Delaware issued a certificate of dissolution of Mideastern. The consent of stockholders for the dissolution was signed by James E. Gibbons, Lydia Vogel Heyman and Gradwik, Inc. of Delaware, on October 13, 1933, as owners of 1,000 shares each of the corporation's stock. 179. On January 17, 1935, Charles Goodman, Lydia Vogel Heyman and James E. Gibbons and Mideastern executed an instrument in the preamble of which the parties recited that the individuals [called creditors in the instrument] had been at all times and then were the owners, directly or indirectly, of all of the *201 corporation's outstanding stock; that the corporation was indebted to the individuals in the amount of $29,384.99; that the corporation was in process of liquidation and that it was the owner of a claim against the city of New York and lacked funds to pay expenses incident to the preparation of the proceeding for trial. The corporation acknowledged liability to the individuals for the recited indebtedness of $29,384.99 and the individuals agreed not to prosecute their claims for the amount until the corporation was financially able to pay the amount. Paragraphs numbered 4 and 5 of the instrument read as follows: (4) The corporation does grant, assign and convey unto the creditors and/or their assignees all its right, title and interest in and to all claims now owned by it against the City of New York. (5) The corporation does agree to continue to prosecute such claim against the City of New York for the benefit of the creditors and/or their assignees, subject however to the creditors' paying all further expenses of such litigation. In the last paragraph of the instrument the corporation agreed "that the owners of the claim" against the city of New York were Charles Goodman and *202 his wife and four children, each one-eighteenth; James E. Gibbons and his wife and three sons, each one-fifteenth and William Heyman and his wife and Samuel Heyman, their son born March 1, 1928, each one-ninth. 180. On October 23, 1937, Charles Goodman, James E. Gibbons and William Heyman, in a recited capacity of individuals and as trustee for their respective wives and children, executed an instrument, in which the parties asserted in the preamble that they had on that day received for themselves and as trustee for others all of the assets of Mideastern, subject to existing liabilities, "as detailed in the attached sheet" and that it was to their best interests that one trustee be appointed to receive transfers of the corporation's assets, with power to convert them into cash and after paying liabilities, distribute the remainder. The instrument contained the following provisions: Therefore, in consideration of the mutual promises hereinafter provided, it is agreed: Charles Goodman does hereby assume the duties as Trustee for all the stockholders of the Mideastern Contracting Corporation; he is hereby given title, in trust nevertheless, of all the assets the stockholders have *203 received from the corporation as distributions in liquidation; he is to convert them into cash; and he is to pay all the liabilities of the company as soon as possible. The instrument then provided that after paying all of the liabilities the balance was to be distributed by Charles Goodman by paying one-third; as the total of the equal shares (1/15th) of James E. Gibbons and his wife and three children, to Rose Goodman and Lydia Vogel Heyman to the extent of the provisions of the agreement of October 21, 1931; one-third to Charles Goodman for the one-eighteenth share each of himself and his wife and four children, and the remaining one-third to William Heyman as the total of the one-ninth share each of himself and his wife and child. 181. The parties also agreed to transfer to Charles Goodman, in trust, any assets they might receive as stockholders and trustees from Mideastern as distributions in liquidation. The sheet attached to the instrument contained a list of assets and liabilities as follows: Assets
Cash
$ 5,492.92
Account Receivable - City of New
York
1,320.26
Bonds - City of New York (market
value)
20,750.00
Loans Receivable
100,000.00
Deposit
2,000.00
$129,563.18
Liabilities
Nevius Brett & Kellogg
$ 5,000.00
James E. Gibbons
11,000.00
Loans payable: Charles Goodman
10,378.50
William Heyman
10,378.50
Martin Fenton - Legal
550.00
Gradwik, Inc. - Rent
1,200.00
Hart & Early, Inc. - Rent
1,800.00
Miscellaneous
550.00
$40,857.00
Capital
Capital stock
$ 3,000.00
Capital surplus
29,384.99
$32,384.99
*204 182. The loans receivable account represented loans of $50,000 made on July 29, 1933, to Lydova Corporation, a personal holding company of Lydia Vogel Heyman, and August 5, 1933, to Gradwik, Inc. of Delaware, by checks of Mideastern against its account with the Fort Greene National Bank. The balance sheets included in the income tax return filed by Mideastern for 1937 contained the amount of $100,000 as an asset in the beginning and close of the year for investments or loans. 183. The loans payable account represented advances made by William Heyman on behalf of his wife and by Charles Goodman to the corporation for expenses incurred in preparing the suit against the City of New York for trial. 184. In his return for 1937, Charles Goodman reported the receipt on October 28, 1937, of $18,773.73 as a final liquidating dividend from Mideastern. The respondent increased the value of the dividend to $29,568.73, an amount equal to one-third of the net assets of the corporation as shown in the statement attached to the instrument executed on October 28, 1937. In the proceeding involving his income tax liability for 1937, Charles Goodman did not contest the valuation so made by the respondent. *205 185. On January 12, 1938, the parties to the instrument executed on October 28, 1937, executed a similar document. After reciting that Charles Goodman, James E. Gibbons and William Heyman, by an agreement entered into on January 17, 1935, with Mideastern had purchased "a certain claim against the City of New York"; that a judgment had been obtained by the plaintiff in an action on the claim, and that it would be to the best interests of the individuals if one trustee were appointed to receive the proceeds of the claim and pay expenses incurred in the appeal of the judgment; the instrument provided, among other things, as follows: Charles Goodman does hereby assume the duties as Trustee for all the aforementioned individuals; he is to collect the proceeds of the claim against the City of New York, and he is to pay all the charges and expenses therefor; Goodman, Gibbons and Heyman covenant on behalf of themselves and their respective cestuls que strust to transfer to Charles Goodman, in trust nevertheless, all assets they might receive as owners of such claim. It then provided that after paying all charges and expenses Charles Goodman was to distribute the remainder the same as *206 was set forth in the instrument executed on October 28, 1937, except that after distributions had been made to Rose Goodman and Lydia Vogel Heyman to the extent of the provision in the agreement of October 21, 1931, out of the one-fifteenth share of each of the five members of the Gibbons family, the remainder of each one-fifteenth share was to go to the owner of the share 186. William Heyman and James E. Gibbons had no written authority to act as trustee for their respective wives and children in regard to the matters set forth in the instruments executed on October 28, 1937, and January 12, 1938. 187. On May 27, 1938, Charles Goodman, as trustee under the instruments executed on October 28, 1937, and January 12, 1938, distributed $21,441.10 to himself and William Heyman by checks for $4,510.13 and $16,930.97 payable to the order of each individual. Nothing was distributed to James E. Gibbons upon advice of counsel that the Gibbons family was not to receive any distributions directly until the Goodman and Heyman families each received $102,300, this amount being the sum of $68,200 referred to in the assignment made by James E. Gibbons on October 21, 1931, plus $34,100. Without *207 that assignment, Charles Goodman, trustee, would have distributed the total amount equally among himself, James E. Gibbons and William Heyman. The amount was not paid directly to James E. Gibbons, having instead been paid to Charles Goodman and William Heyman, one-half to each, and applied in accordance with the assignment executed by James E. Gibbons on October 21, 1931. 188. Mideastern had a checking account with the Fort Greene National Bank until September 1937, when the bank was closed. Numerous deposits and withdrawals were made in and from the account after October 1933. The withdrawals include a check issued about September 20, 1934, for $696.69 in payment of a bill rendered by Nevius, Brett & Kellogg for services and disbursements in connection with the suit against the City of New York. 189. On November 18, 1937, William Heyman, as secretary of Mideastern, certified to the Colonial Trust Co., New York City, that the directors of Mideastern had adopted a resolution designating the bank as a depositary of funds of the corporation. The account was opened to deposit a check for $5,000 from the Federal Deposit Insurance Corporation to Mideastern, in order to make the amount *208 available for distribution to stockholders of Mideastern. The check was in payment of the liability of the Federal Deposit Insurance Corporation for the credit balance of $5,142.99 in the account of Mideastern at the time the Fort Greene National Bank was closed. The account was opened on December 1, 1937, by the deposit of a check for $350 which had been received in payment of interest on bonds of the City of New York. The check for $5,000 was received and was deposited in the account on December 30, 1937. The balance of $5,350 in the account was withdrawn by checks issued on January 10, 1938, and signed by William Heyman and Charles Goodman as secretary and treasurer, respectively, of Mideastern. The payees and amounts of the checks were: James E. Gibbons
$356.67
Eugene F. Gibbons
356.67
Raymond J. Gibbons
356.67
Catherine F. Gibbons
356.66
James E. Gibbons, III
356.66
Lydia Vogel Heyman
1,783.33
Charles Goodman, trustee
1,783.34 The first six checks bear the endorsement of the respective payees and Charles Goodman, trustee, and the remaining check was endorsed by the payee. 190. Several lawsuits were instituted against Mideastern after November 1933. *209 One of the suits, an action instituted after 1931 by employees for loss of personal property in a fire in 1928, has never been noticed for trial. 191. Mideastern kept reserve accounts for self-insurance, property damaged and for completion of the subway contract. Charges were made in each of the accounts from 1932 until October 28, 1937, when the total of the balances in the accounts was $45,053.04. The checks issued in 1937 to October 28 for payments charged to the accounts were drawn on the checking account of Mideastern with the Fort Greene National Bank. 192. The books and records of Mideastern were destroyed or otherwise disposed of about the close of 1940. 193. In his return for 1938, Charles Goodman reported the receipt of $14,364.89 from Mideastern, one-half of one-sixth of which, or $1,197.08, he included in income as a long-term gain. The amount of $14,364.89 is one-third of $43,094.69, the amount determined by an accountant for Charles Goodman as being the amount of income in his hands as trustee for stockholders of Mideastern under the instrument executed on October 28, 1937. In his determination of the deficiency against him, notice of which was mailed on June 27, 1944, the *210 respondent held that the amount of $14,364.89 constituted ordinary income includible in his income in its entirety, and that there was no basis for a division of the income for tax purposes among the members of his family. 194. The respondent also held that he received $2,394.15 of ordinary income as his distributive share of $14,364.90 distributable out of the $43,094.69 to the estate of Rose Goodman. The amount was not included in the return filed by Charles Goodman for 1938. 195. In the 1938 joint income tax return signed and filed by William Heyman and Lydia Vogel Heyman on March 13, 1939, with the collector for the second district of New York, the amount of $9,576.60 was reported as having been received on a claim acquired January 17, 1935, and one-half thereof was included in income as long-term gain. In his return for 1938, Samuel Heyman reported the receipt of $4,788.30 from a claim acquired on the same date and included one-half thereof in income as long-term gain. In his determination of the deficiencies against William and Lydia Vogel Heyman, notice of which was mailed on March 14, 1944, the respondent held that the amount of $14,364.90 constituted ordinary income taxable *211 to Lydia Vogel Heyman, and that there was no basis for dividing the amount among the members of the family. 196. In his return for 1938, filed on March 14, 1939, with the collector for the second district of New York, James E. Gibbons, on advice of counsel, reported as a taxable long-term gain arising out of a claim acquired on January 17, 1935, the amount of $1,436.49, the figure being one-half of one-fifth of $14,364.90. The respondent in determining the deficiency against James E. Gibbons, notice of which was mailed on March 13, 1944, held that the entire amount constituted ordinary income taxable to him and was not divisible for tax purposes among him and members of his family. 197. The income tax returns of William Goodman, Annette Goodman and Doris Jacoby (nee Doris Goodman) for 1938 were prepared and signed by Charles Goodman. The income tax return of Sylvia Goodman for 1938 was signed by her, but was prepared by her husband. Attached to each of the returns, and the income tax returns filed by Charles Goodman, and Robert and Carolyn Goodman for 1938 were identical statements showing, first, the income and expenses of Charles Goodman, and then the following amounts of income *212 as taxable to each: Dividends on stock of American States
Utilities Corporation
$534.25
Dividends on stock of United Public
Utilities Corporation
127.51
Interest on bonds of Granite City Gen-
erating Co.
93.75
Interest on bonds of Laciede Gas
64.17
Gain: Hart & Early Co. Inc.
1,489.55
Mideastern Contracting Corporation
(long-term)
1,197.08
Builo Corporation
1,920.95
Total
$5,427.26 The returns of Sylvia, William, Annette and Doris Goodman do not contain any other items of income. In his determination of deficiencies against them and Robert and Carolyn Goodman for 1938, notices of which were mailed on March 6, 1942, the respondent held that the amounts reported by each as his or her "share of an award paid by the City of New York to the Mideastern Contracting Corporation" was not subject to the limitations of section 117 of the 1938 Act, and, accordingly, increased the amount of income reported by $1,197.07. 198. Mideastern did not file income tax returns for 1938 and 1939. In his determination of the deficiencies for 1938 and 1939, notice of which was mailed on March 13, 1944, by a letter addressed to it in care of Charles Goodman, the respondent *213 included in its income for 1938 the amount of $66,290.59 paid by the City of New York on the judgment, and allowed as a deduction therefrom, the amount of $13,281.97 for legal expenses. For 1939, he included in income the payment of $620,000 made by the City of New York, and allowed as a deduction therefrom, the amount of $90,000 for legal expenses. The petition of Mideastern was filed on June 10, 1944. 199. A part of the deficiencies determined against William Heyman and Lydia Vogel Heyman, against James E. Gibbons, and against Charles Goodman, respectively, for 1938, was due to fraud with intent to evade tax. Opinion This issue involves tax liability arising from the payment made by the City of New York on the judgment obtained against it by Mideastern. At the outset we are met with a contention of Mideastern that we lack jurisdiction to reetermine the deficiencies asserted against it, upon the ground that it ceased to exist as a body corporate three years after dissolution, or on October 18, 1936. The respondent insists that the corporation functioned as such up to the time of the trial herein and points to the pendency of the suit against the City of New York until the *214 settlement thereof in 1939; the fact that one suit is still pending against the corporation, and that it kept one bank account until July 1937 and had another one from December 1937 until January 14, 1938. In Oklahoma Natural Gas Co. v. State of Oklahoma, 273 U.S. 257, the court said: * * * But corporations exist for specific purposes, and only by legislative act, so that if the life of the corporation is to continue even only for litigating purposes it is necessary that there should be some statutory authority for the prolongation. * * * General authority for continuing the life of Delaware corporations after dissolution is contained in section 42 of the Corporation Laws of that state. [2] Section 43 authorizes the Court of Chancery, upon application of any creditor or stockholder of a dissolved corporation, at any time to appoint directors, trustees, or appoint a receiver for the corporation with power to perform as long as necessary, such acts as may be required to settle the affairs of the corporation. *215 It will be observed that the governing statute allows a period of three years after dissolution for liquidation matters, in general, and thereafter for an indefinite time "for the purpose of" litigation instituted by or against the corporation prior to, and within three years after dissolution. The argument of Mideastern is based, in part, upon an assignment to its stockholders on January 17, 1935, of its claim against the City of New York. For reasons to be discussed, this Court does not agree with such a view, and, accordingly, we hold that the corporation had statutory authority to prosecute the action to a conclusion. In any event, it existed at the time of the hearing herein for the purpose of defending the suit pending in court instituted against it at some undisclosed time after 1931. Thus, Mideastern did not cease to exist on October 18, 1936, for all purposes but had corporate power fo the limited purposes set forth in the state statute. Was the restricted existence of Mideastern in 1944, when the petition herein was filed, broad enough to give us jurisdiction? Other than Coast Carton Co. v. Commissioner, 149 Fed. (2d) 739, affirming 3 T.C. 676, *216 on a point in the alternative, the respondent cites no authority to support his position. The statute provides in terms free from doubt that the existence of the corporation after the period of three years is limited to the "purpose of" prosecution and defense of suits brought by and against it prior to the expiration of such period, but "not for the purpose of continuing the business." The power does not extend to the performance of any act commenced after the expiration of the period of three years. In First Bond & Mortgage Co., 21 B.T.A. 1, the petitioner, a former Delaware corporation, was dissolved on February 9, 1925. In August 1928, a petition was filed with the Board with respect to income tax liability for the years 1924, 1925 and 1926. No proof was made that the Court of Chancery ever had appointed trustees or a receiver to liquidate the corporation. Under the circumstances the Board held that there was no proof of jurisdiction. Here, the petition was not filed until 1944, or eight years after the expiration of the three year period, and there is no showing that the Court of Chancery ever appointed any person or persons to act for the corporation in any *217 capacity for any length of time. It is, in our opinion, clear, under the circumstances, that Mideastern had no power to file the petition as a corporation. First Bond & Mortgage Co., supra; S. Hirsch Distilling Co., 14 B.T.A. 1073; Consolidated Textile Corp., 16 B.T.A. 178; Union Plate & Wire Co., 17 B.T.A. 1229; Nibley-Mimnaugh Lumber Co., 37 B.T.A. 617; G. M. Standifer Construction Corp. v. Commissioner, 78 Fed. (2d) 285. Accordingly, the motion of the petitioner Mideastern Contracting Corporation is sustained and petition of Mideastern is dismissed for lack of jurisdiction. The respondent argues, however, that Mideastern is at least an association taxable as a corporation, citing Coast Carton Co. v. Commissioner, supra. Article 1001-2 of Regulations 94 promulgated under the 1936 Act provides: If the conduct of the affairs of a corporation continues after the expiration of its charter, or the termination of its existence, it becomes an association. In the Coast Carton Co. case involving the year 1939, the corporation's charter expired by limitation in 1929 and was never renewed. *218 At some undisclosed time after August 12, in 1940, the corporation's chief executive, who owned substantially all of its stock, was advised by counsel that the corporation's charter had expired. There was no material change in the management and conduct of the corporation's business after the expiration of its charter. Corporate income and capital stock tax returns were filed from 1929 to 1939, inclusive, in the name of the corporation. Commencing in 1940 the income of the business conducted in the name of Coast Carton Co. was included in the individual income tax returns of the principal stockholder. In short, the petitioner, after the expiration of its charter, actively engaged in business for profit under all the powers of a corporation, in view of which there was ample ground for classifying it as an association. It does not appear, and no contention is made by the respondent, that the deficiency here was asserted against the Mideastern Contracting Corporation as an association. The respondent points to the prosecution of the action against the City of New York and the defense of the suit still pending, it never having been noticed for trial, as normal corporate activities. *219 We agree that they are normal activities of corporations engaged in business. Here, however, Mideastern in 1933 ceased to engage in business for the purposes for which it was established. One of the factors for consideration in determining whether a trust is taxable as an association is whether it is a liquidating enterprise or one engaged in business for profit. Morrissey v. Commissioner, 296 U.S. 344. A corporation winding up its affairs after dissolution is not conducting a business for profit even though business transactions are conducted incidental to the liquidation proceedings. Extension Oil Co., 16 B.T.A. 1028, affd. 47 Fed. (2d) 65; Gardiner v. United States, 49 Fed. (2d) 992; The Liquidating Co., 33 B.T.A. 1173; Gonzolus Creek Oil Co., 12 B.T.A. 310. The Mideastern Contracting Corporation was not an association taxable as a corporation. The petitioners do not contest the amounts of distributable income each year from the payments made on the judgment obtained by Mideastern against the City of New York. Neither does Charles Goodman contest the taxation to him as ordinary income of the amount *220 of $2,394.15 distributable in 1938 to the estate of Rose Goodman. The respondent included in the ordinary income of James E. Gibbons the amount of $14,364.90 as representing his distributable one-third share of $43,094.69 and upon the theory that it was constructively received. Upon brief petitioner Gibbons contends that the amount was assigned to Rose Goodman and Lydia Vogel Heyman for full value by the assignment he executed on October 21, 1931, and consequently he did not constructively receive taxable income. The respondent insists that the amount having been applied in discharge of indebtedness, the payment was constructively received by the petitioner. Neither party cites any authority in their discussion of the question. Questions of this sort generally turn upon whether the transfer was of income or corpus. Here, there was no assignment of the stock under which the distribution was made. The thing transferred was the right to receive out of the stock ordinary and liquidating dividends up to $68,200, and it was accepted by the assignees in discharge of the assignor's indebtedness to them for that amount. Thus there was an assignment of future income for a present discharge *221 of a debt. The view of petitioner indicates a belief that since the assignment was made for value and not by way of gift, he derived no economic benefit subject to tax in 1938. The respondent seems to regard the evidence as showing application of the payment to the indebtedness in that year. Such, however, was not the case. The petitioner was fully discharged of his liability in 1931 and was not to be personally liable for any deficiency in dividend payments. Notwithstanding the assignment, Gibbons continued to be the stockholder, and as such, the only one entitled to receive dividends on the shares outstanding in his name. There is no proof here that at the time of the assignment there were unpaid dividends on the stock or that there was any reason to believe that there ever would be anything paid by Mideastern on the shares. Provision was made in the assignment to so endorse the certificate of stock as to show that the assignees were entitled to receive by way of dividends, ordinary and liquidating on the shares up to $68,200. It does not appear whether or not such an endorsement was made. If so, it would have been, at most, an order by the stockholder on the corporation to pay *222 to others what he, as a stockholder, was entitled to receive as the owner of the shares. No useful purpose would be served in discussing various authorities having a bearing on the question. We think the cases of Helvering v. Horst, 311 U.S. 112; Helvering v. Eubank, 311 U.S. 122; Harrison v. Schaffner, 312 U.S. 579; Hyman v. Nunan, 143 Fed. (2d) 425; Commissioner v. Lamont, 127 Fed. (2d) 875, fully sustain the action of respondent in taxing the amount to petitioner as income received by him in 1938. As already pointed out, the respondent taxed the $43,094.69 to Charles Goodman, Lydia Vogel Heyman and James E. Gibbons, one-third to each, as ordinary income, instead of as long-term gain, as returned by the petitioners. This difference between the parties on the character of the income and the interest of the petitioners therein, remains for consideration. The petitioners insist that the claim of Mideastern against the City of New York was assigned to them on January 17, 1935, in liquidation of its assets, and consequently the income in question was realized from their ownership of the claim, a chose in action, and *223 not by way of a liquidating dividend from Mideastern. Counsel for Mideastern argued, upon brief, that having assigned the claim to its stockholders as a liquidating dividend, it, as the prosecutor of the claim as an assignor, derived no taxable income from the judgment. It was not necessary to pass upon that contention in view of our conclusion that we had no jurisdiction to redetermine the deficiency asserted against the corporation. The theory of the contentions of petitioners is that the assignment gave them a property right in the claim, rather than a right to receive future income from property owned by another. The argument of he respondent requires consideration of the good faith of the instrument of January 17, 1935. He contends that the alleged transfer was devised by Charles Goodman, William Heyman and James E. Gibbons, with intent to defraud the Government out of taxes by dividing the proceeds of the claim among their wives and children, and that it lacked consideration. The agreement of January 17, 1935, purports to show the existence of a debtor and creditor relationship between the corporation and its stockholders for the paid-in-surplus of $29,384.99 existing at *224 that time. No such relationship existed. The account represented payments for stock in excess of par and a subsequent reduction of capital stock. Payments to stockholders in 1931 and 1932, prior to dissolution, reduced the balance in the account to $29,384.99. No payments were made out of the account thereafter and it does not appear that the corporation ever authorized any distributions from the account. The corporation was in the process of liquidating its affairs in 1935 and the rights of its stockholders were limited to such assets as remained after it paid its liabilities. At that time, the corporation's paid-in surplus, like its capital stock, was reflected in the assets, freed from liabilities. Distribution of the net assets as a final liquidating dividend would necessarily eliminate any balance there might be in a paid-in surplus account, and the fair market value of the property received would be applied against the basis of the stock as a return of capital and any excess taxed as gain on the investment in the stock, and not as the payment of a debt. The respondent so treated the distribution made to Charles Goodman in 1937 and he did not contest the action in this proceeding. *225 Under the circumstances Charles Goodman is in no position to argue that the item of $29,384.99 constituted a debt of the corporation to its stockholders. The instrument classifies the amount of $29,384.99 as a loan, and contains a release of the stockholders to accrued and future interest. This is a misstatement of the facts. Mideastern never carried the amount on its books as a loan and there is no evidence that the corporation ever agreed to pay interest on the balance in the account. The agreement of January 17, 1935, then states that the stockholders agreed to refrain from prosecuting their claims for the $29,384.99 until such time as the corporation was financially able to pay the amount. As already pointed out, the stockholders had no claim to present for payment except for such amount as they might be entitled to receive as stockholders in liquidation proceedings. No offer was made to prove that Mideastern was financially unable to pay the alleged debt in January 1935. The evidence here indicates that amount could have been paid at that time. Among its assets at that time were notes aggregating $100,000 of Lydova Corporation, a personal holding company of Lydia Vogel Heyman, *226 one of the stockholders, and Gradwik, Inc. of Delaware, whose stock was owned by Goodman and his wife, to evidence loans made to them in 1933. Nothing of record is in any way opposed to the belief that the amount, if payable, could not have been paid out of the proceeds of such notes. Mideastern agreed, in the words of the instrument, to continue the prosecution of the suit against the City of New York subject to the payment by the stockholders of the expenses of litigation. Contrary to this provision, Mideastern paid the cost of preparing the suit for trial, at least in part, from advances of $20,657 made by Charles Goodman and William Heyman, none of which was repaid on October 28, 1937, when the alleged assets of the corporation were distributed to stockholders. The statement attached to the agreement of October 28, 1937, shows a liability of $11,000 to James E. Gibbons, but the evidence does not show how the liability was incurred. Charles Goodman did not contest the deduction of these liabilities by the respondent when determining the amount of the liquidating dividend he received from Mideastern on October 28, 1937. Finally, none of the petitioners request any allowance for *227 litigation costs in determining the net proceeds of their alleged claim against the City of New York. There is other evidence disclosing that the interested parties did not regard the so-called assignment of January 17, 1935, as having any legal effect. Charles Goodman reported the payment made in 1938 as a distribution from Mideastern, but treated the profit as a long-term gain. The Heymans and James E. Gibbons returned their payments as recoveries on a claim acquired January 17, 1935, action consistent with their contentions here. Other evidence discloses that the parties regarded the income as having been derived from another source. By an instrument executed on October 21, 1931, James E. Gibbons gave Lydia V. Heyman and Rose Goodman, jointly, the right to receive out of his stock of Mideastern, "dividends, liquidating dividends or distributions in liquidation" up to $68,200 in full payment of his liability to them for that amount, and without any personal liability for any deficiency. In 1938, these assignees were paid the amount James E. Gibbons would have received as a stockholder of Mideastern if he had not so assigned the money. This application of the proceeds of the judgment *228 money constitutes recognition by the corporation's stockholders that Mideastern, as a corporation, obtained the judgment for its own account, and distributed proceeds thereof as a liquidating dividend to its stockholders and not to them as assignees of the claim on which the judgment was obtained. The petitioners say, in effect, that Mideastern prosecuted the claim as an assignor for the benefit of its assignees. They contended on another point, with reference to the jurisdictional question in the case of Mideastern, that section 42 of the Corporation Laws of Delaware did not authorize the corporation to prosecute a claim in which it had no interest and that on October 18, 1936, Mideastern "was as dead as though it never existed." There is no need to resolve the point, for it is apparent that nothing was done in the suit to disturb the status of Mideastern as the party plaintiff. Recognition of the instrument executed on January 17, 1935, would have so disturbed the delegation, a result which the parties thereto seemed to wish to avoid. It was disregarded by them until it became time to pay taxes on proceeds of the judgment. The delay was too long. We think also that the manner in *229 which the parties distributed the judgment money, i.e., as a liquidating dividend of Mideastern, is conclusive evidence that the parties never intended the so-called assignment to have any legal effect upon them. Treatment and interpretation of an instrument by the parties thereto is potent credence of its meaning and their intent. From the conflicting evidence on the point, we find that the amounts in question were received by way of liquidating dividends on stock of Mideastern and not, as contended by petitioners, on a claim acquired on January 17, 1935, from Mideastern against the City of New York. The whole argument of petitioners is that the money was derived from ownership of a claim, a property right, acquired in 1935, and that the various parties, consisting of the heads and members of the Goodman, Heyman and Gibbons families, received the distributions as returns on their ownership of interests in the claim. No contention is made that interests in the stock were assigned. On the contrary, petitioners argue that the amounts distributed were not liquidating dividends of Mideastern. The shares of stock never having been assigned and the distributions having been liquidating *230 dividends paid on the stock, it necessarily follows that petitioners Charles Goodman, Lydia Vogel Heyman and James E. Gibbons are taxable on the respective amounts paid on the shares outstanding in their names. The petitioners say that only 50 per cent of the amounts received by them is taxable, "since it is undisputed that the amount so received was the proceeds of a final liquidating dividend, taxable only to the extent provided in section 117 of the Internal Revenue Code." The respondent contends that the whole of the several amounts is taxable under the provisions of section 115 (c) of the Revenue Act of 1938. The petitioners contended on other points that the amounts represent proceeds of the claim against the City of New York and we do not construe the expression quoted above from their brief as a departure from such a view. The question is governed by sections 115 and 117 of the Revenue Act of 1938. Section 115 (c) provides, in part, as follows: DISTRIBUTIONS IN LIQUIDATION. - Amounts distributed in complete liquidation of a corporation shall be treated as in full payment in exchange for the stock, and amounts distributed in partial liquidation of *231 a corporation shall be treated as in part or full payment in exchange for the stock. The gain or loss to the distributee resulting from such exchange shall be determined under section 111, but shall be recognized only to the extent provided in section 112. Despite the provisions of section 117, the gain so recognized shall be considered as a short-term capital gain, except in the case of amounts distributed in complete liquidation. For the purpose of the preceding sentence, "complete liquidation" includes any one of a series of distributions made by a corporation in complete cancellation or redemption of all of its stock in accordance with a bona fide plan of liquidation and under which the transfer of the property under the liquidation is to be completed within a time specified in the plan, not exceeding, from the close of the taxable year during which is made the first of the series of distributions under the plan, (1) three years, if the first of such series of distributions is made in a taxable year beginning after December 31, 1937, or (2) two years, if the first of such series of distributions was made in a taxable year beginning before January 1, 1938. Section 117 (a) defines *232 short-term capital gain as "gain from the sale or exchange of a capital asset held for not more than 18 months, if and to the extent such gain is taken into account in computing net income." Section 117 (b) taxes 100 per cent of amounts received, where no contention is made that the stock had an unrecovered cost or other basis, unless the amounts were distributed in complete liquidation, as the terms are defined in section 115 (c). The record shows nothing more than a resolution passed in October 1933 to dissolve the corporation. It does not appear that any plan of liquidation was ever adopted. If the resolution constituted a plan of liquidation, a point we need not decide, it provides no time for completion of the liquidation. Under the circumstances it is clear that the distributions were not made in complete liquidation of the corporation within the meaning of the term as defined in the statute. It follows that no error was committed in taxing petitioners Charles Goodman, Lydia Vogel Heyman and James E. Gibbons on 100 per cent of the amount distributable to each of them. In their returns for 1938, Sylvia Goodman and the four children of Charles Goodman each reported one-sixth *233 of the amount distributed to Charles Goodman, and included one-half thereof as long-term gain. The respondent held that the gain was not subject to the limitations of section 117 of the Revenue Act of 1936 and taxed each of them on 100 per cent of the gain. At the hearing herein their counsel announced that he was not contesting the adjustments made by the respondent. Upon brief, however, he says that the respondent was wrong in treating the income as long-term capital gain. Counsel for the respondent announced at the hearing that if the income was held to be taxable to Charles Goodman, there would probably be overassessments in the cases of his wife and children. It is evident that there is no desire on the part of the respondent to tax the income more than once. Under the circumstances, the income will be eliminated from the gross income of the wife and children under Rule 50. Issue H. - Fraud The respondent determined that the deficiencies asserted against Charles Goodman, James E. Gibbons and William Heyman and Lydia Vogel Heyman were subject to fraud penalties. With respect to Charles Goodman, he relies upon the facts relating to the formation and operation of the family *234 account, and the petitioner's failure to include in his return for 1938, the additional amounts of income determined by him. The failure of James E. Gibbons and Lydia Vogel Heyman to include in their returns all of the amounts distributed by Mideastern on the stock outstanding in their names, is relied upon by the respondent to support his charge of fraud as to them. The facts concerning the formation and operation by Charles Goodman of the family account was fully discussed in connection with the fraud issues involving him in prior years. The account was maintained throughout 1938, with the same division of profits with intent to evade tax. The failure of Charles Goodman to report as taxable to him all of the income earned by the property in the family account, with intent to evade tax, is sufficient to support the imposition of a fraud penalty on all of the deficiency. Further consideration, however, will be given the charge of fraud in connection with the failure to report all of the proceeds of the payment made in 1938 by the City of New York on the judgment obtained against it by Mideastern. We have already discussed the agreement of January 17, 1935, in connection with the *235 interest of the petitioners in the judgment money. In that agreement Mideastern allegedly assigned for a recited consideration, its claims against the City of New York to its stockholders but referred to in the instrument as creditors, "and/or their assignees" and agreed that the owners of the "claim" were the "creditors" and members of their families. In each instance the division was made equally among the members of the three families. That the stockholders should at the same time make like assignments of their interests in the claim is significant, although Charles Goodman had been for several years dividing much of his income equally among the members of his family for tax reporting purposes. The agreement of the stockholders is reflected in the documents executed on October 28, 1937, and January 12, 1938, particularly the latter, which was executed five days after the judgment for $784,064.54 obtained by Mideastern against the City of New York had been entered. The three documents were drafted by Martin Fenton, an attorney and certified public accountant, who was the accountant for Mideastern and Goldberger-Raabin Co. and advised the parties in regard to the distributions. The *236 instruments were drafted in compliance with directions given by the individuals who signed them. Thus there can be no question about the source of the terms of the documents. Counsel for the petitioners refers to the instrument of January 17, 1935, both as an assignment and a distribution in liquidation. Nothing in the document refers to the transfer as a liquidating dividend; rather, it purports to be an assignment to creditors for recited considerations. In the agreement of January 12, 1938, the transaction is referred to as a purchase. The facts are referred to as additional examples of the disregard the parties had for the real import of the papers signed allegedly to define their interests. The disregard extended to the corporation. In the document executed on January 17, 1935, it agreed that the owners of the claim were members of the three families in specified proportions. In 1938 it ignored the agreement by distributing amounts for the account of the estate of Rose Goodman and Lydia Vogel Heyman as liquidating dividends. The individuals were the owners of the corporation's stock and were in a position to control its activities under or without agreements. The exercise of *237 that control is shown here. The document of October 28, 1937, covering the receipt and distribution of a liquidating dividend of Mideastern, and the document of January 12, 1938, relating to distribution of the proceeds of the judgment, were signed by Charles Goodman, James E. Gibbons, and William Heyman, in their individual capacities and as trustee for members of their respective families. James E. Gibbons testified that no instrument appointed him trustee for his wife and children. Other questions put to and answered by him on the point are: Q. Will you tell us why you were described in there as trustee for them? A. I do not know just how to respond to that, except to say that I acted on their behalf and presumed to do it, knowing that there would not be any question about it, as far as they were concerned. Q. Was it just because it was a family affair? A. Because I had acted for them in many matters before. It was a custom in the family. William Heyman testified that he had no written authority to act as trustee for his wife and son with respect to the agreements. After testifying that he did not know why he was designated a trustee in the instruments, he first testified *238 voluntarily that he acted as agent or representative of his wife and then that she authorized him to so act for her. We prefer to accept the documents themselves and the surrounding facts as establishing the capacity in which he acted. The instrument of January 17, 1935, purports to transfer interests in the claim to members of the three families. Nothing is said in the document that it is subject to the assignment executed by James E. Gibbons on October 21, 1931. The document of January 12, 1938, directs that the assignment be recognized in a distribution of proceeds of the judgment. Recognition was given it by Charles Goodman when distributing the payment made in 1938, with the result that the wife and children of James E. Gibbons received no actual payment, instead of one-fifteenth each, the amount they would have received if distribution had been made in accordance with the document of January 17, 1935. The wife and children of Gibbons did not sign the agreement of January 12, 1938, and he was not a trustee for them. If the January 17, 1935, agreement means what it says, Gibbons, without the consent of his wife and children, used their money to comply with one of his commitments. *239 The action of Gibbons shows that the documents were never intended to have the customary effect of binding agreements. It shows that he never intended to be bound to suffer a financial loss by assigning any of his interest in the claim to his wife and children. His actions paint for us a clear picture on the point. The agreement of January 12, 1938, recites that certain expenses incurred in prosecuting the claim had been borne by Charles Goodman and William Heyman. These expenses were, in fact, borne by Mideastern out of advances made by the individuals. We are unable to believe that they could have been mistaken about the matter since the advances totaled about $21,000 and had been taken into account three months earlier in a distribution by Mideastern. It is clear from all of the evidence that the primary object of the instruments was to provide a basis for showing ownership of the claim in members of the respective families, rather than in the stockholders, for the purpose of reporting income therefrom for taxation. To hold otherwise, would require us to recognize as legal and binding for tax purposes, agreements the parties disregarded at their pleasure. From all of the facts *240 we find that a part of the deficiencies against Charles Goodman, James E. Gibbons and William Heyman and Lydia Vogel Heyman, respectively, for 1938, was due to fraud with intent to evade tax. Docket No. 1837 - Charles Goodman - Year 1939 Issue A. - Ordinary dividends on stock: 1045
shares United Public Utilities
$1,224.00
2324 shares American States Utilities
Corp.
4,079.09
120
shares Bankers Securities Corp.
120.00
1290
shares Sioux City Gas & Electric
Co.
322.50
Total
$5,745.59
Interest on bonds: $22,500
Granite City Generating Co.
$1,125.00
26,000
Laclede Gas Co.
493.17
$20,000
Jacksonville Gas
532.65
Total
$2,150.82
Liquidating dividends on stock: 530
shares Hart & Early Co., Inc.
$ 291.69
Broadway Plaza
150.00
100
shares Penn Western Gas & Elec-
tric Co.
266.00
Short-term gain of $266 on 10 shares, and long-term capital loss of $6,568.95 on 1,190 shares of stock of Penn Western Gas & Electric Co.
Findings of Fact 200. In his return for 1939, the petitioner reported as taxable to him, one-sixth of the ordinary dividends and interest listed in our statement of the issue, and one-half of one-sixth, *241 or $24.31 of gain of $291.69 on a liquidating dividend of Hart & Early Co., Inc. In his determination of the deficiency the respondent included all of the ordinary dividends and interest in gross income and held that the gain of $291.69 derived from the liquidating dividend received on stock of Hart & Early Co., Inc., was taxable as short-term capital gain and that all of it was taxable to petitioner. The petitioner reported a loss of $6,302.95 on the 1,290 shares of stock of Penn Western Gas & Electric Co., and deducted one-half of one-sixth thereof, or $525.25, as a long-term capital loss. The respondent held that petitioner realized short-term capital gain of $266 upon the disposition of 100 shares acquired in 1938 at a cost of $700, and a loss of $6,568.95 on the remaining 1,190 shares acquired in 1936. He included the $266 in gross income as short-term capital gain and allowed 50 per cent of the loss as a deduction for long-term capital loss. Opinion The petitioner is not contesting the inclusion in his income of the liquidating dividend of $150 received on stock of Broadway Plaza. The only question involved in the issue relating to ordinary dividends, the liquidating dividend *242 on stock of Hart & Early Co., Inc., and interest on bonds, is whether the petitioner is taxable on all of the income or on one-sixth thereof, the securities having been in the family account. In accordance with the conclusion reached respecting the status of the account, we sustain the action of the respondent in taxing petitioner on 100 per cent of the income. The petitioner testified that he did not sell the block of 100 shares of stock of Penn Western Gas & Electric Co. in 1939, but exchanged the two blocks of stock aggregating 1,290 shares, for 1,290 shares of stock of the Sioux City Gas & Electric Co., without gain. There were three blocks of the stock, one block for 300 shares being in the name of Robert Goodman. Upon brief we are asked to reverse the respondent upon the ground that the testimony of petitioner shows that there was an exchange in liquidation proceedings and that respondent did not prove a sale. It is evident that the respondent computed gain or loss on each block of stock in order to carry out the provisions of the statute relating to gain and loss on capital assets. By so doing, he determined short-term capital gain on the shares acquired in 1938 and loss on *243 the remaining shares, which were acquired in 1936 at a higher cost. In any event, the only issue raised by the pleadings is whether all or only one-sixth the gain of $266 is taxable to petitioner, and petitioner is therefore not warranted in questioning the realization of gain, as determined by the respondent. The only question respecting the loss of $6,568.95 on 1,190 shares of stock of Penn Western Gas & Electric Co. is whether petitioner is entitled to deduct, as a long-term capital loss, one-half thereof or one-sixth of one-half. The three blocks of stock were in the family account, and it was not error for the respondent to include all of the gain of $266 in petitioner's gross income and allow him a long-term capital loss of $3,284.48 on the disposition of the 1,190 shares. Issue B. - Expense deductions of $1,025.07 Findings of Fact 201. During 1939 the petitioner paid the following amounts for the purposes shown: Seven payments to accountants for
preparation of records
$1,866.25
Attorney fee
10.75
Attorney fee to investigate patent for
investment purposes
20.00
Repairing subway
273.15
Accounting work in connection with
family account
180.00
Total
$2,350.15
*244 In his return for 1939 the petitioner claimed $2,200.15 of the amount as a deduction for expenses, only $30 or one-sixth of the item of $180 being included. The respondent allowed $1,175.08 of the amount claimed and disallowed the remainder of $1,025.07 as non-deductible under the provisions of section 24(a) of the Internal Revenue Code. Opinion The petitioner concedes that the attorney fee of $20 is not deductible. He contends that the remainder of the total amount claimed is deductible as ordinary and necessary business expenses. Several reasons require us to leave the parties where we found them. First, there is no proof of any activity of the petitioner in the taxable year constituting a business. In making the adjustment the respondent did not specify the items of expense allowed and disallowed and no segregation was made at the hearing. Even if we were justified in finding from the evidence that the several amounts are ordinary and necessary business expenses, we could not make any allowance because of the probability of conferring a double benefit to petitioner and imposing a corresponding loss to the respondent. Second, the same situation would apply *245 by treating the amounts as falling within the provisions of section 23 (a) (2) of the Revenue Act of 1938, as amended by section 121 of the Revenue Act of 1942, which permits deductions for nonbusiness expenses under certain specified conditions not proven here. Third, some of the expenses are not deductible under either provision. Concerning the accounting fees aggregating $1,866.25, the testimony, given by petitioner, is only that the services were performed in the preparation of "these records for me in 1939 of my affairs" and in response to a leading question of his counsel, that the records related to his business affairs. We have no knowledge of the character of the records prepared and the testimony is too general to support a finding that petitioner was engaged in business. The evidence fails to show the services performed for the attorney fee of $10.75. The cost of the subway work was $519.40, of which Heyman & Goodman Co. paid $246.25, leaving $273.15, which was paid by the petitioner. Concerning this item the petitioner testified that "we fixed the tunnel and subway * * *. That cost us $273.15" that "we all divided" the total cost of $519.40 and that he was guarantor of *246 the bonds given in connection with the repair contract they had. The evidence is not enough to establish the payment as an expense. It may have been a loss of some sort. The remaining item of $30 falls within the provisions of section 23 (a) (2), but, for reasons given, we are in no position to allow it here. Accordingly, we must sustain the respondent. Issue C. - Personal exemption of $2,500 Opinion It was stipulated that the petitioner is entitled to a personal exemption of $2,500 in the taxable year. Issue D. - Loss of $891.05 on liquidation of Gradwik, Inc. of New York Loss of $2,759.60 on real estate at 1860 Broadway Finding of Fact 202. In his return for 1939, the petitioner reported a loss of $10,692.69 on real estate received on September 30, 1939, in the liquidation of Gradwik, Inc. of New York and claimed one-half of one-sixth thereof, or $891.05 as a long-term capital loss. He also reported a loss of $33,115.20 on real estate, known as 1860 Broadway, and claimed one-half of one-sixth thereof, or $2,759.60 as a long-term capital loss. The respondent disallowed the deductions in determining the deficiency. Opinion Upon brief the petitioner abandoned his allegations *247 of error with respect to the deductions. In the nature of an alternative, the petitioner contends, upon brief, that he sustained a loss of $40,350 as a creditor of Gradwik, Inc. of New York in the amount of $67,250.03 at the time of its dissolution, his theory being that the debt was worth no more than 60 per cent of its face amount. The question was not raised by the petitioner in his petition, and although at the conclusion of the hearing time was allowed petitioner within which to amend his pleadings to conform to the proof, no amendment was filed to raise the issue. It is well settled that issues raised only upon brief, as here, may not be considered. If the issue were properly before us, we would be required to deny the deduction. The argument of petitioner on the value of the debt is based upon the same grounds as the contention he made in connection with Issue J, in regard to gain realized in 1936 from the liquidation of Gradwik, Inc. of Delaware. There, we sustained the respondent for lack of proof, due in part to the striking from the record of exhibits purporting to be balance sheets of the two Gradwik corporations in 1936. Here, the petitioner relies upon exhibit No. *248 48 to prove an indebtedness of Gradwik, Inc. of New York to him in the amount of $67,250.03 at the time of its dissolution. The exhibit, purporting to be a balance sheet of the corporation on September 30, 1939, was stricken from the record on motion of petitioner. Thus, there is no evidence to find that Gradwik, Inc. of New York was indebted to petitioner at the time of its dissolution. On this issue we sustain the respondent. Docket No. 1837 - Charles Goodman - Year 1939 Docket No. 5809 - James E. Gibbons - Year 1939 Docket No. 5810 - Lydia Vogel Heyman - Year 1939 Issue E. - Income tax liability on $620,000 paid by New York City on a judgment obtained by Mideastern Contracting Corporation Findings of Fact 203. The check for $530,000 issued on May 3, 1939, by the law firm of Nevius, Brett & Kellogg was deposited in the Manufacturer's Trust Co. After deducting expenses of $5,766, the balance of $524,234 of the proceeds of the check was distributed by Charles Goodman on May 8, 1939, by checks signed by him as trustee, as follows: Payable to the order of
Amount
Endorsement
James E. Gibbons
$30,833.95
James E. Gibbons. Deposit to the a/c of Jas. E. Gibbons
or Catherine F. Gibbons
Catherine F. Gibbons [1]
$30,833.95
For deposit to the account of Catherine F. Gibbons or James E. Gibbons or survivor. Catherine F. Gibbons
Eugene F. Gibbons [2]
$30,833.95
Eugene F. Gibbons
James E. Gibbons, 3d [2]
$30,833.94
James E. Gibbons, 3d
Raymond J. Gibbons [2]
$30,833.94
Raymond J. Gibbons
William Heyman
$61,677.38
For deposit William Heyman
Lydia Vogel Heyman
$61,677.38
For deposit Lydia Vogel Heyman
Samuel Heyman
$61,677.37
For deposit Samuel Heyman
Charles Goodman
$30,838.69
Charles Goodman
Sylvia Goodman
$30,838.69
For deposit in Public National Bank & Trust Co. Sylvia Goodman
Robert W. Goodman
$30,838.69
Robert W. Goodman
Doris Goodman
$30,838.69
Doris Goodman. Deposit in Charles Goodman Special
Charles Goodman
Annette Goodman
$30,838.69
Annette Goodman. Deposit in Charles Goodman Special
Charles Goodman
William Goodman
$30,838.69
William Goodman. Deposit in Charles Goodman Special
Charles Goodman.
*249 204. The expenses in 1939, which were deductible from the proceeds of the check for $530,000, were $6,509.41, leaving $523.490.59 for distribution to stockholders, or $174,496.86 to each stockholder of Mideastern. 205. A short time thereafter James E. Gibbons and his sons and Martin Fenton had a conference. Officials of the Bank of New York had advised the opening of custodian accounts with investment service. Later an official of the Bank of New York informed James E. Gibbons that his bank would not accept a custodian account for less than $150,000. After further discussion of the subject there was developed the idea of pooling the funds to overcome the rules of the bank with respect to the minimum requirements as to amount. 206. The checks issued to Eugene F. Gibbons, James E. Gibbons, 3rd, and Raymond J. Gibbons, by Charles Goodman, Trustee, on May 8, 1939, were deposited by the respective payees in different banks to the credit of accounts in their individual names. None of the deposits was withdrawn until September 28, 1939, when $30,324.59 was withdrawn by each son to pay for $30,000 par value of United States *250 Treasury notes from C. J. Devine & Co., Inc. Receipts for the delivery of the securities by the seller were signed by James E. Gibbons. Eugene F. Gibbons had a balance of $509.36 in his account after issuing the check for $30,324.59. 207. On October 3, 1939, James E. Gibbons delivered the $90,000 face amount of treasury notes purchased by his sons, and $10,000 face amount of like notes purchased by him, to the Bank of New York, opened four custodian accounts under one general account, and received a receipt from the bank for the securities. The four custodian accounts were numbered 1 to 4, inclusive, in the name of James E. and/or Catherine F. Gibbons. The treasury note for $10,000 purchased by James E. Gibbons, and $65,000 deposited by him in cash on October 31, 1939, were entered in account No. 1, and the remaining treasury notes of $90,000 were credited in equal amounts to the other three accounts. The Bank of New York kept each account in the name of James E. and/or Catherine F. Gibbons and rendered monthly statements to them for each account. Petitioner Gibbons called account No. 1 the joint account of himself and his wife, and accounts 2, 3, and 4, the accounts of his sons, *251 Raymond, Eugene, and James, respectively. 208. On October 31, 1939, James E. Gibbons and his wife, Catherine F. Gibbons, signed letters of instructions to the Bank of New York, respecting the custodian investment counsel accounts with the bank, and filed them with the bank on November 2, 1939. A separate letter was signed for each account. The letters were identical except for the number of the account. The letter for account No. 1 read as follows: Referring to the custodian Investment Counsel account with your Bank in the name of James E. and/or Catherine F. Gibbons No. 1 you are hereby advised that any cash or securities at present in the account and any additions thereto of either cash or securities made by either of the undersigned upon the making thereof shall become the property of the undersigned as joint tenants and not as tenants in common; and the same, together with all interest on the cash balance or interest and dividends on securities shall be held for the exclusive use of the undersigned and the cash or securities therein may be withdrawn by either during the lifetime of both, or by the survivor after the death of one of them. Such payment or withdrawal by either *252 of the undersigned and the receipt or acquittance of either to whom such payment or delivery is made, shall be a valid and sufficient release and discharge to you for all payments or deliveries made from this account prior to the receipt by you of notice in writing signed by either or both of the undersigned not to honor such payment or withdrawal in accordance with the terms thereof. We further authorize either of the undersigned, and also the Bank of New York, to endorse for credit to the account referred to, any checks, drafts or other instruments calling for the payment of money which may be drawn or endorsed to the order of either of us individually. An additional letter of instruction was signed by them on December 16, 1939, for each account. The terms of the letters were identical. They provided that the custodian service consisted of the safekeeping of securities, collection of and deposit of cash items and delivering out of and receiving into the account, securities in accordance with instructions of the client, and that the investment counsel service consisted of supervising the securities in the account and to make recommendations with respect thereto. The accounts were *253 to be considered as a unit for fee purposes. Remittances of all of the income in the accounts were to be made monthly by deposit in an account at the bank, entitled "James E. Gibbons and/or Catherine F. Gibbons." There were some transfers of principal from the accounts to the checking account in 1941. 209. In July 1939 James E. Gibbons had an attorney draft instruments in the form of agreements between himself and his wife, who were referred to as parents, and each of his sons. The instruments, as drafted, recited that the son was indebted to the parents for advances, with interest at the rate of 6 per cent per annum and that the son desired to secure the parents for repayment of the sum. The form of agreement then provided, in effect, that the son had deposited a sum of money in escrow with his parents as security for the payment of the indebtedness; that the parents were authorized to invest the fund and apply the net income therefrom in payment of interest and principal on the indebtedness; that the parents might invest the money in any manner they saw fit, without any liability to the son for loss, including loss resulting from errors of judgment; that the son might reduce his *254 indebtedness from funds other than those deposited; that upon payment of the indebtedness, the parents would distribute the principal to the son; that in the event the son should die before paying the indebtedness or become insolvent, the parents might liquidate the fund and apply the proceeds toward the satisfaction of the indebtedness and in the event of the death of the parents or either of them, or an assignment of their claim, the legal representatives or assignees of the parents, as the case might be, might administer the fund upon the same conditions. Space provided in the drafts of agreement to insert the date of execution, the place of residence ff the parties, the amount of the advances, the date from which the interest was to run and the amount deposited by the son, was never filled in. The forms of agreement were signed by the sons at some undisclosed time prior to 1943, but were never signed by the parents. The amount for advances had not been ascertained at the times the sons executed the forms in view of which James E. Gibbons was authorized by his sons to insert the amount of the alleged indebtedness when his accountant determined the correct amounts. 210. All of *255 the sons of James E. Gibbons were of age in July 1939, the youngest being about 21 years and eight months of age. June 15, 1927 to October 29, 1940 September 26, 1933 to May 1, 1940 September 26, 1933 to October 1, 1938 The amount in each case includes $6,000 for college expenses for four years. The amount of $1,485 is given as the college expense of Raymond in 1928, and James in 1936; otherwise, a slightly different amount is listed for each son for the respective years. 212. The entries for Raymond also include $2,300 for a loan made to the Acorn Trucking Co., in which the son had a 50 per cent interest. 213. The entries for Eugene include an item of $500 in 1933 for a trip to the Pacific Coast, $1,250 in 1938 and 1939 for furniture and $9,400 in 1939 for a home. The other entries for James are $500 for a trip to the Pacific Coast in 1933 and $1,000 in 1938 for a trip to Europe. The accountant obtained the entries for college expenses and the Pacific Coast and European trips from James E. Gibbons. The remaining entries were made by the accountant from bank statements, checks or other evidence. 214. At the same time accounts were opened for each son in which the journal *256 entries were posted and in which entries were subsequently made as representing were subsequently made as representing payments and advances. No interest was ever charged. 215. From November 1, 1939, to the close of 1944, the net income of custodian accounts Nos. 2, 3 and 4 was $4,583.77, $4,219.59 and $5,715.85, respectively, all of which was credited to the joint account of James E. and Catherine F. Gibbons in the Bank of New York and the accounts kept by James E. Gibbons as representing indebtedness of his sons. Gain from the sale of securities in the account was not credited to the personal accounts of his sons. Eugene made some payments on his account out of income derived from sources other than the custodian account. James E. Gibbons showed his sons quarterly reports rendered by the bank on the custodian accounts. 211. In July or August 1940 the accountant for James E. Gibbons made entries in books, opened for the purpose, to show indebtedness of each of the sons to his parents. The journal entries made for each of the accounts aggregate the following amounts for the period shown: $17,832.00
Raymond J. Gibbons
$17,768.50
Eugene F. Gibbons
$ 7,500.00
James E. Gibbons,3d.
*257 216. During 1941 principal was withdrawn from custodian accounts Nos. 2, 3, and 4, to pay income taxes of the sons. The amounts were deposited in the joint account of James E. and Catherine F. Gibbons at the Bank of New York and were charged and credited in the accounts of the respective sons in the books of James E. Gibbons. Principal in the amount of $2,000 was withdrawn from account No. 4 in March 1943 and paid to James E. Gibbons. James E. Gibbons, 3d, invested the amount in a partnership of which his father was a member. The withdrawal was not entered in the account of James E. Gibbons, 3d, on the books of James E. Gibbons. 217. On about March 12, 1940, the balance of $509.36 in the checking account of Eugene F. Gibbons after purchasing the United States Treasury notes was withdrawn by check payable to James E. Gibbons, who credited the amount to the account of Eugene in his books. 218. In his return for 1939 Charles Goodman reported as taxable long-term capital gain derived from a liquidating dividend paid by the trustee for stockholders of Mideastern, the amount of $14,541.40, the figure being 50 per cent of one-sixth of $174,496.86. In determining the deficiency the respondent *258 included all of the amount of $174,496.86 in gross income as ordinary income. 219. The returns filed by Lydia Vogel Heyman, William Heyman and Samuel Heyman for 1939, with the collector for the Second District of New York, each include gain of $58,165.62 from a claim against the city of New York, one-half of which was included in income as long-term capital gain. In his determination of the deficiency against Lydia Vogel Heyman for 1939, the respondent included the amount of $174,496.86 in her ordinary income as income realized from the liquidation of a claim against the city of New York. 220. In his return for 1939, filed with the collector for the Second District of New York, James E. Gibbons reported gain of $34,899.38 on a claim against the city of New York and included one-half thereof, or $17,449.69 in gross income as long-term capital gain. In his determination of the deficiency the respondent held that James E. Gibbons received $174,496.86 from the liquidation of a claim against the city of New York, all of which was taxable to him as ordinary income. 221. Attached to the return filed by Charles Goodman for 1939 was a statement, signed by him, reading as follows: *259 Statement of Charles Goodman, Settlor Charles Goodman, Trustee - To and including 1937 Statement of account of Goodman family of six each one-sixths, consisting of Charles, born 1885, his second wife, Sylvia, born 1902, and four children of Charles Goodman and former wife, Rose Goodman, who died May 1, 1934; four children are Robert, born August 5, 1914; Doris, born October 21, 1919., Annette, born January 5, 1924 and William, born December 6, 1926. Charles Goodman, husband and father, by gifts gave property, stocks, bonds, etc., to trust-ship for investment purposes; Charles Goodman to be trustee and agent or nominee for same. Sylvia Goodman and Robert Goodman and other children on reaching twenty-one years of age, may substitute for Charles Goodman when necessity arises. From avails each one is to pay his one-sixth share of expense and one-sixth of Tupper Lake property improvements and expense. Income is to be distributed one-sixth to each as conditions warrant. Upon Charles Goodman's death or during his life, any adult may withdraw his share, which shall be paid as soon as possible and within twelve months thereafter if possible. All questions must be settled by adults without *260 outside interference and a bond or security must not be required of anyone to insure his correct and honest action. Interest on loans between parties is not to be charged. 222. A part of the deficiencies against Charles Goodman, James E. Gibbons and Lydia Vogel Heyman, respectively, for 1939 was due to fraud with intent to evade tax. Opinion Of the total of $524,234 distributed by Charles Goodman on May 8, 1939, as trustee, members of each of the Gibbons, Heyman, and Goodman families, received a total of $154,169.73, $185,032.13, and $185,032.14, respectively. Each of the respective petitioners reported as income, his or her alleged interest in total distributions of $174,496.86 to each family. The respondent accepted as correct the amount of the total distributions and there is no disagreement here on the point. The respondent, as in 1938 with respect to the distributable amount of $43,094.69 in that year out of the proceeds of the judgment, taxed one-third of the amount distributable, or $174,496.86, as ordinary income received by the respective petitioners. Here, as in 1938, the respective petitioners contend that their interest in the total amount was no more than one-sixth, *261 one-fifth and one-third of one-third thereof, respectively, and that of such amount, only 50 per cent is taxable as long-term gain. In addition, petitioner Gibbons contends that he received no more than one-fifth of $154,169.73, upon the ground that the difference of $20,327.13 between $174,496.86 and $154,169.73, the amount actually received by members of his family, went to his assignees under the assignment of October 21, 1931. All of these contentions of the petitioners were considered at length in our discussion of like questions involved in the issues raised on the distributions made in 1938, and it would unnecessarily duplicate the record to repeat here what we there concluded. Following the conclusions there reached, we sustain the action of respondent in taxing each petitioner on $174,496.86 as ordinary income received in the distribution. Issue F. - Fraud Opinion The respondent's charge of fraud in this year takes substantially the same course as his assertions in 1938, with the addition of facts applicable only to the taxable year. The family account opened by petitioner Goodman in 1934 was maintained in 1939 in the same manner as in prior years. During the year, *262 1,290 shares of stock of the Penn Western Gas & Electric Co., 330 shares of which were outstanding in the name of Robert Goodman, were exchanged for a like number of shares of stock of the Sioux City Gas & Electric Co. and petitioner Charles Goodman claimed a loss in the family account on 1,190 shares in the exchange, including the 300 shares of Robert. Dividends paid on the Sioux City Gas & Electric stock in 1939 were reported as income of the family account, as petitioner had previously reported the income from the Penn Western stock. The facts are additional proof of the disregard the petitioner had in his dealings with the tax collector for ownership of income-producing property.They are examples of the effort he made to divide income among the members of his family for tax-paying purposes only. The operation of the account and his failure to report all of the income therefrom as taxable to him, is, for reasons already given, sufficient to sustain the imposition by the respondent of a fraud penalty against him. Other facts corroborate the fact that a part of the deficiency was due to fraud with intent to evade tax. The distributions made by Charles Goodman, as trustee, in 1938, *263 were made by checks issued to his and William Heyman's order, and included the share James E. Gibbons would have received without his assignment in 1931 of dividends, ordinary and liquidating, of Mideastern to Rose Goodman and Lydia Vogel Heyman up to $68,200. Such distribution was not in accordance with the agreements of January 17, 1935, October 28, 1937, and January 12, 1938. The first agreement purported to make the members of the respective families equal owners of the claim against the City of New York, i.e., each member of Goodman, the Gibbons and Heyman families was described as the owner of a 1/18th, 1/15th and 1/9th share, respectively. There is no provision in the instrument on how the proceeds of the claim should be paid to the individuals. The second agreement, entered into primarily for the distributions made by Mideastern in 1937 but containing terms for the distribution of all assets they might receive as stockholders and trustees directly from Mideastern as distributions in liquidation, lists like ownership in Mideastern's net assets on liquidation, but provides for payment to Rose Goodman and Lydia Vogel Heyman of not in excess of $68,200 out of the shares of the *264 Gibbons family and that payment of the shares of the Goodman family should be paid to Charles Goodman and of the Heyman family, to William Heyman. It will be recalled that William Heyman and James E. Gibbons were not appointed trustees by their respective wives and the former was not a stockholder of Mideastern, his wife having owned the stock. The third agreement was entered into five days after the entry of the judgment of $781,808.77 obtained by Mideastern and its terms are confined to distribution of the proceeds of the claim against the city of New York. The provision for payment does not differ from the second agreement, except that the balance remaining after liquidation of the indebtedness of James E. Gibbons to Rose Goodman and Lydia Vogel Heyman equally out of the listed interests of members of the Gibbons family, was to be paid in equal amounts to the five members of the Gibbons family. The distributions made in the taxable year 1939 did not follow the pattern of the payments made by Charles Goodman as trustee in 1938 out of the judgment money. As in 1938, there was no distribution directly to the estate of Rose Goodman, or to Lydia Vogel Heyman. There was no distribution *265 to Charles Goodman and William Heyman for the listed shares of the members of their respective families, as provided for in the instruments executed on October 28, 1937, and January 12, 1938; instead, distributions were made to members of the two families, and the amounts paid to them included amounts deducted from the shares of the Gibbons family on account of the assignment made by James E. Gibbons in 1931. The payments were made to the individuals listed as owners in the document executed on January 17, 1935, which makes no provision for deductions from shares of members of the Gibbons family to comply with the terms of the assignment made by James E. Gibbons in 1931. Thus the interested parties did not respect their alleged agreements in 1939 any more than they did in 1938. They recognized the fund as a liquidating dividend of Mideastern, yet petitioners Gibbons and Heyman reported the distribution as proceeds of a claim acquired in 1935. Except for including the amount in distributions to members of the Heyman and Goodman families, there was no payment to the estate of Rose Goodman and Lydia Vogel Heyman under the assignment made by James E. Gibbons in 1931. The shares of *266 Charles Goodman were in his family account and he reported the distribution in 1939 as a liquidating dividend from Mideastern, but none of the checks for distributions to members of his family were made payable to himself as trustee. The dividend was not entered in the family account in 1939. The checks payable to Doris Goodman, then 19 years of age, and Annette and William Goodman, then 15 and 12 years of age, respectively, were deposited in a special account of Charles Goodman. The children had no interest in the account so far as the record here shows.
The manner in which the distributions were made is evidence that the petitioners, as in 1938, never intended to be bound by the instrument of January 17, 1935, or the subsequent document, as to ownership of the claim or the proceeds thereof. The several agreements and the course of conduct of petitioners disclose that the documents were prepared primarily to serve as a basis for pretending that members of the families of the petitioners had an interest in the claim equal to their own in order to evade income tax, and bear out the allegations of fraud as to all of the petitioners. The respondent also cites the opening and operation *267 of the custodian accounts as additional support of his allegation of fraud in the case of James E. Gibbons. In answer petitioner Gibbons contends, in effect, that the money distributed to his sons was paid to them as owners of fractional interests in the claim; that they were in a position to use it in any manner they saw fit; that they decided to invest it in custodian accounts and did with his help to meet the minimum requirements of the bank; that his sons were indebted to him for advances; that the treasury notes were turned over to him under the terms of the instruments drafted in July 1939 as security for the payment of the indebtedness, with power to invest the notes and apply the net income therefrom in payment of interest and principal of the indebtedness; that principal was withdrawn from the custodian accounts only for the purpose of meeting obligations of the sons and that the net income of the custodian accounts in which the notes were entered was used to pay indebtedness of his sons to him. We have carefully examined the facts involved in the opposing contentions. The four custodian accounts were in the names of petitioner and/or his wife and the net income of the securities *268 in the accounts was credited regularly to their joint checking account at the bank. Books were opened by petitioner to show indebtedness of each of his sons to him and to the accounts therein; the net income of the three custodian accounts alleged maintained for the sons were credited in due course. To us the whole transaction appears form and not reality. The details are shown in our findings of fact and need not be referred to at length. The instruments drafted in July 1939 were never completed or signed by both parties and do not constitute agreements. Petitioner Gibbons testified that his and his wife's signatures were not necessary because the provisions merely authorized him to do certain specified things. Assuming that the signatures of himself and his wife were not necessary, the instruments contain no acknowledgment of indebtedness of the sons to him in any specified amount. The books of petitioner Gibbons are unacceptable as convincing proof of the indebtedness entered therein. The accountant who opened the books had nothing to support the charges for college expenses other than the amounts as given to him by petitioner. No testimony was offered by petitioner in an effort *269 to justify the position he outwardly assumed that his sons were indebted to him for costs of educating them at college, plus interest from a date never indicated. We are not convinced that a man of the financial position and business standing of petitioner did not pay the college expenses of his sons, without charging them to the sons. It is significant that the expenses of each son should have been stated as $6,000, even though all were not at college during the same years. Of greater importance here is the fact that with one exception the expense of each son each year is only slightly different. It discloses that the amounts were not even estimated with any idea of approximation to accuracy. The entries are evidence of an attempt to create indebtedness to divide the net income of the custodian accounts for income tax-paying purposes. Interest was not in fact charged the sons on the alleged indebtedness, though provided for in the purported agreement of July 1939. No reason was given for the failure to do so. Under all the circumstances here, we can not believe that such a charge was ever really considered. Further, if the sons were actually indebted to their father, why was the *270 money in the alleged possession of the sons not used to pay their financial obligations to their father? The transaction appears to us nothing more than part of a fraudulent scheme of petitioner Gibbons to split his income among the members of his family for the purpose of evading income tax. We conclude that the respondent has sustained his burden of proving that the deficiencies against the petitioners for 1939 were due in part to fraud with intent to evade tax. Docket No. 4976 - Charles Goodman - Year 1940 Issue A. - $5,319.17 ordinary dividend income $3,377.25 interest on bonds $2,952.52 liquidating dividend Hart & early Co. Inc. Findings of Fact 223. During 1940 the petitioner received, in the family account, the following ordinary dividends on stock: 120
shares Bankers Securities Cor-
poration
$ 120.00
1,290
shares Sioux City Gas & Elec-
tric Company
1,290.00
2,320
shares American States Utili-
ties Corporation
3,195.50
1,045
shares United Public Utilities
Corporation
1,530.00
Total
$6,135.50
224. In his return for 1940 the petitioner included one-sixth of $6,135.50, or $1,022.58 in income as dividends received on the *271 stock. In his determination of the deficiency the respondent held that petitioner received dividends of $6,341.75 on the stock, and increased the amount reported by $5,319.17. 225. The petitioner included in his taxable income for 1940 the amount of $675.45 as one-sixth of interest of $4,052.70 on bonds in the family account. In determining the deficiency the respondent taxed petitioner on the entire amount of the interest. 226. In his return for 1940 the petitioner reported a liquidating dividend of $2,952.52 on stock of Hart & Early Co. Inc. and included in his taxable income one-half of one-sixth thereof, or $246.05, as long-term capital gain. The respondent included the entire amount of $2,952.52 in income as short-term capital gain. Opinion Aside from the amount of income of ordinary dividends paid on the stock, which we have found to be $6,135.50 instead of $6,341.75, as determined by the respondent, the only difference between the parties is whether the petitioner is taxable on one-sixth or 100 per cent of the income. The securities were in the family account. We have held that all of the income of the family account is taxable to petitioner. Following that conclusion, *272 we sustain the respondent on this issue, with the exception of the amount of dividend income, which will be included in income in the amount of $6,135.50. Issue B - $4,700 dividend Winhill Corporation Findings of Fact 227. In 1940 petitioner and his son Robert Goodman received $3,133.33 and $1,566.67, respectively, from the Winhill Corporation for services rendered to the corporation in 1937. No part of the amount was reported by the petitioner in his return for 1940. In his determination of the deficiency the respondent included the amount of $4,700 in gross income of petitioner as dividend. Opinion The respondent's determination is no more than that the petitioner received dividends of $4,700 from the Winhill Corporation and failed to report them in his return. In the case of Winhill Corporation herein for 1937, we found that the salary of $6,000 of petitioner and $3,000 of his son Robert, was credited to paid-in surplus of the corporation; that petitioner reported his salary as taxable income and concluded that, inasmuch as the salaries were not actually or constructively paid, the corporation was not entitled to a deduction for the salaries. The petitioner testified *273 that the amounts were paid by the Winhill Corporation out of paid-in surplus. The testimony is consistent with the arguments made on the deductibility of the compensation in 1937 by the corporation. However, as the corporation paid nothing in 1937, it had no basis for crediting paid-in surplus to represent a contribution by the Goodmans. Under the circumstances, it is apparent that the amount in controversy does not represent a return of capital or a dividend, but constitutes salary earned in 1937. Of the amount paid, petitioner received $3,133.33 and that amount will be included in his income as compensation for services rendered. The respondent is not sustained as to the remaining amount, which was paid to Robert Goodman. Issue C. - $201.54 interest on bonds of Hamilton Gas Corporation Findings of Fact 228. In his return for 1940 the petitioner reported the receipt of $480 as interest received on coupon bonds of the Hamilton Gas Corporation in a reorganization. From the amount of interest received he deducted $201.54 which he had paid on an assessment made against him by the reorganization committee for the bondholders and included the remainder of $278.46 in gross income. *274 In his determination of the deficiency, the respondent increased the amount of interest reported on the bonds by $201.54. Opinion The only question under the issue is whether the petitioner should be taxed on $480, or that amount, less the expenses of $201.54. The effect of the respondent's action was to disallow the expenses as a deduction. Section 23 (a) (2) of the Revenue Act of 1938, as amended by section 121 of the Revenue Act of 1942, allows as a deduction to an individual "all the ordinary and necessary expenses paid or incurred during the taxable year for the production or collection of income." It is clear that the amount in question was an ordinary and necessary expense paid for the collection of the income. On this issue the petitioner is sustained. Issue D - Interest on loans to Airhill Corporation Findings of Fact 229. On December 31, 1940, the petitioner received a check, bearing the same date, from the Airhill Corporation, all of whose stock was then owned by members of the Goodman family, for $1,709.71 in payment of interest for 1940 on a personal loan of petitioner. On the same day he received another check from the corporation for $4,517.11 in payment *275 of interest for 1940 on a loan made out of funds of the family account. The check was dated December 31, 1940; signed by Robert Goodman as president and petitioner as secretary-treasurer, and was payable to the order of "Charles Goodman. In trust for William, Annette, Doris, Robert, Sylvia and Charles Goodman, each one-sixth." 230. The check for $1,709.71 was not deposited until about January 7, 1941. The check for $4,517.11 was deposited on January 9, 1941, in a bank account entitled "Charles Goodman, special." 231. On December 31, 1940, there was an overdraft in the bank account of the Airhill Corporation on which the checks were drawn. At that time the corporation had considerable property and was solvent. The checks would have been good on that day if the petitioner had made the loan to the corporation which he had intended to make with money in the family account, and did make therafter prior to January 7, 1941. It was a routine matter for petitioner to make personal loans to the Airhill Corporation or out of funds of the family account for construction purposes. The petitioner filed his return for 1940 on the cash basis. 232. In his return for 1940 the petitioner included *276 in gross income as interest, all of the amount of $1,709.71, and one-sixth, or $752.85 of the check for $4,517.11. The respondent, in his determination of the deficiency, eliminated the amounts from gross income upon the ground that they were not actually or constructively received in the year 1940. The respondent included the aggregate amount of the checks, $6,226.82, in gross income of petitioner for 1941. Opinion The sole point for decision under the issue is whether the amounts were constructively received by the petitioner in 1940. It is well established that the doctrine of constructive receipt is to be sparingly applied. John A. Brander, 3 B.T.A. 231; J. E. Farrell, 45 B.T.A. 162, affd. 134 Fed. (2d) 193. This is not a case of treating as cash, or its equivalent, a check capable of being cashed upon demand. The petitioner was aware at the time of issuance of the checks that they were not good and would not be until he made another loan to the corporation. With such knowledge it is apparent that he did not regard the receipt of the checks as actual payment in 1940 and had no intention of depositing them for collection at any definite *277 time after they were delivered to him. The corporation did not obtain another loan until 1941, pending which the checks in petitioner's possession were incapable of being reduced to cash. The petitioner reported the amounts in 1940 only because the checks were in payment of interest for that year. This action is evidence of a belief on the part of petitioner that the time of reporting the interest as income should agree with the taxable period in which the amounts were deductible by the corporation. Questions of this sort turn upon their peculiar facts. Here, the petitioner, upon brief, has expressed lack of much interest in whether the amounts are taxed in 1940 or 1941 if proper adjustments are made. Aside from this expression of indifference, the facts do not support a holding for petitioner, and, accordingly, we sustain the respondent on the issue. Issue E. - Rental net income of $4.18 Findings of Fact 233. In 1940 the petitioner rented a twofamily residence which he had constructed at a cost of $7,200 for the improvements. In his return for 1940 he claimed depreciation for six months on a cost of $7,500. The respondent adjusted the computation by allowing depreciation *278 for seven months on cost of $5,600, and as a result increased by $4.18 the amount of rental income derived by the petitioner from the property. Opinion The only difference between the parties on this issue is the cost basis of the house, which we here found to be in the amount of $7,200. Accordingly, depreciation should be recomputed for seven months at 3 per cent of such cost. Issue F. - Short-term gain of $250 on disposition of real property Findings of Fact 234. On August 16, 1940, the petitioner, as trustee for the stockholders of Gradwik, Inc. (New York or Delaware not shown) and as special guardian for William, Annette and Doris Goodman, his minor children, and the petitioner and his wife and son Robert, executed deeds in favor of the Dry Dock Savings Institution for real property known as 1860 Broadway. The grantee held a mortgage on the property. The respective grantors received $123.99, $125.01 and $1, a total of $250, for the deeds. In addition thereto the petitioner received the amount of $43.37. The property was in the family account at the close of 1938. None of the amounts was reported in the income tax return filed by petitioner for 1940. In his determination *279 of the deficiency the respondent included in petitioner's gross income, the amount of $250 as short-term capital gain realized from the disposition of the property. Opinion The question raised by the petition is that the respondent erred in including $250 in income as short-term capital gain realized upon the disposition of the property. The facts alleged were that petitioner received $41.66 as the owner of a one-sixth interest in the $250. Upon brief it is contended that the petitioner received $64.37 for executing a deed for the property. The testimony relied upon to support the statement shows that the grantors received for the three deeds, a total of $250, and in addition thereto the grantee paid $43.37 to petitioner and $100 to Herbert Klosk for unexplained reasons. The testimony does not include a payment of $64.37 and petitioner does not disclose how he computed such amount. The property was in the family account at the close of 1938 at a book figure of $33,115, and in 1939 the petitioner claimed a loss on the property which loss was later abandoned, of one-half of one-sixth of such amount. Nothing of record discloses that the property was conveyed out of the family *280 account, or that petitioner's interest in the real estate was less than 100 per cent. Lack of proof of error requires a holding that we sustain the respondent. Accordingly, we will not disturb his adjustment. Issue G. - Income of $2,225.33 from the Winhill Corporation Findings of Fact 235. In 1940 the petitioner received from the Winhill Corporation $2,673.76, of which $448.43 constituted interest and the remainder of $2,225.33 represented payment of principal of a mortgage owned by the petitioner. The petitioner reported the $448.43 as interest. In his determination of the deficiency the respondent taxed petitioner on the remainder of $2,225.33 as other income received. Opinion The uncontradicted evidence establishes that the amount in controversy was a return of capital and not income, as determined by the respondent. Accordingly, on this issue we sustain the petitioner. Issue H. - Expense deductions of $2,762.01 Findings of Fact 236. During 1940 the petitioner paid the following amounts for the purposes shown: Accounting fees for work on books
kept by petitioner for his invest-
ments
$1,391.54
Office supplies
45.00
Cleaning the office building
46.53
Repairs to the office building
16.85
Water for the office building
15.00
Electricity for the office building
8.38
Fee to architect for preparation of
plans to remodel a building at 313
West 53rd Street, New York City,
which was owned by petitioner [and]
in which he established his office
85.00
Petty cash expenses of supervisor of
construction in remodeling of the
office building
5.72
Paid to city collector for undescribed
purpose in connection with the re-
modeling of the office building
10.00
"Shuster, tax book"
2.00
Fees for filling petitions of petitioner
with Board of Tax Appeals
30.00
New York City taxes on Bayside prop-
erty
125.37
New York City taxes on the office
building
415.35
Transfer tax on shares of stock
1.50
Total
$2,198.24
*281 237. The petitioner intended to lease the office building to the Cooper Union Alumni Association at some undisclosed time and eventually give the property to it. 238. In his return for 1940 the petitioner claimed the amount of $4,777.06 as a deduction for expenses. The respondent allowed $2,015.05 and disallowed the remainder of $2,762.01 upon the ground that it constituted personal expenses. Opinion Of the disallowances made by the respondent, the petitioner offered testimony on expenditures aggregating $2,621.96. Upon brief he concedes that items aggregating $423.72 are non-deductible, leaving the amount of $2,198.24, as listed in our findings of fact, in controversy, which the petitioner contends is deductible as ordinary and necessary business expenses. The petitioner did not direct any of the evidence to the kind of business, if any, that he was conducting in the taxable year. Such evidence as is before us on the point discloses no activity that can be characterized as a business. He was, however, engaged in the production and collection of income, and the management, conservation or maintenance of property held for the production of income, and some of the expenses *282 in controversy are deductible as non-business expenses under the provisions of section 23 (a)(2) of the Revenue Act of 1938, as amended by section 121 of the Revenue Act of 1942. The first six items for accounting fees and costs of maintaining his office in the building which he remodeled in 1940 for that purpose, constitute expenses incurred in the production of income. Edward Mallinckrodt, 2 T.C. 1128. The next two items,$85 and $5.72, are capital expenditures and, therefore, are not deductible. Insufficient evidence in regard to the amount of $10 and $2 requires us to sustain the respondent as to them. The filing fees of $30 constitute deductible expenses. Herbert Marshall 5 T.C. 1032. The remaining three items are deductible under section 23 (c) as taxes paid within the taxable year. Issue I. - Earned income credit of $188.55 Findings of Fact 239. During 1940 the petitioner received $7,467.37 as salary and professional fees for personal services actually rendered. In his return for other taxable years he claimed one-tenth of such amount, or $746.73, as earned income credit. The respondent, in determining the deficiency, allowed 10 per cent of *283 $5,581.82, or $558.18. Opinion The evidence fails to disclose how the respondent determined the figure of $5,581.82 and he does not discuss the issue upon brief. The proof here is that petitioner received salaries and professional fees of $7,467.37. Such figure will be used in computing the earned income credit under Rule 50. Issue J. - Fraud Findings of Fact 240. The petitioner attached to his return for 1940 a list of securities and other assets in the family account on December 31, 1940. The stocks included shares of Hart & Early, Co., Inc., Goldberger-Raabin Co., Mideastern, Heyman & Goodman Co. of New Jersey, and Winhill Corporation. 241. A part of the deficiency for 1940 was due to fraud with intent to evade tax. Opinion The respondent, to support his finding of fraud, cites the failure of petitioner to report as taxable to him no more than one-sixth of the income of the family account. The family account extended throughout the taxable year with no more reality than in prior years. Petitioner created the account and used it for the purpose of dividing the income therefrom equally among the family unit to evade income taxes. The intent of petitioner is as clear *284 in the taxable year as it was in prior years. Some of the income involved was derived from securities in the family account. Petitioner failed to report all of such income as taxable to him. A part of the deficiency was due to fraud with intent to evade tax; therefore, it was proper for respondent to subject all of the deficiency to the fraud penalty. Docket No. 6002 - Charles Goodman - Year 1941 Issue A. - Long-term capital gain of $2,274.84 on bonds of the Granite City Pig Iron Co. and Granite City Generating Co. Dividend income of $5,917.25 Interest income of $14,401.39 Findings of Fact 242. During 1941 the petitioner received the following amounts of interest on securities in the family account: $46,000
bonds of Laclede
$2,640.00
32,000
bonds of Jacksonville Gas &
Electric Co.
1,318.68
22,500
bonds of Granite City Generat-
ing Co.
1,202.99
Loan Airhill Corporation
3,420.00
Loan Airhill Corporation
4,517.11
$13,098.78 In addition thereto he received $570 and $1,709.71 as interest on a personal loan to the Airhill Corporation. 243. In his return for 1941, the petitioner reported interest income of $1,417.28 from the bonds *285 and loans referred to in the preceding findings of fact and $360 of interest on the bonds of the Hamilton Gas Corporation as part of the proceeds of sale of the securities. The respondent determined that the petitioner received interest payments of $15,878.67 and increased the amount reported by $14,401.39. Opinion The only difference between the parties on the issue relating to long-term capital gain and dividends is whether the petitioner is taxable on all of the amounts, as determined by the respondent, or on one-sixth thereof, as reported and contended by petitioner, the securities having been in the family account. On the sole point on which the parties disagree, we find for the respondent, following previous conclusions, that all of the income of the family account is taxable to the petitioner. The respondent, showing the source of the income, determined that petitioner received interest payments of $15,878.67. The petitioner concedes, upon brief, that interest payments of $2,640 and $1,318.68 were received in the family account on the Laclede and Jacksonville Gas & Electric bonds, respectively; that $570 was received on a personal loan to the Airhill Corporation and that *286 he received $360 on bonds of the Hamilton Gas Corporation, which is taxable to him. From the evidence we have found that $1,202.99 was received in the family account on bonds of the Granite City Generating Co. and $3,420 on a loan to the Airhill Corporation. The remaining interest of $4,517.11 and $1,709.71, received on loans made to the Airhill Corporation, was involved in issue D of petitioner for 1940. Having held there that the amounts were not constructively received in that year, and the amounts having been actually received in the taxable year, the amounts constitute taxable income in 1941. Thus we have found that interest of $15,738.49 was received. Of the amount of interest received, $2,639.71 was received on personal loans of, and bonds owned by petitioner, without any connection with the family account. Clearly such amount is taxable to him. As to the remaining amount of $13,098.78, derived from securities and loans made from funds in the family account, the petitioner contends that he had no more than a one-sixth interest. In accordance with our conclusion on like questions in the cases of this petitioner for prior years we hold that he is taxable on the entire amount *287 of interest. Issue B. - Rental income $72 Opinion The only difference between the parties on this issue is whether depreciation at 3 per cent per annum should be computed on a cost of $7,200, as contended by petitioner, or $5,600, the cost used by respondent in his determination of the deficiency. The cost of the property was $7,200, as found by us in Issue E, in the case of petitioner for 1940. Accordingly, the petitioner is entitled to a deduction of $216 for depreciation on the property. Issue C. - Expense deductions of $824.12 Findings of Fact 244. During 1941 the petitioner paid the following amounts for the purposes shown: Office repairs
$15.30
Legal services performed for brother of
petitioner
10.00
Accounting work on family account
1,170.55
To accountant
550.00
245. In his return for 1941 the petitioner claimed a deduction of $2,922.16 for expenses. The respondent allowed $2,098.04 and disallowed the remainder of $824.12 on the ground that the expenses represented personal expenditures. Opinion Of the amounts disallowed by the respondent, the petitioner, upon brief, concedes that certain expenses are not deductible. The items in controversy *288 are as listed in our findings of fact, except that only $195.09 of the accountant's fee of $1,170.55 is being claimed as a deduction. The petitioner contends that those amounts, aggregating $770.39, are deductible as ordinary and necessary business expenses. There is no proof of any business conducted by petitioner in 1941. He was, however, engaged in the production and collection of income and the office repairs, and $195.09 of the accounting fee of $1,170.55 are deductible as non-business expenses. The legal fee of $10 was not paid in connection with any income activity of petitioner and the evidence fails to establish the purpose for which the accounting fee of $550 was paid. Accordingly, the additional amount of $210.39 will be allowed under Rule 50 as non-business expenses. Issue D. - Earned income credit of $117.20 Findings of Fact 246. During 1941 the petitioner received income of $3,000 from the Airhill Corporation and $117.25 from the Goldberger-Raabin Co. In his return for the taxable year the petitioner reported the amounts as salaries received from the corporations and claimed an earned income credit of $317.72, which amount the respondent reduced to $300. Opinion
*289 Although, upon brief, the petitioner requests findings that he received $3,177.20 as compensation for services rendered, (Finding 100) in his argument of the question he $300 "is correct." The admission appears to be a mistake. In any event, we are required to sustain the respondent. The difference between the parties is whether the income of $117.25 received from the Goldberger-Raabin Co. should be included in the computation. Section 25 (a) (3) (4) of the Revenue Act of 1938 allows as an earned income credit, 10 per centum of amounts received as compensation for personal services actually rendered. The proof of petitioner is only that he received $117.25 of income from the corporation. He did not establish that the amount was received as compensation for services actually rendered. Accordingly, on this issue we sustain the respondent. Issue E. - Fraud Findings of Fact 247. The income tax return filed by the petitioner for 1941 contains no statement that the family account had been terminated and the securities therein and other assets distributed to beneficiaries, or other reference to the account. He reported the following dividends and interest paid on stock and bonds *290 which were in the family account until November 13, 1941, when the securities in the account are alleged to have been distributed: 215
shares of Sioux City Gas & Electric
$236.50
387
shares of American States Utilities
Corp. pfd.
532.13
124
shares of United Public Utilities, $3
pfd.
93.00
50
shares of United Public Utilities,
$2.75 pfd.
34.38
$8,000
Laclede bonds
440.00
$6,000
Jacksonville Gas & Electric
129.78 The number of shares of stock and amount of bonds listed above agree with distributions alleged to have been made to petitioner on November 13, 1941, out of the family account. 248. A part of the deficiency for 1941 was due to fraud with intent to evade tax. Opinion The respondent's charge of fraud is based upon the failure of petitioner to report as taxable to him all of the income he derived from securities in the family account in the taxable year. Income was derived from the securities in the family account but none of it was reported by the petitioner as having been derived from trust property. The income tax return conveys the impression that the securities had been owned by petitioner throughout the year, contrary to *291 his contention that his interest therein was one-sixth. Taxpayers have a duty to make accurate statements with respect to the source of income reported for taxation. The reutrn made by petitioner for 1941 is misleading and inaccurate. The manner in which the income was reported is additional evidence of petitioner's disregard of formalities in dealing with property interests in carrying out his fraudulent purpose to evade income taxes. It is additional evidence of shifting of property rights and income among members of the family without regard to ownership or income tax liability. We have above considered and come to the conclusion that the family account was created for a fraudulent purpose. The family account and its essential purpose to evade tax continued throughout practically the entire year 1941. The deficiency was due in part to fraud with intent to evade tax. The action of the respondent in imposing the fraud penalty is sustained. Decisions will be entered in the proceedings herein under Rule 50. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Gradwik, Inc. of Delaware; Builo Corp.; Winhill Corp.; Sylvia Goodman; Robert Goodman and Carolyn Goodman, husband and wife; William Goodman, by Charles Goodman, father and General Guardian; Annette Goodman, by Charles Goodman, father and General Guardian: Doris G. Jacoby; Mideastern Contracting Corporation, a dissolved corporation, by James E. Gibbons, Lydia V. Heyman, William Heyman, and Charles Goodman, its former officers, directors, and stockholders; James E. Gibbons, William Heyman and Lydia Vogel Heyman, husband and wife; and Lydia Vogel Heyman.↩
1. The checks were endorsed by Charles Goodman for deposit in a bank account. ↩
2. The check was endorsed as follows: "Charles Goodman. For deposit Boody, McLellan & Co., 111 Bdwy. Rose Goodman, 235 W. 76 St., N.Y. City." ↩
3. The check was endorsed as follows: "Charles Goodman. For deposit Chase Bank, 72 So. Bdwy. Rose Goodman, C.G."↩
1. The amount includes interest aggregating $260 on bonds of New York City and General Water Works and Electric Corp., concerning which no issue was raised, and is not, therefore, includible in petitioner's income.↩
2. Sec. 42 Continuation of Corporation After Dissolution for Purposes of Suit, Etc.: - All corporations, whether they expire by their own limitation, or are otherwise dissolved, shall nevertheless be continued for the term of three years from such expiration or dissolution bodies corporate for the purpose of prosecuting and defending suits by or against them, and of enabling them gradually to settle and close their business, to dispose of and convey their property, and to divide their capital stock but not for the purpose of continuing the business for which said corporation shall have been established; provided, however, that with respect to any action, suit or proceeding begun or commenced by or against the corporation prior to such expiration or dissolution and with respect to any action, suit or proceeding begun or commenced by the corporation within three years after the date of such expiration or dissolution, such corporation shall only for the purpose of such actions, suits or proceedings so begun or commenced be continued bodies corporate beyond said three-year period and until any judgment, orders, or decrees therein shall be fully executed.↩
1. Wife of James E. Gibbons. ↩
2. Son of James E. Gibbons.↩